**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SAN LUIS OBISPO COASTKEEPER,
LOS PADRES FORESTWATCH,
CALIFORNIA COASTKEEPER
ALLIANCE, and THE ECOLOGICAL
RIGHTS FOUNDATION,

               Plaintiffs,

     v.

COUNTY OF SAN LUIS OBISPO,

               Defendant.

Case No. 2:24-cv-06854-SPG-AS

**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 13]**

Before the Court is Plaintiffs San Luis Obispo Coastkeeper, Los Padres Forestwatch, California Coastkeeper Alliance, and the Ecological Rights Foundation's Motion for Preliminary Injunction (ECF No. 13 ("Motion")). Defendant opposes, (ECF No. 18 ("Opposition")), and Plaintiffs have replied. (ECF No. 24 ("Reply")). Having considered the parties' submissions, the oral arguments during the hearing on the Motion, the relevant law, and the record in this case, the Court GRANTS, in part, the Motion.

## I.    BACKGROUND

According to the Motion, Plaintiffs have brought this citizen suit to preserve South-Central California Coast ("SCCC") Steelhead. For historical context, the National Marine Fisheries Service agency ("NMFS") issued a series of final rules pursuant to its federal

enabling statute, the Endangered Species Act ("ESA").  In 1997, for example, NMFS initially listed the SCCC Steelhead as a threatened species.  *See* 62 Fed. Reg. 43,937, 43,953 (Aug. 18, 1997); *see also* 16 U.S.C. § 1532(20) ("The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.").  In 2005, the NMFS determined that Arroyo Grande Creek ("AG Creek" or "the Creek") represented a critical habitat that remained "essential for conservation" of the SCCC Steelhead species.  70 Fed. Reg. 52,488, 52,508 (Sept. 2, 2005) (explaining that areas of the Creek provided "an essential migratory habitat linking upstream spawning and rearing areas with the ocean"); *see also* (ECF No. 14-6 ("NMFS 2024 Memorandum") at 11) ("Critical habitat supports one or more life stages (migration, spawning, rearing, and estuarine acclimation) and contains physical or biological features essential to the survival, growth, and reproduction of the species.") (internal citation omitted).  A year later, the NMFS affirmed its listing of the SCCC Steelhead as a threatened species.  *See* 71 Fed. Reg. 834, 857 (Jan. 5, 2006) (concluding that South-Central California Coast Steelhead "are likely to become endangered within the foreseeable future throughout all or a significant portion of their ranges" and therefore "warrant listing as threatened species").  Moreover, the regulation classified the SCCC Steelhead population as a Distinct Population Segment ("DPS") of the anadromous *Oncorhynchus mykiss* (*O. mykiss*) fish species.  *Id.* at 859.  This DPS designation means that the population is "genetically significant to the taxon" and therefore warrants "preserv[ation] to protect the genetic variation and strength of the *O. mykiss* species."  (ECF No. 13-2, Declaration of Tevin Schmitt ("Schmitt Decl.") ¶ 7).

Steelhead undergo various stages in their life cycle to self-sustain and require a variety of habitats to survive these different cycles.  *See* (*id.* ¶ 14); *see also* (ECF No. 18-8, Declaration of Dr. Charles Hanson ("Hanson Decl.") ¶ 16).  Relevant to this present Motion, Steelhead are born and rear in freshwater streams like the AG Creek, out-migrate to the ocean to mature, and subsequently return to the streams as adults to spawn.  (Schmitt Decl. ¶ 8).  This migration, spawning, and rearing cycle depend on multiple factors, such

as the presence of cold, oxygen laden water, suitable cobble or gravel streambed substrate for egg incubation, and complex stream channels. *See* (*Id.* ¶¶ 14-36); *see also* (Hanson Decl. ¶¶ 21-22). In general, adult migration and spawning typically occur during the wet months of January through March. (Hanson Decl. ¶ 24).

The Arroyo Grande Creek contains Steelhead that the NMFS has designated as a "Core-1" population, which is "essential for recovering the DPS of Steelhead as a whole." (ECF No. 14-1 ("NFMS 2017 Biological Opinion") at 18). In other words, the NMFS has concluded that "reducing the likelihood of survival and recovery of a Core-1 Population, would have adverse consequences for the survival and recovery of the DPS as a whole." (*Id.*); *see also* (NMFS 2024 Memorandum at 3) (emphasizing that the AG Creek's Core-1 population "must be recovered in order for the threatened South-Central California Coast Steelhead DPS to be eligible for removal from the Federal list of threatened and endangered species").

Defendant operates Lopez Dam, which is 166 feet high and without fish ladders. (Mot. at 14); *see also* (ECF No. 18-17, Declaration of David Spiegel ("Spiegel Decl.") ¶ 5). The Dam is located approximately 13 miles upstream from the Creek's ocean confluence. (Mot. at 14). Since 2007, Defendant has been operating Lopez Dam according to its Interim Downstream Release Schedule ("IDRS"). *See* (Spiegel Decl. ¶ 7). According to Defendant, the IDRS serves municipal, industrial, agricultural irrigation, and environmental needs. (Opp. at 9, 11). Throughout the year, in accordance with the IDRS, Defendant seasonally releases a minimum flow of water from the Lopez Reservoir into the AG Creek. *See* (Spiegel Decl. ¶ 7).

Plaintiffs maintain that Lopez Dam physically blocks both the adult Steelhead from migrating to and spawning in the upper reaches of AG Creek and the juvenile Steelhead from migrating to and maturing in the ocean. (Mot. at 14). As Plaintiffs and the NMFS note, the upper reaches of the Creek represent "64% of the high-quality potential Steelhead habitat." (*Id.*); *see also* (NMFS 2024 Memorandum at 9) ("[A]pproximately 42 miles (64%) of this high intrinsic potential steelhead spawning and rearing habitat is located

*above* Lopez Dam which presents an impassible barrier to upstream migrating steelhead, as well as an impediment to juvenile steelhead (smolts) attempting to emigrate out of the watershed to the Arroyo Grande Creek Estuary and Pacific Ocean.") (emphasis in original).[1]  Accordingly, this migration cycle to and from the upper Creek habitat remains crucial for Steelhead to self-sustain.  As a counter, Defendant contends that Steelhead have access to alternative habitats, including the Creek's downstream area, for spawning and juvenile rearing.  (Opp. at 18); *see also* (Hanson Decl. ¶¶ 4, 19).  Plaintiffs, however, view this alternative habitat—namely the Creek's lower reaches—as "both limited in size and significantly degraded," thereby remaining insufficient for spawning and juvenile rearing. (Mot. at 14); *see also* (Schmitt Decl. ¶¶ 81-115).

    In addition to the Dam's physical barrier, Plaintiffs claim that Defendant's IDRS alters the Creek's natural hydrology, such that the Creek's habitat is no longer adequate for Steelhead to migrate, spawn, and self-sustain.  Defendant's release schedule significantly reduces the volume of the Creek's downstream water flow, with an average reduction amounting to approximately 41% of the downstream flow.  (Mot. at 15); *see also* (ECF No. 23-11, Ex. 30 at 8).  Notably, Defendant's IDRS seasonally releases higher flows of water during the dry months, July through November, and lower flows of water in December through June, "when most adult Steelhead migration occurs."  (Mot. at 15); *see also* (Schmitt Decl. ¶ 67).  According to Plaintiffs, this water release schedule remains problematic for multiple reasons.  For one, Plaintiffs claim that this seasonal schedule eliminates the "historic large pulse flows" that facilitate the development of stream channel complexity, signal cues for Steelhead to migrate from the ocean back to the Creek's spawning habitat, and recruit cobble or gravel substrate used for Steelhead egg incubation. (Mot. at 14); *see also* (Schmitt Decl. ¶¶ 63, 82).

---

[1] Particularly, the upper Creek habitat contains "a greater prevalence of cold, oxygenated water, suitable streambed substrate, and stream channel complexity."  (Mot. at 14); *see also* (Schmitt Decl. ¶ 52).

Additionally, the schedule's reduction of high flow conditions hinders the Steelhead migration for multiple reasons. First, high flow conditions partially facilitate the breaches of the Creek lagoon's sandbar where adult Steelhead re-enter and migrate upstream while juvenile Steelhead depart and migrate to the ocean. Second, high flow conditions provide sufficient channel depth and width at "critical riffle locations" for adult and juvenile Steelhead to successfully pass through and migrate to their habitat. Third, high flows remove fine sediment buildup that degrades the substrate conditions needed for Steelhead spawning. (Mot. at 15-16); *see also* (Schmitt Decl. ¶¶ 81-97). Lastly, according to Plaintiffs, Defendant's flow schedule artificially warms the water in the Creek's lower reaches, causing harmful oxygen levels and promoting the presence of warm-water predator species. (Mot. at 16); *see also* (ECF No. 14-16, Ex. 16 at 21).

Moreover, Defendant owns and operates road crossing culverts at the Biddle Regional Park.[2] (Opp. at 23). Plaintiffs claim that, through the collection of debris, this culvert further delays or blocks Steelhead migration to the Creek. (Reply at 14); *see also* (Schmitt Decl. ¶¶ 106-07); (ECF No. 14-9 ("AGC Steelhead Restoration Opportunities") at 11). Defendants suggest that its culvert does not create a complete barrier and still "provide[s] adequate flows" for Steelhead's passage. (Opp. at 23).

Plaintiffs' proposed injunctive relief requires Defendant to take certain actions, including, but not limited to: submitting and implementing a proposed plan for releasing sufficient flows from Lopez Dam into the lower AG Creek area; monitoring the new plan's impact on Steelhead passage conditions; and developing and submitting an ESA Habitat

---

[2] Plaintiffs also claim that a grade control structure directly below Lopez Dam "may be limiting fish passage." (Schmitt Decl. ¶ 131). However, Defendant explains that it does not own or operate the grade control structure that Plaintiffs identified. (Opp. at 24). Additionally, Plaintiffs allege that predatory fish from Lopez Lake spill over into the AG Creek due to the absence of a fish screen. (Mot. at 16). Defendant notes that the California Department of Fish and Wildlife control the stocking of fish in Lopez Lake. (Opp. at 21); *see generally* (ECF No. 18-18, Declaration of Chuck Woodard ("Woodard Decl.")). Therefore, the Court's Order will not apply to the unidentified grade control structure and the fish stocking operation in Lopez Lake.

Conservation Plan ("HCP") application.  *See generally* (ECF No. 46-2 ("Proposed Order")).

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  Traditionally, a movant seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. *Id*. at 20.  This traditional test for preliminary injunctions, however, does not apply to injunctions under the Endangered Species Act.  In *Tennessee Valley Auth. v. Hill*, the Supreme Court emphasized that "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . ." 437 U.S. 153, 194 (1978).  When crafting the Endangered Species Act, "Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996).  Moreover, as the Ninth Circuit noted, "*Hill* also held that Congress established an unparalleled public interest in the 'incalculable' value of preserving endangered species." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) (quoting *Hill*, 437 U.S. at 187-88).  Accordingly, courts lack the traditional equitable discretion to reconsider the balance of equities and public interest factors, therefore leaving only the likelihood of success on the merits and likelihood of irreparable harm factors at issue. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793-94 (9th Cir. 2005).

Furthermore, when, as here, the movant is not seeking to maintain the status quo pending a determination of the action on the merits, *see Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988), but instead is seeking an order requiring the nonmoving party to take action, the movant is seeking a mandatory injunction. *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).  Such injunctions are disfavored. *Id*. (emphasizing that a

mandatory preliminary injunction "goes well beyond simply maintaining the status quo" and is therefore "particularly disfavored").  Thus, in the Ninth Circuit, a request for a mandatory preliminary injunction is generally subject to "heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."  *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).  A plaintiff must demonstrate "extreme or very serious damage" will occur unless the requested injunction is granted.  *Snyder*, 28 F.4th at 106.  "In plain terms, mandatory injunctions should not issue in 'doubtful cases.'"  *Garcia*, 786 F.3d at 740 (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)).[3]

## III.  DISCUSSION

Plaintiffs bring forth this Motion, alleging that Defendant has violated § 9 of the Endangered Species Act, California Fish and Game Code §§ 5937 and 5901, and California Public Trust Doctrine.[4]  Plaintiffs claim that Defendant's operation of the Lopez Reservoir harms the Core-1 population of Steelhead located in the AG Creek, thereby also

---

[3] Plaintiffs correctly note that Ninth Circuit precedent, assessing a preliminary injunction, has adopted a "sliding scale" approach, in which a plaintiff may only need to demonstrate that "there are serious questions going to the merits–a lesser showing than likelihood of success on the merits . . . ."  *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (internal quotation marks omitted).  This approach applies if "the balance of hardships tips *sharply* in the plaintiff's favor . . . ."  *Id.*  (internal quotation marks omitted) (emphasis in original).  In an abundance of caution, however, the Court declines Plaintiffs' invitation to apply such standard where, as here, the requested mandatory injunction requires a showing that the facts and the law clearly favor such relief.  *See Snyder*, 28 F.4th at 111, n.4 (declining to apply the "sliding scale standard" when reviewing "the denial of a mandatory preliminary injunction based on a factual evaluation of harm"); *see also Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *15 (N.D. Cal. Sept. 3, 2024) ("The Ninth Circuit has also implied that the 'serious questions' sliding scale inquiry for preliminary injunctions does not apply to mandatory injunctions.") (citing *Snyder*, 28 F.4th at 111, n.4).

[4] Plaintiffs also listed Article X, § 2 of the California Constitution as a cause of action but did not offer any analysis for this cause of action in their opening motion or reply.  *See* (Mot. at 22). The Court, therefore, will not address this cause of action.

significantly impairing recovery and viability of the entire SCCC Steelhead population. Specifically, Plaintiffs allege that Defendant's management of Lopez Dam, waterflow release schedule, and culverts infrastructure collectively harm Steelhead by modifying their habitat in a way that hinders their ability to migrate, spawn, and rear—all of which constitute essential behavioral patterns for the fish to self-sustain.[5]  The Court will analyze the merits of Plaintiffs' claims in turn.[6]

## A.    Section 9 of the Endangered Species Act

Section 9 of the Endangered Species Act forbids any person to "take" any designated endangered species of fish or wildlife, absent an authorized exception.  Federal regulation also proscribes "take" of threatened Steelhead DPS populations, including SCCC Steelhead.  *See* 50 C.F.R. § 223.203(a).  The term "take" encompasses acts that "harass, harm, pursue . . . wound, kill, trap, capture, or collect" any ESA-protected species.  16 U.S.C. § 1532(19).  The federal regulation, implemented pursuant to the ESA, defines "harm" as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3.  The regulation

---

[5] For simplicity, the Court will refer to Lopez Dam, the Interim Downstream Release Schedule, and the culvert structure collectively as "Defendant's operation."

[6] Both parties filed objections to most declarations on the grounds that the declarants lacked personal knowledge, did not qualify as experts, or proffered statements rooted in hearsay. The Court overrules these evidentiary objections at this stage of the proceedings only. Courts have emphasized that, given the procedural posture and purpose of a preliminary injunction, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[G]iven the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). Further, in any event, the Court's analysis significantly relies on the agencies' specialized expertise and scientific findings demonstrated in the record. As the Ninth Circuit once noted, courts "give great deference to the agency" when the agency provides evidence of "scientific prediction." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 664 (9th Cir. 2009); *see also Wishtoyo Found. v. United Water Conservation Dist.*, No. CV163869DOCPLAX, 2018 WL 6265099, at *58 (C.D. Cal. Sept. 23, 2018), *aff'd*, 795 F. App'x 541 (9th Cir. 2020) (finding NMFS's biological opinion "persuasive and well supported by the record").

further elaborates that under the "harm" definition, such "act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* Regarding harassment, the regulation defines it as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.* The ESA authorizes citizen suits "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C § 1540(g)(1)(A).

### 1. Likelihood of Success on the Merits

The Court first addresses the likelihood of success on the merits for Plaintiffs' federal ESA claim. Under the harm factor, Plaintiffs assert that Defendant's operation of Lopez Dam, water diversion schedule, and culverts infrastructure not only restrict the AG Creek's Steelhead from accessing their historical habitat but also significantly degrade their current habitat, which in turn, impairs the Steelhead's essential migration and life-cycle patterns. According to Plaintiffs, Defendant's operation essentially creates a harmful domino effect by "causing the decline of the AG Creek watershed's Steelhead population," "increas[ing] the risks that this important population will be extirpated," and consequently "increas[ing] the risk that the entire Steelhead population will also be rendered extinct." (Mot. at 20).[7] Moreover, Plaintiffs claim that proving an unlawful "take" only requires a showing that "Defendant's current or planned future conduct would likely harm" the Steelhead, even if they have not yet produced evidence of an actual death. (*Id.* at 21).

Defendant, on the other hand, contends that Plaintiffs fail to demonstrate that Defendant's conduct constitutes "harm" as defined under the ESA. (Opp. at 18).

---

[7] In essence, Plaintiffs maintain that given NMFS's designation of the AG Creek Steelhead as a Core-1 population, such detrimental effects yield a significant risk of extirpation and extinction of not only the Core-1 population but also the entire SCCC Steelhead population at large.

According to Defendant, the current Steelhead population in the AG Creek is estimated to be around 100 members, which remain "in line with the pre-Dam numbers." (*Id.* at 19); *see also* (Hanson Decl. ¶¶ 5, 35-45). Based on this estimate, Defendant suggests that its operation does not kill or injure the Creek's Steelhead population, thereby not constituting a "harm" under the ESA. Moreover, Defendant claims that the lower reaches of the Creek, where many Steelhead are currently located, provide spawning and juvenile rearing habitats for them to self-sustain. (Opp. at 20); *see also* (Hanson Decl. ¶ 4).

The Court agrees with Plaintiffs here. The available record overwhelmingly displays the harmful effects from Defendant's activity, such that the AG Creek Steelhead population may be in peril. As early as 1997, the NMFS determined that abundance of SCCC Steelhead "appear to have declined significantly, with widespread stock extirpations." 62 Fed. Reg. 43,937, 43,947 (Aug. 18, 1997). Factors such as "water diversions" and "[l]oss of habitat complexity" have "contributed to the decline of Steelhead." *Id.* at 43,942. Years later, the NMFS stated that "the only dam which is a full barrier to Steelhead in Arroyo Grande Creek is Lopez Dam." 70 Fed. Reg. 52,488, 52,507 (Sept. 2, 2005). The NMFS elaborated that, although Steelhead "still use[d] Arroyo Grande Creek for spawning and rearing," the Dam's "presence and operation have certainly contributed to declines in the quality and quantity of habitat for Steelhead." *Id.* at 52,507-08. Considering the Dam's effects on Steelhead and their critical Creek habitat, NMFS urged "the need for special management considerations or protections in this watershed." *Id.* at 52,508.

Once again, in 2017, the NMFS presented an "Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion." *See generally* (NFMS 2017 Biological Opinion). The Biological Opinion further illuminated Lopez Dam's harmful effects on Steelhead and their critical habitat. The Biological Opinion, relying on previous NMFS reports, explained that "the operation of Lopez Dam affects the natural pattern and magnitude of creek discharge." (*Id.* at 24) (citing a November 2004 letter sent from the NMFS agency to the San Luis Obispo County). This altered flow impacts "passage and migration opportunities," causes the "historical spawning ground [to] remain[] unavailable," and "shrink[s] [the] available

habitat to only the lower 12 miles" of the AG Creek.  (*Id.*) (citing a March 2010 letter sent from the NMFS agency to the San Luis Obispo County); *see also* (ECF No. 14-4 ("2023 NMFS Review") at 4) ("Lopez Dam on Arroyo Grande Creek block[s] access to the *overwhelming majority* of steelhead spawning, rearing, and refugia habitat in this Core-1 recovery population.") (emphasis added) (internal citation omitted).   The Biological Opinion ultimately concluded that "[r]educing the availability of spawning and rearing habitats is expected to translate into declines in population abundance and spatial structure within the action area . . . ."  (NFMS 2017 Biological Opinion at 24-25); *see also* (*Id.* at 14) ("The reductions in the amount and extent of streamflow are one of the major factors responsible for range-wide declines in steelhead abundance."); (NMFS 2024 Memorandum at 18-19) (stressing that "[p]roviding fish passage around the Lopez Dam and Reservoir, including its major upstream steelhead spawning and rearing tributaries, is therefore an essential element in the recovery of the steelhead runs of Arroyo Grande Creek and in meeting NMFS' population viability criteria for the South-Central California Coast Steelhead DPS").   Most importantly, according to NMFS, this reduction in available quality spawning and rearing habitats essentially "increases the risk of species extinction and delays recovery."  (NFMS 2017 Biological Opinion at 25).[8]

Defendant's proffered evidence does not overcome evidence in the record.  In fact, Defendant's proposed expert, Dr. Charles Hanson, acknowledged that multiple factors, including the lack of access to suitable upstream spawning and rearing habitats, passage impediments, exposure to depressed dissolved oxygen, and competition and predation by other fish, collectively "contribute to the relatively variable population size of Steelhead inhabiting Arroyo Grande Creek."  (Hanson Decl. ¶¶ 6, 34).  Dr. Hanson's declaration elaborated that one of the contributing factors to "the relatively low but variable steelhead

---

[8]   Again, the NMFS recently emphasized that failure to reconnect the upstream and downstream populations in the AG Creek could cause "permanent loss of the anadromous phenotype (and the related loss of genetic diversity) in the upstream populations because of the lack of fish passage to suitable upstream Steelhead spawning and rearing habitat." (NMFS 2024 Memorandum at 21).

population size" in the Creek "has been the loss of access to historical spawning and juvenile rearing habitat within the upper reaches of the Arroyo Grande Creek as a result of the *complete migration barrier* to adult upstream migration caused by construction of Lopez Dam." (*Id.* ¶ 46) (emphasis added). Moreover, although Defendant purports that the current estimated Creek Steelhead population remains in line with the pre-Dam numbers, Dr. Hanson nonetheless noted that "no quantitative monitoring data exists" to accurately assess the abundance of AG Creek Steelhead "since the 1960s before Lopez Dam was constructed." (*Id.* ¶ 5); *see also* 71 Fed. Reg. 834, 851 (Jan. 5, 2006) ("Assessing the extinction risk for Southern California steelhead is made difficult by the general lack of historical or recent data for this DPS, and the uncertainty generated by this paucity of information."). Due to the scarcity of such data, Dr. Hanson acknowledged that the population estimates "are characterized by high levels of uncertainty." (Hanson Decl. ¶ 5). However, Dr. Hanson, without providing exhibits to support his ultimate conclusion, opined that the current population of the Creek's Steelhead and other non-anadromous fish varies from dozens to low 100s. (*Id.* ¶¶ 5, 44).[9] Lastly, to the extent that Defendant claims its Interim Downstream Release Schedule "substantially improved habitat conditions" for the Creek's Steelhead, Defendant does not point to any evidence or elaborate on how its flow schedule improved such conditions. *See* (*Id.* ¶¶ 7, 10, 50, 60). Such conclusory statements, without further explanation, cannot and does not contest the substantial evidence already in the record, consisting of reports and memoranda published by the NMFS agency and its experts.

Precedent also supports a finding of Plaintiffs' likelihood of success on their "harm" claims. It is well-settled that an activity that modifies a species' habitat in a manner that "significantly impairs the breeding and sheltering of a protected species amounts to harm

---

[9] Defendant's assertion that the current AG Creek Steelhead population consists of approximately 100 members rests solely on Dr. Hanson's declaration. *See* (Opp. at 19). The Court notes, however, that, unlike Plaintiff's expert declarations, Dr. Hanson's declaration did not attach exhibits with the sources or studies that he used to form his opinion.

under the ESA." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996)*, as amended on denial of reh'g* (June 26, 1996) (internal quotation omitted); *Cf. Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704, (1995) (emphasizing that the Senate Report of the Endangered Species Act "stressed that '[t]ake is defined . . . in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife'") (internal quotation marks omitted) (quoting S. Rep. No. 93–307, p. 7 (1973)).  In fact, in *Marbled Murrelet*, the Ninth Circuit rejected a defendant's argument that "impaired breeding is not harm to an actual bird . . . and therefore is legally insufficient to qualify as harm under the ESA." 83 F.3d at 1067; *see also Palila v. Hawaii Dep't of Land & Nat. Res.*, 852 F.2d 1106, 1108 (9th Cir. 1988) (emphasizing that "[w]hile promulgating a revised definition of harm, the Secretary noted that harm includes not only direct physical injury, but also injury caused by impairment of essential behavior patterns via habitat modification that can have significant and permanent effects on a listed species").  The Ninth Circuit found sufficient evidence of future harm where experts testified that the implementation of defendant's harvesting plan "would likely harm" the endangered species "by impairing their breeding and increasing the likelihood of attack by predators . . . ." *Marbled Murrelet*, 83 F.3d at 1067-68. *Marbled Murrelet* remains good law. *See Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1156-57 (9th Cir. 2024) ("The [district] court's articulation of the standard—that impaired breeding is considered actual injury and, thus, harm to an animal—aligns with our holding in *Marbled Murrelet*.") (internal quotation marks and citation omitted).

Indeed, the facts in *Cascadia Wildlands* closely mirror the proffered evidence of harm in this present case.  In that case, the Ninth Circuit held that eliminating 49 acres of the forest significantly impaired "the breeding of murrelets by preventing them from returning to that portion of the Benson Tract to nest and engage in other breeding activities for the next century." *Cascadia Wildlands*, 105 F.4th at 1157.  Similarly, here, as discussed above, the record reflects that Defendant's conduct hinders Steelhead's ability to migrate,

spawn, and rear in their high-quality historical habitat—all of which, according to experts and agencies, stunt the species' recovery. Additionally, Defendant's operation confines members of the population to degraded habitat conditions within the Creek's lower 12 miles, further compounding Steelhead's essential behavioral patterns necessary for recovery. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994) (requiring plaintiff to "prove that the habitat degradation prevents, or possibly, retards, recovery of the species"). Indeed, given the operation's degradation of the Creek's natural hydrology, access to this confined lower area, contrary to Defendant's assertion, does not provide an alternative habitat that adequately sustains Steelhead's viability and recovery needs. *See supra* Section I (outlining several changes to the Creek's hydrology).[10] The NMFS agency, publishing its SCCC Steelhead Recovery Plan, explained that dam and water diversion operations within fresh streams, including the AG Creek, contribute to the "[l]oss of surface flows" which "adversely affect the productivity of important downstream mainstem habitats, and upstream tributaries otherwise providing spawning and rearing habitats for anadromous steelhead." (ECF No. 14-5 ("NMFS 2013 Recovery Plan") at 31); *see also* (*Id.* at 25) ("Modification of natural flow regimes by dams and other water control structures have resulted in increased water temperatures, changes in fish community structures, depleted flow necessary for migration, spawning, rearing, flushing of sediments from spawning gravels, and reduced gravel recruitment."); (NFMS 2024 Memorandum at 17) (highlighting that "[l]imited flow releases from Lopez Dam and Reservoir" have also "reduced . . . the suitability of rearing habitat in lower Arroyo Grande Creek"). Tellingly, the agencies have dedicated extensive effort and research through the years to reconnect Steelhead to their historical habitat, thereby indicating that the limited reaches of the Creek

---

[10] The NMFS agency's definition of "harm"—although not dispositive—confirms that "[m]aintaining an existing barrier that prevents or impedes access to habitat may cause take of listed species, if *adequate comparable habitat* is not otherwise available to the listed population." 64 Fed. Reg. 60,727, 60,729 (emphasis added); *see also Id.* (further elaborating that "diverting water may be engaged in a take if the diversion of water injures or kills listed species by significantly impairing essential behavioral patterns").

are neither suitable nor adequate to maintain Steelhead's viability. For the foregoing reasons, the Court finds that Plaintiffs have demonstrated a likelihood of success for their federal ESA claim.[11]

           2.   <u>Irreparable Injury Analysis</u>

      The Court next considers whether Plaintiffs have shown a likelihood of irreparable harm in the absence of preliminary relief. To satisfy this burden, Plaintiffs must prove that, absent an injunction, "irreparable harm is not only possible, but likely." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1191. In ESA cases, "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA." *Marbled Murrelet*, 83 F.3d at 1066. This standard, therefore, requires "a definitive threat of future harm to protected species, not mere speculation." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1193 (internal quotation marks omitted) (quoting *Burlington N. R.R.*, 23 F.3d at 1512, n.8).

      To satisfy this burden, Plaintiffs advance two main arguments. First, Plaintiffs emphasize that, although not necessary, they have demonstrated how Defendant's conduct poses a "non-speculative threat of future harm" to the survival of Steelhead on a population-wide scale, considering that the NMFS designated the impacted Steelhead population in AG Creek as an essential Core-1 population. (Mot. at 26). Second, Plaintiffs suggest that, based on voluntary cessation principles, the Court should also consider whether Defendant's challenged conduct will likely continue and consequently result in future "takings" of Steelhead. To support their position, Plaintiffs point to evidence showing that NMFS "has repeatedly advised" Defendant that its Lopez operations "are

---

[11] Considering that Plaintiffs satisfied a likelihood of success on the merits for their "harm" claim, the Court does not need to address whether Defendant's conduct "harasses" Steelhead under the ESA. *See e.g.*, *Cascadia Wildlands*, 105 F.4th at 1159, n.4 (noting that the "district court's 'harm' determination . . . alone is sufficient for the issuance of injunction"); *Marbled Murrelet*, 83 F.3d at 1068, n.5 ("The district court's finding of 'harm' under the ESA is sufficient to support its injunction without a finding of harassment.").

causing unlawful take of Steelhead," but Defendant "is far from securing ESA authorization to take Steelhead." (*Id.* at 27); *see, e.g.*, (ECF No. 14-20 ("NMFS 2024 Letter to County") at 2) ("recommend[ing] the County develop a comprehensive steelhead-passage feasibility assessment of Lopez Dam" and expressing "concern[]" regarding the County "experienc[ing] further delays in receiving an incidental take permit").

On the other hand, Defendant argues that, because external factors contribute to the suitability of the Creek habitat, Defendant's operation does not proximately cause harm to the Steelhead. (Opp. at 20, 22); *see also* (Hanson Decl. ¶¶ 5, 33, 56); (ECF No. 18-14, Declaration of Kate Ballantyne ("Ballantyne Decl.") ¶ 10); (ECF No. 18-6, Declaration of Jared Emery ("Emery Decl.") ¶¶ 9-14). Further, Defendant contends that Plaintiffs must, and ultimately fail to, prove that Defendant's challenged conduct likely causes irreparable harm to "the species' population as a whole, not merely 'take' of individual animals." (Opp. at 27). Citing to Dr. Hanson's declaration, Defendant claims that the historical population estimates show the Creek's Steelhead population numbers remaining stable or are increasing, signaling that the Creek supports a self-sustaining population. (*Id.* at 28); *see also* (Hanson Decl. ¶¶ 4-5, 36).

There are, however, several flaws in Defendant's arguments. Starting with the proximate causation issue, Defendant correctly notes that an "ESA § 9 claim cannot succeed unless the [challenged] conduct is the proximate cause of the alleged take." *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1246 (9th Cir. 2022), *cert. denied sub nom. City of Santa Maria v. San Luis Obispo Coastkeeper*, 144 S. Ct. 74 (2023) (citing *Babbitt*, 515 U.S. at 696 n.9, 700 n.13); *see also Wishtoyo Found.*, No. CV163869DOCPLAX, 2018 WL 6265099, at *57 ("Ninth Circuit courts apply the following standard: whether the alleged injury is fairly traceable to the challenged action of Defendants.") (internal quotation marks and citation omitted). In other words, there must be a "sufficient causal connection between the alleged irreparable

harm and the activity to be enjoined . . . ." *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (internal quotation marks omitted).[12]

Defendant's opposition nonetheless assumes that liability under the ESA is only possible if the challenged activity is the *sole* cause for the "taking" of the ESA-protected species. Precedent says otherwise. Defendant's opposition takes the language "sufficient causal connection" from the Ninth Circuit opinion referenced above. *See* (Opp. at 16) (quoting *Nat'l Wildlife Fed'n*, 886 F.3d at 819). The opposition omits the following language appearing immediately after in the opinion: "[S]howing that the requested injunction would forestall the irreparable harm qualifies as such a connection. However, a plaintiff need not further show that the action sought to be enjoined is the *exclusive* cause of the injury." *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (emphasis added) (internal quotation marks and citation omitted) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) and *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)); *see also* 64 Fed. Reg. 60,727, 60,728 ("Whenever an action alone or in combination with, or in concert with other actions is reasonably certain to injure or kill listed species, it will constitute a take. An action which contributes to injury can be a 'take' even if it is not the only cause of the injury."). Indeed, the Ninth Circuit—rejecting the position that "the cause of an

---

[12] The reasoning in *Nat'l Wildlife Fed'n* remains instructive. The Ninth Circuit emphasized that its analysis in *Nat'l Wildlife Fed'n*—involving an injunction pursuant to Section 7 of the ESA—nonetheless accords with similar analyses from precedential cases upholding injunctions sought under Section 9 of the ESA. 886 F.3d at 819 ("That the plaintiffs in *Marbled Murrelet* and *Burlington N. R.R.* sought injunctions under section 9 of the ESA rather than for procedural violations of section 7(a)(2) does not render those cases inapposite. When a court assesses whether the purposes of a statute constrain its equitable discretion, it is error to 'focus[ ] on the statutory procedure rather than on the underlying substantive policy the process was designed to effect.' Here, the ESA's underlying purpose is the conservation of species, and that purpose animates both sections 7 and 9.") (internal quotation marks and citation omitted) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544 (1987)); *see also Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1239 (9th Cir. 2001) ("The structure of the ESA and the legislative history clearly show Congress's intent to enact one standard for 'taking' within both" sections 7 and 9 of the ESA).

irreparable injury must be defined as narrowly as federal defendants . . . suggest"—emphasized that "[i]rreparable harm may be caused by activities broader than those that plaintiffs seek to enjoin." *Nat'l Wildlife Fed'n*, 886 F.3d at 819.  Thus, such as the case here, "[w]hile natural events on their own might not constitute 'take,' acts of nature that interact with a structure, such as a river flowing into a dam, can constitute 'take.'" *Wishtoyo Found.*, 2018 WL 6265099, at *58 (applying the reasoning from *Hill*, 437 U.S. at 153, where the Supreme Court found "an endangered fish would be harmed by water flowing into a dam and flooding the fish's habitat").

Accordingly, the Court finds that the significant impairment of Steelhead's breeding and migration pattern is fairly traceable to and proximately caused by Defendant's operation, which in turn, prevent and delay the species' recovery.  *See Arizona Cattle Growers' Ass'n*, 273 F.3d at 1238; *Burlington N. R.R.*, 23 F.3d at 1513.  According to the record, the NMFS agency, Plaintiffs' experts, and Defendant's expert all concur that physical barriers coupled with degrading habitat conditions in the lower reaches of AG Creek contribute to the anticipated decline in the Creek's Steelhead population. Specifically, the physical barrier and degrading habitat conditions in the Creek's lower reaches are, in part, attributed to Defendant's operation of Lopez Dam and its Interim Downstream Release Schedule.  The Court acknowledges that according to the NMFS, "multiple stressors cumulatively" influence the "ecological value" of the AG Creek. (NFMS 2017 Biological Opinion at 21).  The agency nonetheless also stressed that the "presence of Lopez Dam creates the *most significant impact* to streamflow in the lower mainstem and is *the largest system-wide stressor* that alters sediment dynamics by specifically reducing winter peak flows that have the magnitude to breech the lagoon berm and allow connectivity between the river and ocean."  (*Id.*) (emphasis added) (internal citations omitted); *see also* (NMFS 2013 Recovery Plan at 24) (noting that "of those factors identified, the destruction and modification of habitat and natural and man-made factors had been recognized as the primary causes for the decline of the SCCCs DPS").  Defendant's operation therefore significantly exacerbates the impaired migration and

breeding opportunities for Steelhead, such that the NMFS agency, itself, concluded that the operation is the most significant "stressor" to Steelhead's habitat needs. Nowhere in the defense experts' declarations do they refute this proffered fact. Moreover, their declarations neither demonstrate nor support Defendant's proposition that its flow release schedule is "so attenuated as to break the chain of proximate causation." (Opp. at 22). Perhaps, additional external factors advance these negative effects, but the record sufficiently shows that Defendant's challenged conduct—whether the exclusive cause or not—impedes Steelhead's essential life patterns.

Additionally, Ninth Circuit precedent forecloses Defendant's argument that the irreparable harm analysis mandates a showing of likely harm to the species population as a whole. In *Nat'l Wildlife Fed'n*, the court rejected this similar argument and made clear that the "ESA accomplishes its purpose in incremental steps, which include protecting *the remaining members of a species*." *Nat'l Wildlife Fed'n*, 886 F.3d at 818 (emphasis added) (also acknowledging that precedent cases like *Marbled Murrelet* concluded habitat modification harmed the species, "even though plaintiffs did not allege extinction-level threat to the species"). The court further elaborated that "[h]arm to those members is irreparable because '[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult.'" *Id.* (quoting *FCC v. Rosboro Lumber*, 50 F.3d 781, 785 (9th Cir. 1995)); *see also Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) ("§ 9 of the ESA issues a blanket prohibition on the taking of *any member* of a listed species.") (emphasis added); *Burlington N. R.R.*, 23 F.3d at 1512, n.8 ("We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps."); *Wishtoyo Found.*, 2018 WL 6265099, at *64 ("Showing an extinction-level threat to listed species is not required before an injunction can issue under the ESA . . . ."); *but see Ctr. for Env't Sci., Accuracy & Reliability v. Cowin*, No. 1:15-CV-00884 LJO, 2015 WL 3797693, at *9 (E.D. Cal. June 18, 2015) ("While the death of a

small number of individuals of a species may constitute irreparable harm, injunctive relief is only warranted where loss of those individuals would be significant for the species as a whole.") (internal quotation marks omitted).  Accordingly, Plaintiffs do not need to prove likely harm to the Steelhead on a population-wide level.

Notwithstanding this standard, Plaintiffs demonstrated that Defendant's continued operation presents a reasonably certain threat not only to individual members of the species but also to the overall population.  As discussed in-depth above, experts and agencies consistently warn that reduction in the "availability of spawning and rearing habitats is expected to translate into declines in population abundance and spatial structure within the action area, which increases the risk of species extinction and delays recovery." (NMFS 2017 Biological Opinion at 24-25) (citing its 2013 Steelhead Recovery Plan).  Considering its Core-1 designation, the AG Creek Steelhead population remains crucial to the survival and recovery of all Steelhead in its range; indeed, as the NMFS emphasized, the Core-1 population warrants "the highest priority for recovery" of the threatened SCCC Steelhead species.  (*Id.* at 18).  This priority, the NMFS explained, rests on a variety of factors, including but not limited to: "the intrinsic potential of the population in an unimpaired condition;" "the severity of the threats facing the populations;" and "the potential ecological or genetic diversity the watershed and population could provide to the species." (*Id.*).  Stated differently, this designated Core-1 population in the AG Creek plays a powerful role in securing the survival and recovery of the Steelhead DPS population as a whole.  Thus, interfering with the Creek Steelhead's ability to migrate and breed poses a likely threat to survival for not only the Core-1 population but also the SCCC Steelhead population as a whole.  For the foregoing reasons, Plaintiffs have shown a likelihood of irreparable injury absent an injunction.

### 3.    Balance of Equities and Public Interest Factors

Under the ESA, courts need not consider the balance of equities and public interest factors.  However, Defendant maintains that granting Plaintiffs' proposed schedule of pulse flow and base flow would result in a "take" of other species, particularly the ESA-protected

tidewater goby and California red-legged frog.  (Opp. at 28); *see also* (ECF No. 18-10, Declaration of Dr. Mark R. Jennings ("Jennings Decl."), ¶¶ 18-23).[13]  Defendant cites to one case in the Northern District of California, which considered whether to grant a preliminary injunction that might have caused harm to another endangered species.  *See Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 484-85 (N.D. Cal. 2017), *order clarified sub nom. Tribe v. United States Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018).  There, the plaintiffs maintained that defendant could implement the injunctive flows with "various management options . . . while complying with its other obligations." *Id.* at 485.  In fact, the court concluded that, "with collaboration, [the defendant] could implement at least some of the plaintiffs' proposed injunctive measures" and refused to "conclude that the hypothetical impact to the suckers precludes injunctive relief." *Id.*  Here, Dr. Jennings claims that Plaintiffs' proposed flow schedule would harm the tidewater goby, because "any large rainstorms" during the tidewater goby's breeding season along with the increased downstream flows would sweep out the juvenile and adult gobies.  (Jennings Decl. ¶ 19).  In response, Plaintiffs' expert, Tevin Schmitt, disagrees with Dr. Jennings' conclusion and suggests that the proposed flow release schedule "includes an adequate adaptive management process" that could adjust the flows and avoid any harm to the other species.  (ECF No. 27, Reply Declaration of Tevin Schmitt ("Schmitt Reply Decl.") ¶ 144).  Based on the available evidence, the Court also finds that both parties must collaborate with the appropriate agencies to implement some of the Plaintiffs' proposed injunctive measures, to the extent that the tidewater gobies and

---

[13] Defendant also claims that Plaintiffs' proposed relief would harm the Southwestern pond turtle species, which is currently being proposed as an ESA-protected species.  (Jennings Decl. ¶ 17).  Because this species is not currently listed under the ESA as endangered or threatened and the ESA caselaw instructs courts to adhere to the preliminary injunction test established, the Court will not consider the alleged harms to this species.

California red-legged frogs, as ESA-protected species, are neither harmed nor harassed by an unauthorized "take."[14]

### B.    California Fish and Game Code § 5937

The Court next examines Plaintiffs' claim under the California Fish and Game Code § 5937 ("CFGC").  As an initial matter, however, in their opening motion, Plaintiffs do not address the balance of equities and public interest factors for their state law claims.  In its opposition, Defendant argued that such claims are deemed waived, as Plaintiffs failed to meet their burden.  (Opp. at 18).  In their reply, Plaintiffs assert that, when exercising supplemental jurisdiction over their state law claims, the Court applies the federal, not state law standard, for determining the preliminary injunction.

Although federal courts typically apply the federal standard when assessing both federal and state law claims for a preliminary injunction, Plaintiffs erroneously assume that the tailored preliminary injunction test for ESA claims also applies to their state law claims.  Courts do not consider the balance of equities and public interest factors for ESA claims because, as previously stated, Congress has already considered those two factors when drafting the ESA.  That test, however, does not also extend to California-based state law claims.  In any event, Plaintiffs dedicated two sentences to showing that the balance of equities favors their claim under the CFGC § 5937.  Therefore, the Court will consider the CFGC § 5937 claim but finds that Plaintiffs have waived consideration of their other state law claims as bases for injunctive relief because Plaintiffs failed to meet their burden.

### 1.    Likelihood of Success on the Merits

The CFGC § 5937 establishes that: "The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may

---

[14] Moreover, Plaintiffs point out that Defendant also has the option to seek comments from the NMFS and the U.S. Fish and Wildlife Service to implement an adaptive management adjustment to the flow releases in a manner that does not harm other AG Creek species. (Reply at 19).

be planted or exist below the dam." Cal. Fish & Game Code § 5937.  Both parties, citing
to *Cal. Trout v. Superior Court* ("*Cal. Trout II*"), concede that sufficient water to keep the
Steelhead in "good condition" entails "enough to restore the historic fishery."  218 Cal.
App. 3d 187, 210 (1990).  *See* (Mot. at 23); *see also* (Opp. at 24).  The current estimates,
Defendant maintains, suggest that the Steelhead population is equal to or above the
population's numbers during the pre-Dam era.  (Opp. at 25).  As discussed above, *see supra*
Section III(A)(1), the available record does not reflect Defendant's view that the species
remains in good condition.  Furthermore, agencies such as the NMFS have repeatedly
emphasized that the Core-1 Steelhead population remains in great peril, justifying the need
to place this species on the ESA-protected species list for nearly two decades.  Although
both parties' experts dispute the estimated population numbers, recent agency reports
repeatedly stress that the issues surrounding Steelhead conditions still remain unresolved.
Because the Court discussed in great length the likelihood of irreparable harm, determining
that Plaintiffs have met their burden as to this factor, it will not duplicate its analysis here.
*See generally supra* Section III(A)(2).  Therefore, the Court now turns to the balance of
equities and public interest factors.

2.     <u>Balance of Equities and Public Interest</u>

Before issuing a preliminary injunction, the Court must identify the harm that an
injunction might cause a defendant and weigh it against the injury threatening the Plaintiffs.
*Justin v. City of Los Angeles*, No. CV0012352LGBAIJX, 2000 WL 1808426, at *11 (C.D.
Cal. Dec. 5, 2000).  According to Defendant, Plaintiffs' proposed relief would require the
County to reduce its water supply, thereby posing a risk to the "communities that rely on
water from Lopez Reservoir."  (Opp. at 28-29).  In fact, Defendant advocates that certain
service areas, relying on the County's water supply, would not have any alternative or
readily available water source.  (*Id.* at 29).  Plaintiffs, on the other hand, contend that the
California courts established that, by enacting CFGC § 5937, the California Legislature
"has already balanced the competing claims for water . . . and determined to give priority
to the preservation of their fisheries."  (Reply at 20) (quoting *Natural Resources Defense*

-23-

*Council v. Patterson*, 333 F. Supp. 2d 906, 918 (E.D. Cal. 2004)).  In *Patterson*, the court analyzed in great detail the seminal California case, *California Trout, Inc. v. State Water Resources Bd.*, 207 Cal. App. 3d 585 (1989) ("*Cal. Trout I*").  A closer read of the *Patterson* and *Cal. Trout I* decisions contradicts Plaintiffs' interpretation.  As the court in *Patterson* noted, the *Cal. Trout I* opinion held that two statutes—CFGC §§ 5946 and 5937—"straightforwardly limit the amount of water that may be appropriated by diversion from a dam in the designated area by requiring that sufficient water first be released to sustain fish below the dam."  207 Cal. App. 3d at 599.  However, the court also correctly noted that the *Cal. Trout I* "opinion expressly did *not* 'reach the question of the application of section 5937 *alone* as a rule affecting the appropriation of water.'"  *Patterson*, 333 F. Supp. 2d at 920 (emphasis added and emphasis in original) (quoting *Cal. Trout I*, 207 Cal. App. at 601).  Because the *Cal. Trout I* decision specifically interpreted Section 5946 in conjunction with Section 5937, it did "not explicitly hold that § 5937 mandates placing the preservation of fish above the irrigation purposes of a dam, but reserves the question of the statute's application alone as a rule affecting appropriation of water, separate from § 5946."  *Id.*  This reserved question—whether Section 5937, alone, prioritizes the preservation of fish above other competing interests—generally remains unanswered.[15]

In any event, the Court does not conclude that Plaintiffs' proposed relief would result in the significant harm that Defendant alleges.  Defendant's opposition cites multiple declarations, in which the non-expert declarants only state that their water supply relies on the Lopez Lake source.  *See* (Spiegel Decl. ¶ 11); (ECF No. 18-19, Declaration of Benjamin Fine ("Fine Decl.") ¶ 5); (ECF No. 18-20, Declaration of Bradley Hagemann ("Hagemann Decl.") ¶ 5); (ECF No, 18-21, Declaration of Gregory A. Ray ("Ray Decl.") ¶ 5); (ECF

---

[15] The Court notes that the United States Court of Federal Claims once explained that "Section 5937 cannot be viewed as an absolute or in isolation, but must be subject to the same considerations that underpin the other, fundamental water doctrines: the desire to balance competing needs for the good of the whole."  *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 462, n.20 (2011), *aff'd*, 708 F.3d 1340 (Fed. Cir. 2013).

No. 18-22, Declaration of Peter Brown ("Brown Decl.") ¶ 5). The Court acknowledges these concerns. However, beyond these declarations, Defendant does not address or explain how the proposed relief hinders its ability to supply water. As a result, the Court is left without evidence to adequately assess Defendant's purported hardships. Nor can the Court determine whether Plaintiffs' proposed relief could, perhaps, be tailored in a manner that balances both the Steelhead's sustainability and Defendant's water supply.[16] For these reasons, the Court finds that Defendant's alleged harm does not outweigh Plaintiffs' threatened injury.

### C.    Narrowly Tailored Remedies

A preliminary injunction must be narrowly tailored to avoid the irreparable harm identified. *Nat'l Wildlife Fed'n*, 886 F.3d at 823. As stated above, *see supra* Section III(A)(2), "there must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined." *Id.* (internal quotation marks and citation omitted). Plaintiffs, however, "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Id.* (internal quotation marks and citation omitted). In sum, a court does not abuse its discretion by issuing "an injunction that does not completely prevent the irreparable harm that it identifies." *Id.*

---

[16] To the extent possible, Defendant may also collaborate with the appropriate agencies to adhere to an adaptive water system. In fact, the NMFS agency, encouraging collaboration with stakeholders regarding streamflow conditions, noted that implementing an adaptive flow plan is not only necessary for the Steelhead population but also manageable to meet competing needs. *See* (NMFS 2013 Recovery Plan at 39) ("In general, while it is often not possible to re-create original flow conditions, the closer that the managed (restored) streamflow regime mimics the natural or pre-impact streamflow regime, the more likely the managed streamflow regime will meet the life history requirements of fishes and perpetuate a viable steelhead population indigenous to a particular watershed . . . ."); *see also* (*Id.* at 41) (noting that the expectations of water-management operations "should not preclude stakeholders from collaborating with NMFS, and other resource managers such as the CDFW, in efforts to define streamflow recommendations that represent an approximation of the natural or unimpaired streamflow regime").

Upon review of Plaintiffs' requested injunctive relief, the Court finds that the proposed short-term and long-term measures "would forestall the irreparable harm" to the Steelhead population. *Id.* at 819. Specifically, Plaintiffs request that Defendant develop, implement, and study: 1) a flow release plan, *see* (Proposed Order at 10-14); 2) a debris removal and fish screen installation plan (*Id.* at 15-16); 3) a sediment reduction plan (*Id.* at 17); 4) a volitional passage plan (*Id.* at 17-18); 5) a Habitat Conservation Plan and an ESA § 10 Incidental Take Permit (*Id.* at 18-19); 6) a habitat restoration plan (*Id.* at 19-20); 7) and a non-native predatory species removal plan (*Id.* at 20).[17]  Importantly, these proposed plans will also have the benefit of receiving NMFS's feedback, as the injunction requests that Defendant submit such plans to the agency in a timely manner. Defendant opposes such measures, contending that this process would require studies and authorizations from the appropriate agencies. *See* (Opp. at 30-31). Much of this process, Defendant also maintains, is already underway, and therefore, the Court need not interfere. *Id.*

The Court finds Defendant's arguments unpersuasive. Although a court, in "fashioning equitable relief," should not "intrud[e] upon the administrative province," it also "may adjust its relief to the *exigencies* of the case in accordance with the equitable principles governing judicial action." *Nat'l Wildlife Fed'n*, 886 F.3d at 823–24 (emphasis added) (internal quotation marks omitted) (quoting *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989)). Given the upcoming migration season, such exigencies exist here. This endeavor of securing a suitable habitat for the survival of Steelhead has remained ongoing for years; indeed, Defendant already has an obligation to pursue some of these measures in collaboration with the NMFS agency. *Cf.  Wishtoyo Found.*, 2018 WL 6265099, at *66 ("There is a definite threat of future harm, but no one is in the driver's seat, no one is steering this complex issue towards a solution."). The NMFS agency, dedicating its expertise to this issue for decades, confirms this conclusion. *See* (NMFS 2013 Recovery Plan at 36) ("Based on NMFS' experience collaborating with stakeholders

---

[17] The Court reiterates that Defendant is only responsible for removing debris from the culvert that it owns.

-26-

within the SCCCs Recovery Planning Area and throughout California, objectives guiding water-management needs and recovery of the species are compatible when stakeholders are willing to engage in effective collaboration and innovation."). Over ten years ago, it urged operators of the AG Creek to implement "core principles" for the "recovery of the SCCC Steelhead"—which overwhelmingly align with Plaintiffs' requested relief here. *See, e.g.,* (*Id.*) (listing the following remedial measures for AG Creek Steelhead's recovery: "[d]evelop and implement operating criteria to ensure the pattern and magnitude of groundwater extractions and water releases, including bypass flows around diversions, provide the essential habitat functions to support the life history and habitat requirements of adult and juvenile steelhead[;] [r]emove or modify instream fish passage impediments, including dams and diversions, to allow steelhead natural rates of migration to upstream spawning and rearing habitats, and passage of smolts and kelts downstream to the estuary and ocean[;] [i]dentify, protect, and where necessary, restore estuarine rearing habitat, including management of artificial sandbar breeching at the river's mouth, and upstream freshwater spawning and rearing habitats"); *see also* (Schmitt Decl. ¶ 144) (noting that Plaintiffs' requested relief is consistent with the NMFS's Recovery Plan recommendations). Indeed, as the NMFS emphasized, this "basic recovery strategy, to restore and protect a wide variety of steelhead habitats (including refugia habitats) throughout the SCCCs Recovery Planning Area" intends to "address [sic] this largely unpredictable threat to the recovery and persistence of the SCCCs DPS." (NMFS 2013 Recovery Plan at 29).

Now, in 2024, the agency once again reiterated that the "[f]ailure to provide ecologically meaningful flows below Lopez Dam, and effective fish passage (for both juvenile and adult steelhead) throughout the Arroyo Grande Creek watershed, would effectively preclude meeting the viability/recovery criteria (both the Population-Level and DPS-Wide viability criteria) identified by the [Technical Recovery Team] and set forth in NMFS' South-Central California Steelhead Recovery Plan." (NMFS 2024 Memorandum at 4) (internal citation omitted) (citing the NMFS 2013 Recovery Plan); *see also* (NMFS

2013 Recovery Plan at 39) ("One of the *most fundamental actions for the recovery* of the species is the regulation of surface and subsurface water diversions and extractions to ensure that the pattern and magnitude of surface flows provide the essential habitat functions to support the life history and habitat requirement of adult and juvenile steelhead; this includes the provision of stream flows necessary to support steelhead migration, spawning and rearing.") (emphasis added).  The Court therefore deems it appropriate to propel this process in a timely manner, so the appropriate agencies—in collaboration with the parties—may determine next steps to secure Steelhead viability.[18]

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' preliminary injunction as to the ESA and CFGC § 5937 claims.  The Court will issue a separate Preliminary Injunction Order.

**IT IS SO ORDERED.**

DATED:  November 27, 2024



_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

---

[18] The Court also has a duty to ensure that the proposed measures, particularly the deadlines, are feasible.  Given that the parties represented to the Court that Steelhead's migration is ongoing throughout the entire winter season, completion of the short-term measures is important.  Defendant noted to the Court that it is already in the process of working through some of these proposed measures.  However, to ensure that Defendant has sufficient time to submit its proposed plans to the appropriate agencies for review, the Court orders the parties to meet and confer and promptly propose an updated timeline.