Christopher Sproul (Cal. Bar No. 126398)
Brian Orion (Cal. Bar. No. 239460)
Marla Fox (Cal. Bar. No. 349813)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com
Email: borion@enviroadvocates.com
Email: mfox@enviroadvocates.com

**Attorneys for Plaintiffs**

**Additional Counsel Listed on Next Page**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS OBISPO COASTKEEPER, LOS PADRES FORESTWATCH, CALIFORNIA COASTKEEPER ALLIANCE, and THE ECOLOGICAL RIGHTS FOUNDATION,<br><br>the Plaintiffs,<br>v.<br><br>COUNTY OF SAN LUIS OBISPO,<br><br>Defendant. | Case No: 2:24-cv-06854-SPG-AS<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CIVIL CONTEMPT ORDER TO ENFORCE THE COUNTY OF SAN LUIS OBISPO'S COMPLIANCE WITH THE PRELIMINARY INJUNCTION<br><br>(Endangered Species Act, 16 U.S.C. §§ 1531, *et seq*; California Fish and Game Code §§ 5901, 5937; California Public Trust Doctrine; California Constitution, Article X; California Code of Civil Procedure § 1085)<br><br>Hearing time and date: 1:30 PM, July 30, 2025<br><br>Location: First Street Courthouse, 350 West 1st Street, Courtroom 5C |

*Additional Counsel for the NGOs*

Jesse Colorado Swanhuyser (Cal. Bar No. 282186)
Sycamore Law Inc.
1004 O'Reilly Avenue
San Francisco, California 94129
Telephone: (805) 689-1469
Email: jesse@sycamore.law

Drevet Hunt (Cal. Bar No. 240487)
Lauren Chase Marshall (Cal. Bar No. 324162)
California Coastkeeper Alliance
1100 11th Street, 3rd Floor
Sacramento, California 95814
Tel: (415) 606-0864
Email: dhunt@cacoastkeeper.org
Email: lauren@cacoastkeeper.org

# TABLE OF CONTENTS

I.    Introduction ........................................................................................... 1

II.   Statement of Facts and Procedural History ........................................ 4

III.  Legal Background ................................................................................ 9

IV.   Argument ........................................................................................... 10

    **A.**    This Motion Should Not Be Deemed Barred by the Partial Stay ............... 12

    **B.**    The County's Final BMP Plan Violates the Preliminary Injunction Order ................................................................................. 13

    **C.**    The County's Proposed Steelhead Passage Barriers Plan Violates the Preliminary Injunction Order .................................. 16

    **D.**    The County's Final Spillway Fish Screen Plan Violates the Preliminary Injunction Order ................................................... 18

    **E.**    The County's Final Habitat Restoration Plan Violates the Preliminary Injunction Order ................................................... 19

    **F.**    The County's Final Predator Removal Plan Violates the Preliminary Injunction Order ................................................... 21

    **G.**    The Court Should Order an Expert Panel to Supervise the County's Revisions to the Challenged Plans ........................... 22

V.    Conclusion ......................................................................................... 23

# TABLE OF AUTHORITIES

**Federal Cases**

*Aecom Energy, Inc. v. Ripley*,
  No. 17-05398, 2018 U.S. Dist. LEXIS 79412 (C.D. Cal. May 10, 2018) ............. 10

*Bessette v. W.B. Conkey Co.*,
  194 U.S. 324 (1904) ......................................................................................... 9

*Donovan v. Mazzola,*
  716 F.2d 1226 (9th Cir. 1983) ......................................................................... 9

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ......................................................................... 10

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) ......................................................................... 3

*FTC v. Panda Ben. Servs., LLC*,
  No. 24-01386, 2025 U.S. Dist. LEXIS 107225
  (C.D. Cal. June 5, 2025) .............................................. 10, 11, 15, 18, 25

*In re Crystal Palace Gambling Hall, Inc.*,
  817 F.2d 1361 (9th Cir. 1987) ....................................................................... 10

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ...................................................................*passim*

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) ................................................... 9, 10, 11

*John B. Stetson Co. v. Stephen L. Stetson Co.*,
  128 F.2d 981 (2d Cir. 1942) ................................................................ 10, 11

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
  558 F. Supp. 3d 1056 (D. Or. 2021) .................................................... 22, 23

*Perry v. O'Donnell*,
  759 F.2d 702 (9th Cir. 1985) ......................................................................... 9

*Richmark Corp. v. Timber Falling Consultants*,

    959 F.2d 1468 (9th Cir. 1992)...............................................................*passim*

*Schein, Inc. v. Certified Bus. Supply, Inc.*,

    No. 03-1662, 2008 U.S. Dist. LEXIS 81826 (C.D. Cal., Aug. 20, 2008)........ 10, 25

*Simon v. City & Cnty. of San Francisco*,

    No. 22-cv-05541-JST, 2024 U.S. Dist. LEXIS 174835

    (N.D. Cal. Sept. 26, 2024).................................................................. 10, 11

*U.S. v. Bright*,

    596 F.3d 683 (9th Cir. 2010)............................................................. 10

*Whittaker Corp. v. Execuair Corp.*,

    953 F.2d 510 (9th Cir. 1992)............................................................. 10

## I. Introduction

Commencing on November 27, 2024 and continuing through June 18, 2025, the Court issued a series of four orders establishing and reaffirming that the County of San Luis Obispo (the "County") must implement a suite of remedial measures designed to lessen the harms caused by Lopez Dam, associated water diversions, and various County infrastructure (collectively, "the Lopez Project") to the South-Central California Coast Distinct Population Segment of Steelhead ("Steelhead"). Order Granting in Part Plaintiffs' Motion for Preliminary Injunction (Dkt. 54, Nov. 27, 2024); Order Granting in Part Plaintiffs' Proposed Preliminary Injunction Order (Dkt. 57, Dec. 9, 2024); Preliminary Injunction Order (Dkt. 58, Dec. 9, 2024); Order Granting Motion to Stay the Case Pending Resolution of Interlocutory Appeal of the Preliminary Injunction Order (Dkt. 131, June 18, 2025). The Court reiterated the importance of the County implementing these remedial measures in its June 18, 2025 Stay Order. The Court expressly noted that it was granting the stay on a finding that the stay would not irreparably harm Steelhead or the NGOs because the County will remain required to implement the Preliminary Injunction's Steelhead protective measures. Dkt. 131 at 2-3.

As these court orders recognized, Steelhead are a threatened species protected under the Endangered Species Act ("ESA") and the Lopez Project is causing grave harm to Steelhead that is significantly adding to their risk of extinction. *E.g.*, Dkt. 54 at 10-11, 18. Relying on its findings that the Lopez Project is having dire adverse impacts on Steelhead, the Court granted the Plaintiffs San Luis Obispo Coastkeeper, Los Padres ForestWatch, California Coastkeeper Alliance, and Ecological Rights Foundation's (collectively, "the NGOs") requested preliminary injunction, finding that the NGOs' requested injunctive relief was needed to forestall the irreparable harm to Steelhead that the Lopez Project is causing. As requested by the NGOs, the Court's Preliminary Injunction Order mandated that the County *study, develop, and implement* several plans for remedial actions to be performed forthwith, while the case proceeded and while the County was pursuing ESA authorization from the National Marine Fisheries Service

("NMFS") and the U.S. Fish and Wildlife Service ("USFWS") (collectively, "the Services"). *Id.*; Dkt. 57 at 3-4 n.4; Dkt. 58 at 2-17.

In briefing following the Court's initial order granting the NGOs' preliminary injunction motion, the County requested the Court to allow it to fold development of several of these plans into the County's habitat conservation plan ("HCP") that the Court had ordered the County to complete as part of the County's ESA section 10 incidental take permit ("ITP") application to the Services for ESA authorization for the Lopez Project. Dkt. 56 at 12, 22; 56-2 at ¶¶ 14, 17, 25. The County requested that the Court allow it to delay actual adoption and implementation of the plans until it secured the Services' approval of its Lopez Project HCP and an accompanying ESA section 10 ITP. Dkt. 56 at 12, 22. The NGOs opposed this request, explaining that the County's proposal to wrap completion and implementation of its remedial plans into the HCP and ITP process was problematic given that it would be virtually certain that the Services would not promptly approve the HCP and issue an ITP to the County for the entire Lopez Project. Dkt. 56 at 2-5. That the County has half-heartedly—and futilely—pursued HCP and ITP approval for more than two decades while repeatedly declining to respond to NMFS's criticisms of the County's proposed approaches to ESA compliance gave credence to the NGOs' objections, which the Court recognized as valid. *See* Dkt. 54 at 26-27, Dkt. 57 at 1-2.

In its December 9, 2024 Order, the Court sided with the NGOs and approved, with only minor modifications, the NGOs' proposed preliminary injunction order rather than the County's version. Noting that the County's approach was unacceptable because it would delay without justification implementation of the Preliminary Injunction's urgently needed remedial measures, the Court expressly rejected the County's suggestion that it should be allowed to proceed by developing the various preliminary injunction remedial plans only as part of its HCP development process rather than having independent obligations to develop the plans. Dkt. 57 at 1-3 & n.4.

Though the Court expressly rejected the County's request to be allowed to develop

the Preliminary Injunction remedial plans only as part of its HCP and in conjunction with its extended schedule for HCP development, the County nonetheless has proceeded to do precisely that. Specifically, the County has developed several Preliminary Injunction remedial plans that repeatedly state the County will only develop the actual remedial measures as part of its HCP. In so doing, the County has openly defied the Court's Preliminary Injunction and should be found in contempt. The Court should issue appropriate contempt relief that puts the County back on track for doing what the Preliminary Injunction ordered months ago.

That the Court has now partially stayed this action until the Ninth Circuit rules on the County's interlocutory appeal increases the urgency of requiring the County's compliance with the Preliminary Injunction. The likely timing of a Ninth Circuit ruling will keep this case and any further opportunity for the NGOs to secure added protection for Steelhead beyond that in the Preliminary Injunction frozen for several months, possibly half a year or more.[1] Additionally, final judgment in this case will now inevitably be delayed several months.[2] Accordingly, the Preliminary Injunction will be in place as the only means to protect Steelhead from the extinction risk posed by the Lopez Project for many months longer than was originally contemplated—making it all the

---

[1] The timing of the Ninth Circuit's decision in *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) provides useful guidance here. In *Flathead*, the Ninth Circuit addressed an analogous interlocutory appeal of a preliminary injunction issued under the ESA. Notably, the Ninth Circuit expedited the briefing schedule to one month and hearing date shortly thereafter (unlike here where the Ninth Circuit denied the County's motion to expedite its appeal). The Ninth Circuit issued a decision affirming the preliminary injunction three months after oral argument. With *Flathead* as a guide, a Ninth Circuit decision on the County's appeal will likely issue around mid-November 2025 (three months after the Ninth Circuit's August 12, 2025 oral argument).

[2] Given that the parties will have to conduct and complete expert discovery and dispositive motion practice prior to trial, the stay will delay a final judgment by several months. Dispositive motions will almost certainly be pushed past the original November 2025 hearing date and if such motions do not result in a final judgment, the stay will also move the trial well past the original March 2026 date.

more critical that the County actually complies with the injunction.

## II. Statement of Facts and Procedural History

In granting the NGOs' preliminary injunction motion, the Court found that "the available record overwhelmingly displays the harmful effects from defendant's activity, such that the AG [Arroyo Grande] Creek Steelhead population may be in peril." Dkt. 54 at 10. The Court elaborated that Lopez Dam "block[s] access to the *overwhelming majority* of steelhead spawning, rearing, and refugia habitat" in Arroyo Grande Creek ("AG Creek")—which is particularly problematic because the AG Creek Steelhead population is a critical NMFS-designated "Core 1" population that is especially important for Steelhead survival and recovery. *Id*. at 11 (emphasis original). As the Court found, relying on NMFS's analysis, "this reduction in available quality spawning and rearing habitats essentially 'increases the risk of species extinction and delays recovery.'" *Id.* The Court further noted that the County's adverse impacts on Steelhead was beyond dispute: "the NMFS agency, Plaintiffs' experts, and Defendant's expert all concur that physical barriers coupled with degrading habitat conditions in the lower reaches of AG Creek contribute to the anticipated decline in the Creek's Steelhead population." *Id*. at 18. The Court further relied on NMFS's analysis that the "presence of Lopez Dam creates the *most significant impact* to streamflow in the lower mainstem and is *the largest system-wide stressor* that alters sediment dynamics by specifically reducing winter peak flows that have the magnitude to breech the lagoon berm and allow connectivity between the river and ocean." *Id.* (emphasis original).

The Court found the NGOs' requested injunctive measures appropriate to address these dire adverse impacts on Steelhead, holding that the NGOs' "proposed short-term and long-term measures 'would forestall the irreparable harm' to the Steelhead population." *Id.* at 26. As the Court recited, the NGOs' preliminary injunction motion unmistakably had requested the Court order the County to *study, develop, and implement* several plans for remedial actions to be performed forthwith, while the case proceeded and while the County was pursuing ESA authorization from the Services, *i.e.*, while the

County was developing its Lopez Project HCP and ESA section 10 ITP application. *Id.*; Dkt. 57 at 2-3 n.4; Dkt. 58 at 2-16.

The Court's November 27, 2024 Preliminary Injunction Order and subsequent minute order required the parties to submit a detailed follow-up joint order that would specify the timeline for the County to implement the injunctive relief. Dkt. 54 at 28 n.18; Dkt. 55 (Minute Order). However, the parties were unable to agree on a joint order and submitted competing proposed preliminary injunction orders, along with an introductory pleading explaining the competing approaches. Dkt. 56; Dkt. 56-1; Dkt. 56-2. The NGOs objected to the County's proposed version of the preliminary injunction order on grounds that it would "effectively reverse this Court's Preliminary Injunction Ruling and block for the remainder of this case the interim relief that the Preliminary Injunction Ruling endorsed." Dkt. 56 at 2. The NGOs pointed out that the County's proposed preliminary injunction order was designed to effectively block all preliminary injunctive relief. *Id.* The County's proposal would allow the County to delay developing and implementing many of the remedial measures ordered by the Preliminary Injunction until it secured "regulatory approval." *Id.* at 2-3. The County made plain that this "regulatory approval" would come in the form of the County's securing an ITP from the Services in conjunction with the County's HCP submittal. *Id.* at 12, 22 (County explanation that its version of the proposed preliminary injunction order was "intended to allow the County to integrate [several of its plans] into its HCP.").

The NGOs explained why the County's proposal to wrap the remedial plans into the HCP and ITP application was problematic: it would be virtually certain that the Services would not promptly issue an ITP to the County for the entire Lopez Project. As the Court's Preliminary Injunction Order recognized, the County has been going round and round with the Services for decades about an ESA section 10 ITP for the Lopez Project but to no avail. *See* Dkt. 54 at 26-27. Moreover, allowing the County to avoid implementing the Preliminary Injunction relief until it secured such a comprehensive ITP would perversely incentivize the County to submit an HCP and ITP application that the

Services likely would not approve—since the absence of an ITP would continue to insulate the County from its injunctive obligations. Dkt. 56 at 3-5.

In its December 9, 2024 Order, the Court approved, with minor modifications, the NGOs' proposed preliminary injunction order rather than the County's version. The Court emphatically rejected the County's version, noting that it would "significantly delay" developing plans to address harms to Steelhead "without much justification." Dkt. 57 at 1. The Court found the County's contention that it should not be required to proceed with designing and implementing the plans until securing an ITP "unavailing for several reasons." *Id.* The Court stressed that "Defendant has engaged in an extensive and lengthy regulatory process with the National Marine Fisheries Service ("NMFS") agency to improve the Steelhead Creek habitat for nearly two decades--the results of which have remained seemingly unavailing…." *Id.* at 2. The Court expressly rejected the County's suggestion that it should be allowed to proceed by developing the various preliminary injunction remedial plans only as part of its HCP development process rather than having independent obligations to develop the plans. Dkt. 57 at 2-3 n.4.

As issued, the Preliminary Injunction Order required the County to develop and implement the following plans for various remedial measures to protect Steelhead from the adverse impacts of the Lopez Project: (1) a Lopez Dam Flow Release Plan governing releases from Lopez Dam to provide improved flow conditions for Steelhead in AG Creek, (2) a Steelhead Monitoring Plan specifying the means for the County to monitor the effects of Lopez Dam releases on Steelhead and Steelhead habitat conditions in AG Creek and then potentially adjusting how much water is released from Lopez Dam based on the findings of the monitoring effort, (3) a Spillway Fish Screen Plan for installing a fish screen on the Lopez Dam spillway to prevent non-native species that prey on and/or compete with Steelhead from escaping Lopez Reservoir into downstream Steelhead habitat in AG Creek, (4) a Steelhead Passage Barriers Plan for removing or modifying specified Steelhead passage barriers in AG Creek downstream of Lopez Dam, (5) a BMP Plan for implementing appropriate best management practices ("BMPs") to reduce

sediment loading into tributaries to AG Creek that is harmful to Steelhead, (6) a Habitat
Restoration Plan for a habitat restoration project in AG Creek that would include
measures to enhance Steelhead habitat such as adding spawning gravel substrate, planting
new riparian vegetation, and placing large woody material in AG Creek, and (7) a
Predator Removal Plan specifying measures to remove Steelhead predator and competitor
non-native species from AG Creek. Dkt. 54 at 26; Dkt. 57 at 2-4; Dkt. 58 at 2-16.

Ostensibly to comply with the Preliminary Injunction, the County has submitted to
the Court the following "final" plans: (1) Final Flow Release Plan (Dkt. 72-2); (2) Final
Monitoring Plan (Dkt. 88-1); (3) Final Steelhead Volitional Passage Study Plan (Dkt.
104-1); (4) Final BMP Plan (Dkt. 112-1); (5) Final Habitat Restoration Plan (Dkt. 112-2);
(6) Final Predator Removal Plan (Dkt. 118-2); and (6) Final Spillway Fish Screen Plan
(Dkt. 118-1). The County has further filed a Proposed Steelhead Passage Barriers Plan
(Dkt. 128-1) and faces a June 30, 2025 deadline to submit its Final Steelhead Passage
Barriers Plan. As provided for in the Preliminary Injunction Order, the NGOs submitted
comments to the County pointing to various shortcomings in these plans, including, as
relevant to the present motion, comments on the BMP Plan, Habitat Restoration Plan,
Predator Removal Plan, Spillway Fish Screen Plan, and Proposed Steelhead Passage
Barriers Plan (collectively "Challenged Plans"). *See* Sproul Decl., ¶¶ 4-8, Exs. 1-5.

The NGOs' comments on the Challenged Plans objected that the plans consistently
delay implementation, and to a large extent even development, of remedial measures
mandated by the Preliminary Injunction Order until the County not only submits its
Lopez Project HCP to NMFS and USFWS, but presumably until the Services approve the
HCP and issue an ITP to the County. *See* Sproul Decl., ¶ 9, Ex 6. The NGOs noted the
County's nearly two-decade failure to secure an ITP and approval of an HCP. *Id.*
Compounding the NGOs' concerns, to-date the County has been unwilling to submit an
HCP that reasonably addresses NMFS's concerns and is reasonably fashioned to actually
win regulatory agency approval. *Id.* The NGOs objected that the County's approach of
repeated delays is tantamount to a strategy of not having to actually implement the

7

remedial measures to benefit or protect ESA-listed species for years to come, if ever. *Id.* The NGOs further objected that, interrelatedly, large sections of the Challenged Plans are only plans to someday develop plans, not actual plans for action as required by the Preliminary Injunction Order. *Id.*

Since the Preliminary Injunction issued, the County has complied with the requirement to release more base flows from Lopez Dam. Sproul Decl., ¶ 10.[3] However, the County has failed to comply with many of the remaining Preliminary Injunction requirements. Notably, the County has not developed or even begun to implement any of the following Preliminary Injunction remedial measures: (a) a fish screen on the Lopez Dam spillway to prevent non-native species that prey on and/or compete with Steelhead from escaping Lopez Reservoir into downstream Steelhead habitat in AG Creek, (b) removal or modification of the specified Steelhead passage barriers in AG Creek downstream of Lopez Dam, (c) BMPs to reduce sediment loading into tributaries to AG Creek, (d) a habitat restoration project to offset take of Steelhead that includes placing spawning gravel substrate, planting new riparian vegetation, or placing large woody material in AG Creek, or (e) measures to remove Steelhead predator and competitor non-native species from AG Creek. Sproul Decl., ¶¶ 4-9, Exs. 1-6. Moreover, for the most part, the County has not provided a schedule for implementation of these measures and has not specified which regulatory approvals it will need prior to implementation, the necessary steps for obtaining such approvals, or a schedule to obtain approvals.

---

[3] Despite releasing base flows, the County has never released the Lopez Dam pulse flows contemplated by the Preliminary Injunction to promote adult Steelhead spawning migration in AG Creek. *See* Dkt. 58, ¶ 1. As it has turned out, the requirement that the County need only release pulse flows when AG Creek flow reaches 100 cubic feet per second ("cfs") or more at the Arroyo Grande Creek Gauge ("AGCG") has effectively precluded and will in the future most likely effectively preclude the County from having to release such pulse flows. Sproul Decl. ¶ 13, Ex. 8 at 28 & 3; *id.* ¶ 15. The County's consultants presently working on the County's draft HCP have pointed out this problem and have suggested the County consider a much lower flow level trigger for pulse flow releases. Sproul Decl. ¶ 13, Ex. 8 at 3.

In addition to timely submitting comments to the County identifying their concerns regarding each of the Challenged Plans and attending multiple conferral meetings with the County to discuss these comments, the NGOs met and conferred on June 13, 2025 with the County's counsel consistent with Local Rule 7-3 regarding the NGOs' intentions to address the County's ongoing Preliminary Injunction violation with this Motion. Sproul Decl., ¶ 11. The County has made plain its intentions to continue its approach in the Challenged Plans and thus avoid implementing any of the remedial measures called for in the portions of the Preliminary Injunction relating to the Challenged Plans until such time as the County secures approval for its Lopez Dam HCP and ITP, if that ever happens. The NGOs are thus bringing the present Motion as the only means for securing compliance with these aspects of the Preliminary Injunction.

### III.    Legal Background

"'[T]he purpose of contempt proceedings is to uphold the power of the court,' . . . and to ensure that the court's vindication of litigants' rights is not merely symbolic." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 951-52 (9th Cir. 2014) (quoting *Bessette v. W.B. Conkey Co*., 194 U.S. 324, 327 (1904)). Civil contempt occurs when a party disobeys "a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order." *Id*.; *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) (party's intent for noncompliance is not an issue in civil contempt proceedings). Instead, "[t]he sole question is whether a party complied with the district court's order." *Donovan*, 716 F.2d at 1240; *see also Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) (a showing of willfulness is not a necessary element for civil contempt because while the purpose of criminal contempt is punishment, the purpose of civil contempt is remedial).

In sum, the party alleging civil contempt must establish "by clear and convincing evidence" that the opposing party (1) violated a court order, (2) beyond substantial

compliance, and (3) the violation was not based on a good faith and reasonable interpretation of the order. *In re Dual-Deck*, 10 F.3d at 695. However, this "good faith" exception only applies where the violated term was "vague." *Sea Shepherd*, 774 F.3d at 953. Further, "'[i]n deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction even though its strict letter may not have been disregarded.'" *Simon v. City & Cty. of S.F.*, No. 22-5541, 2024 U.S. Dist. LEXIS 174835, at *10-11 (N.D. Cal. Sep. 26, 2024) (quoting *Sea Shepherd*, 774 F.3d at 949; *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)).

"Civil contempt is characterized by the court's desire to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the noncompliance." *U.S. v. Bright*, 596 F.3d 683, 695-96 (9th Cir. 2010) (internal citation omitted). There are two forms of civil contempt sanctions: compensatory and coercive. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983); *see also In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366 (9th Cir. 1987) (compensatory sanctions); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992) (coercive sanctions). To determine whether a coercive sanction is appropriate, courts must "consider the character and magnitude of the harm threatened by continued contumacy" as well as the probable effectiveness of the sanction. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

Attorneys' fees and costs may properly be awarded as a sanction for contempt. *FTC v. Panda Ben. Servs., LLC*, No. 24-01386, 2025 U.S. Dist. LEXIS 107225, at *23-24 (C.D. Cal., June 5, 2025); *Schein, Inc. v. Certified Bus. Supply, Inc.*, No. 03-1662, 2008 U.S. Dist. LEXIS 81826, at *24 (C.D. Cal., Aug. 20, 2008); *Aecom Energy, Inc. v. Ripley*, No. 17-05398, 2018 U.S. Dist. LEXIS 79412, at *13 (C.D. Cal. May 10, 2018).

## IV. Argument

The County's Challenged Plans do not delineate what actions the County will actually take to mitigate the harms the Lopez Project is causing to Steelhead, where it

will take those actions, or when. Instead, as drafted, the County's Challenged Plans delay the actual development and implementation of remedial measures to benefit or protect Steelhead until the County both submits and secures the Services' approval of its long-delayed HCP for the Lopez Project. The Challenged Plans are, at best, plans to create plans at some time in the future. As a result, in defiance of the Preliminary Injunction, the County has failed to carry out development of the required action plans or to implement most of the actions the Court found necessary to reduce harm to Steelhead while this case proceeds. The Preliminary Injunction Order, Dkt. 58, is "a specific and definite court order" which the Court deemed necessary to remedy the past, current, and future harm to Steelhead that the Lopez Project is causing while a final decision on the merits is reached. *See, e.g.,* Dkt. 57 at 2; *In re Dual-Deck Video*, 10 F.3d at 695. The County's defiance of the Preliminary Injunction Order warrants a finding of contempt and a further order compelling the County to change course. *See Simon*, 2024 U.S. Dist. LEXIS 174835, at *10-11; *Sea Shepherd*, 774 F.3d at 949; *John B. Stetson Co.*, 128 F.2d at 983.

The Preliminary Injunction Order is detailed and clear and the County's Challenged Plans unmistakably have not complied with the injunction. Accordingly, the County has no "good faith" defense to its noncompliance with the Challenged Plans. *Sea Shepherd*, 774 F.3d at 953. The Challenged Plans fail to identify specific actions and omit proposed schedules for implementing required remedial measures, fail to specify which regulatory approvals the County will need, and omit schedules for obtaining those regulatory approvals. In the presence of such compliance failure, there can be no dispute that the County has thus failed to "take all reasonable steps within the party's power to comply" and its actions are not "based on a good faith and reasonable interpretation of the court's order." *In re Dual-Deck Video*, 10 F.3d at 695. The County's actions "undermine[] the spirit and purpose of the Endangered Species Act," extending harm to Steelhead that the County has already been unlawfully causing for decades. Dkt. 57 at 2. Accordingly, the Court should find the County to be in contempt of the Preliminary Injunction. *E.g.*, *Panda*, 2025 U.S. Dist. LEXIS 107225, at *7-21. The NGOs further

request as a remedy that the Court order the County to submit revised versions of the Challenged Plans that comply with the Preliminary Injunction Order in accord with the prompt schedule discussed in the Conclusion section below.

### A.    This Motion Should Not Be Deemed Barred by the Partial Stay.

In the Parties' conferral prior to this Motion, the County took the view that the Court's Stay Order (Dkt. 131) stays all motion practice pending the Ninth Circuit ruling on the County's interlocutory appeal and thus precludes this Motion. But the Court has granted only a *partial* stay, staying discovery, pretrial filings, and trial, but expressly excluding compliance with the Preliminary Injunction from the stay. Dkt. 131 at 2, 6 ("Defendant requests that the Court exercise its discretion to stay this matter, including discovery, pretrial, and trial dates, until the Ninth Circuit renders a ruling on Defendant's interlocutory appeal…. Defendant, however, does not seek to stay the preliminary injunction order….;" granting motion as so characterized). Notably, the Court partially stayed this action based on the County's assertion that it is complying with the Preliminary Injunction. *Id.* at 2-3. The Court found that staying the action will not irreparably harm Steelhead and the NGOs due to the County's Preliminary Injunction compliance. *Id.* However, the County's assertion of full Preliminary Injunction compliance is false. Such compliance will only occur if the Court issues an order mandating that the County do as the Court already ordered and (1) desist from using lack of HCP and ITP approval as a shield to avoid implementing many of the Preliminary Injunction's remedial measures intended to benefit and protect Steelhead, and (2) promptly take affirmative steps to study, develop, and then implement the remedial measures required by the Preliminary Injunction. It would be ironic indeed if the Stay Order still required the County to comply with the Preliminary Injunction but nonetheless barred the NGOs from going to court should the County defy that obligation.

For the above reasons, the NGOs interpret this Motion to enforce the County's compliance with the Preliminary Injunction as being outside of the stay. However, if the NGOs are wrong, they respectfully request the Court to order the stay modified or

1  partially lifted to allow a hearing on this important Motion. Again, this Motion addresses

2  the fundamental assumption in the Court's stay order, that the County is complying in

3  full with the Preliminary Injunction, which, as discussed below, is not the case.

### B. The County's Final BMP Plan Violates the Preliminary Injunction Order.

5  The Preliminary Injunction required the County to submit a Final BMP Plan by

6  March 31, 2025 that specified: (1) "appropriate best management practices to reduce

7  sediment loading into tributaries to AG Creek," (2) a schedule for implementation of the

8  specified BMP measures, (3) "all regulatory approvals necessary or access agreements to

9  implement the Plan," and (4) "a timely schedule for any necessary steps to obtain such

10  regulatory approval or access agreements for implementation of the Plan." Dkt. 58 ¶¶ 17-

11  18. The Preliminary Injunction Order further mandated that "[t]he County shall

12  implement the Final BMP Plan according to the schedule set forth in the Final Plan." *Id*.,

13  ¶ 19. The County's Final BMP Plan (Dkt. 112-1) fails to comply with these requirements.

14  At best, the County's Final BMP Plan is a plan to create a plan at a future date as it defers

15  decisions about actual BMPs until completion of the HCP.

16  First, the Final BMP Plan fails at the gate by not specifying which BMPs the

17  County proposes to implement. Section 3 of the BMP Plan outlines various potential

18  treatment BMPs and stormwater runoff retention treatments generally but does not

19  specify any of them as appropriate BMPs to implement to reduce sediment loading into

20  tributaries of AG Creek. Dkt. 112-1 at 8-9. Instead, defying the Preliminary Injunction's

21  rejection of the County's request to delay BMP development until it completes the HCP,

22  the County expressly defers the substantive components of the BMP Plan "*to include as*

23  *conservation strategies for the HCP that is currently under development and ordered for*

24  *submission by October 1, 2025*." Dkt. 112-1 at 1 (emphasis added). Later, the BMP Plan

25  again states that "BMP and outreach efforts described herein . . . may be incorporated

26  into the final conservation strategies of the HCP." *Id.* at 10. These directives copy the

27  approach in the County's proposed preliminary injunction order *that this Court expressly*

28  *rejected*. Dkt. 57 at 2-3, n.4 (court order rejecting County's preliminary injunction order

approach); Dkt. 56-2 ¶ 17 (County proposed preliminary injunction order provision rejected by the Court that "[t]he County may, at its discretion, submit the Proposed BMP Plan as a component of its HCP or as a stand-alone project."); Dkt. 56 at 14 (County explanation that its proposal to extend the deadline for the BMP Plan was "intended to allow the County to integrate the . . . BMP Plan . . . into its HCP."); *see also id.* at 24. The Court plainly rejected the County's previous attempt to push BMP planning and implementation off until the HCP, holding that "well before this HCP submission deadline, Defendant will have the benefit of developing its remedial plans and submitting those plans to the agencies in incremental stages throughout the duration of the preliminary injunction." Dkt. 57 at 1-3 & n.4; *see also* Dkt. 57 at 1 (criticizing the County's BMP Plan deadlines as examples of the County's further attempts at delay and finding the County's attempt to justify such delay as "unavailing.").

Second, relatedly, the Final BMP Plan does not identify where it will implement new BMPs or provide a schedule for implementation of the BMPs. Instead, the County states that "[t]he plan's inventory and field survey components described in this plan . . . will be completed by September 30, 2025 and will include an implementation schedule for each County-owned site identified for recommended treatments." Dkt. 112-1 at 10. Again, identifying where and when the County will implement BMPs is an indispensable part of the Final BMP Plan--not a task that the County is allowed to shift into its HCP.

Third, the County's Final BMP Plan fails to "specify all regulatory approvals necessary or access agreements to implement the Plan" and does not "outline a timely schedule for any necessary steps to obtain such regulatory approval or access agreements for implementation of the Plan." Dkt. 58 ¶ 18.

Fourth, as a function of omitting the key information above, the County has failed to "implement the Final BMP Plan according to the schedule set forth in the Final Plan." Dkt. 58 ¶ 19. Given that the Preliminary Injunction by its own terms governed action up through final judgment, the County was necessarily required to frame its Final BMP Plan to at least commence obtaining regulatory approvals and then commence implementing at

least some BMPs--and have some BMPs measures in place while this case is proceeding. Failure to schedule prompt pursuit of regulatory approvals and at least the commencement of BMPs implementation while the case is proceeding thus defies the Preliminary Injunction. By omitting key information and deferring to the HCP submission timeline, the County has unilaterally introduced further delay into the BMP planning process. *See In re Dual-Deck Video*, 10 F.3d at 695.

An important further consideration is that even if the County could now belatedly be given latitude to shift BMP planning into its HCP despite the Preliminary Injunction's plain contrary mandate, available information strongly suggests that the County would utilize that as another avenue to delay actual implementation of the BMPs. This likelihood is supported by the evidence of how the County has conducted itself to date with respect to HCP drafting. To the best of the NGOs' knowledge, the County's 2004 Draft HCP is the only complete HCP draft that the County has prepared. Sproul Decl., ¶ 12. Yet even the 2004 Draft HCP deferred specifying actual BMPs, indicating these would be developed later. *See, id.*, ¶ 12, Ex. 7. The County's present HCP drafts perpetuate this approach. *See, e.g.*, Sproul Decl., ¶ 13, Ex. 8 (excerpts of June 2025 Draft HCP). Deposition testimony from the County's Public Works Director Kate Ballantyne confirmed that at this late date the County has not yet decided whether to include actual, specific BMPs as a conservation measure in the HCP. Sproul Decl., ¶ 14, Ex. 9 at 226.

The Preliminary Injunction Order requires the County to identify which BMPs the County will implement, where it will implement them, when it will do so, and what regulatory approvals will be necessary to implement those BMPs; to plan for necessary regulatory approvals and access agreements; and then to actually implement the Final BMP Plan, *i.e.* to complete the planning process and commence implementation of the BMPs independent of the HCP (and in the interim while this case is proceeding). Implementation was intended to lessen Lopez Dam's harms to Steelhead. As discussed above, the County's Final BMP Plan defies these requirements in a contemptuous failure to comply with the Preliminary Injunction Order. *E.g.*, *Panda*, 2025 U.S. Dist. LEXIS

107225, at *7-21. The Court should thus issue an appropriate contempt remedy order requiring the County to complete and submit a revised BMP Plan that, pursuant to the Preliminary Injunction Order, specifies which BMPs the County plans to implement, where it will implement them, when it will do so, which regulatory approvals will be necessary to implement those BMPs, and includes a schedule for obtaining those regulatory approvals. *Richmark*, 959 F.2d at 1481.

### C.    The County's Proposed Steelhead Passage Barriers Plan Violates the Preliminary Injunction Order.

The Preliminary Injunction requires the County to submit a proposed plan to remove or modify specified Steelhead passage barriers in lower AG Creek by May 30, 2025, and submit a final plan by June 30, 2025. Dkt. 58 ¶¶ 14, 15. The County's Proposed Steelhead Passage Barriers Plan, filed with the Court on May 30, 2025, does not comply with the Preliminary Injunction requirements for three key reasons.

One, the County's Proposed Steelhead Passage Barriers Plan omits an actual plan to remove or modify the specified barriers. The County's proposed plan to assess whether the specified barriers are in fact an impediment to Steelhead passage or migration is not a plan to remove or modify those barriers.[4] *See* Sproul Decl., ¶ 8, Ex. 5 at 4. Instead, the County improperly defers such plan to its HCP submission, stating that "the most expeditious and efficient method to implement any potential barrier removal project as described in the plan is to present the information described herein through the consultation efforts for the HCP and Section 10 application." Dkt. 128-1 at 8. Just like the other Challenged Plans, the Steelhead Passage Barriers Plan is a remedial plan that is

---

[4] The proposed plan also impermissibly omits five of the seven Steelhead passage barriers specified in Attachment 1 to the Preliminary Injunction Order without evidence or support for the County's assertion that it does not own them. *See* Sproul Decl., ¶ 8, Ex. 5 at 2-3. In the very least, the County should include all seven specified barriers in its inventory assessment. *Id.* at 3-4.

distinct from the HCP and required well before the deadline to submit the HCP.[5] The County's failure to include an actual plan to remove or modify the specified Steelhead passage barriers and attempt to defer this effort to the HCP submission again violates the Preliminary Injunction Order.

Two, the County fails to specify all necessary regulatory approvals and detail the steps for obtaining those approvals or access agreements for implementation of the Steelhead Passage Barriers Plan, in violation of the Preliminary Injunction Order. Sproul Decl., ¶ 8, Ex. 5 at 6-8. The County's proposed plan lists various regulatory approvals that may or may not apply to the barrier removal project. Dkt. 128-1 at 8-9. The County's "Permitting Options Summary and Schedule" in Table 2 of the proposed plan outlines the ESA approval process but lacks any information about the steps needed to obtain regulatory approval from agencies such as the U.S. Army Corps of Engineers and the California Department of Fish and Wildlife ("CDFW"). *Id.* at 11-13.

Three, the proposed plan omits an implementation schedule. Sproul Decl., ¶ 8, Ex. 5 at 9-10. Instead, the County states that its barriers inventory, expected by September 30, 2025, "will include an implementation schedule for potential barrier assessments . . . and for each site's remediation treatments, if applicable[.]" Dkt. 128-1 at 10.

On June 23, 2025, the NGOs submitted comments urging the County to rectify these flaws. Sproul Decl., ¶ 8, Ex. 5. Given that the County has ignored many of the NGOs' previous comments on the Challenged Plans, the NGOs anticipate that the County's Final Steelhead Passage Barriers Plan will largely mirror the proposed plan.[6] If

---

[5] The County's recent 2025 Draft HCP also contemplates further delay of the substance of any remedial barrier removal plan. Sproul Decl., ¶ 13, Ex. 8 at 13. This again suggests that even if the County could belatedly be allowed to defy the Preliminary Injunction's mandate to not shift development of the Challenged Plans into its HCP development, the County still is not on track to develop a barrier removal plan as part of its HCP.

[6] If the NGOs' prediction in this respect proves to be inaccurate and the County in fact revises its Final Steelhead Passage Barriers Plan to specify development and implementation of barrier removal or modification independent of HCP and ITP approval, then the NGOs will withdraw this portion of the Motion.

so, this Court should find the County to be in contempt and order a revised Steelhead
Passage Barriers Plan that is consistent with the Preliminary Injunction. *See Richmark*,
959 F.2d at 1481; *Panda*, 2025 U.S. Dist. LEXIS 107225, at \*7-21.

### D.    The County's Final Spillway Fish Screen Plan Violates the Preliminary Injunction Order.

The Preliminary Injunction requires that the County prepare a Spillway Fish
Screen Plan for installing a fish screen on the spillway at Lopez Dam to prevent non-
native species that prey on and/or compete with Steelhead from escaping Lopez Lake into
downstream Steelhead habitat in AG Creek. Dkt. 58 ¶¶ 11, 12. The County's Final
Spillway Fish Screen Plan (Dkt. 118-1) violates the Preliminary Injunction Order for two
key reasons.

One, the County's Final Spillway Fish Screen Plan does not include a schedule for
installing the proposed fish screen. The Preliminary Injunction clearly requires "a
schedule in the Proposed Plan for installing the proposed fish screen," and directs that the
County "shall implement the Final Spillway Fish Screen Plan as soon as fish screen
installation is feasible" given various considerations. Dkt. 58 ¶¶ 11, 13. However, the
County's plan broadly outlines five phases for seeking proposals to develop a fish screen
design, conduct permitting, contract and install, and monitor and maintain a fish screen.
Dkt. 118-1 at 3-5. This is not a schedule for installing the proposed fish screen, but rather
a schedule for developing a proposed plan to install a fish screen on the spillway. The
County acknowledges that a fish screen may never ultimately be installed, stating that
"[i]f no feasible alternative is identified, then no further action will be undertaken." *Id.* at
4 n.1. The County states that fish screen installation would not start until August 2, 2027.
*Id.* at 5-6. This is not "as soon as fish screen installation is feasible." Dkt. 58 ¶ 13.

Two, the County's Final Spillway Fish Screen Plan fails to outline a timely
schedule for any necessary steps to obtain the regulatory approvals necessary to
implement the plan. The plan states "at a minimum, the following additional regulatory
authorizations would be needed" and lists "U.S. Army Corps of Engineers (USACE)

Clean Water Act Section 404 permit; CDFW Lake or Streambed Alteration Agreement and other CDFW permit(s) or license; a Regional Water Quality Control Board Section 401 Water Quality Certification; and a California Division of Safety of Dams permit and/or approval." Dkt. 118-1 at 2. The County's plan broadly lists "Permitting and Approvals" under phase 3, which is estimated to last 12-18 months but not starting until February 2, 2026. Dkt. 118-1 at 4-5. But the plan does not identify the necessary steps to obtain any of the specific regulatory approvals that the County identified as necessary to implement a fish screen on the spillway. The County's failure to comply with the unambiguous requirements of the Preliminary Injunction is not reasonable. *See In re Dual-Deck Video*, 10 F.3d at 695. The Court should correct the County's violations by granting the relief requested in this Motion. *See Richmark*, 959 F.2d at 1481.

## E.    The County's Final Habitat Restoration Plan Violates the Preliminary Injunction Order.

The Preliminary Injunction required the County to submit a Final Habitat Restoration Plan by March 31, 2025 for a habitat restoration project for AG Creek that will help to offset the Lopez Project's take of Steelhead. Dkt. 58 ¶¶ 25, 26. The County's Final Habitat Restoration Plan (Dkt. 112-2) violates the Preliminary Injunction because it: (1) omits an actual habitat restoration project or any commitment by the County to implement such a project; (2) lacks sufficient description to ensure the project includes the required beneficial components; (3) fails to specify the steps needed to comply with all necessary regulatory permits; and (4) omits a schedule for project implementation.

To start, the County's Final Habitat Restoration Plan improperly defers identifying an actual habitat restoration project until submission of its HCP, in direct contravention of the Preliminary Injunction. The Final Habitat Restoration Plan states:

> Because the County anticipates it will be necessary to obtain take authorization from NMFS (and possibly USFWS) to implement any of the habitat restoration projects defined in the attached memo, given the Preliminary Injunction Order's deadline to also submit a draft HCP and Section 10 application to USFWS and NMFS by October 1, 2025, the most efficient means to secure that authorization

> and implement habitat restoration opportunities is to incorporate this Final HRP into the suite of conservation strategies identified within the HCP to address anticipated impacts to Steelhead and other covered species.

Dkt. 112-2 at 2. In her deposition testimony, Ms. Ballantyne confirmed that the County had not yet identified or committed to implementing a specific habitat restoration project. Sproul Decl., ¶ 14, Ex. 9 at 220-221. Ms. Ballantyne confirmed that, consistent with the statement in the Final Habitat Restoration Plan, the County intends to incorporate habitat restoration work into the HCP's potential conservation strategies. *Id.* at 221-22. Ms. Ballantyne also confirmed that as of May 30, 2025, the County had not yet identified any conservation measures to include the HCP. *Id.* Again, as discussed in section IV.B., the County has a multi-decade history of kicking the can down the road even in its HCPs, thus raising red flags that even if the County were belatedly allowed to shift habitat restoration planning exclusively into the HCP, that the HCP will perpetuate the County's proposal simply to develop a specific habitat restoration project "later."

Just like with the BMP plan, this Court previously rejected the County's proposal for extended deadlines to complete the Habitat Restoration Plan that would have allowed the County to incorporate the plan into the HCP process. *Compare* Dkt. 56-2 ¶ 25 (the County's Proposed Preliminary Injunction Order proposed to allow the County to, "at its discretion, submit the Proposed Habitat Restoration Plan as a component of its HCP or as a stand-alone project.") *and* Dkt. 56 at 14 (explaining the extended proposed deadlines "are intended to allow the County to integrate the . . . Proposed Habitat Restoration Plan into its HCP.") *with* Dkt. 58 ¶ 26 (Preliminary Injunction omitting the option to integrate and imposing shorter deadlines prior to the October 1, 2025 HCP deadline). By failing to identify an actual habitat restoration project and deferring that decision to the HCP, the County violated the clear and express terms of this Court's Preliminary Injunction Order and the County is in contempt. *See In re Dual-Deck Video*, 10 F.3d at 695.

The County's Final Habitat Restoration Plan is also deficient because it omits key information required by the Preliminary Injunction. Specifically, the Preliminary Injunction requires the plan "shall include beneficial components" including placement of

gravel substrate, planting of new riparian vegetation, and addition of large woody material. Dkt. 58 at ¶ 25. The limited description of actions that the County identifies in its plan provides insufficient detail to ensure that the ultimate habitat restoration project (which, as described above, the County has not yet identified) will include the required beneficial components. *See* Sproul Decl., ¶ 5, Ex. 2 at 4-5. Similarly, the County's Final Habitat Restoration Plan does not specify the performance of steps needed to comply with all necessary regulatory permits to implement the plan, despite the express requirement in the Preliminary Injunction Order to do so. *Compare* Dkt. 112-2 at 7-8 (listing various entities that might require regulatory approval but omitting any steps to achieve authorizations) *with* Dkt. 58 ¶ 25. And the Final Habitat Restoration Project lacks a schedule for implementation of any restoration measures despite the Preliminary Injunction's clear and express requirement for a schedule. Dkt. 58 ¶¶ 25, 27.

The Final Habitat Restoration Plan omits key provisions that the Preliminary Injunction Order clearly requires, continuing the County's delaying of ESA compliance. The Court should therefore find the County to be in contempt and order the County to submit a revised Habitat Restoration Plan that complies with the Preliminary Injunction. *See In re Dual-Deck Video*, 10 F.3d at 695; *Richmark*, 959 F.2d at 1481. A compliant Habitat Restoration Plan would, *inter alia*, specify a schedule for obtaining spelled out regulatory approvals for some tangible AG Creek restoration efforts before judgment, while this case is pending, and a schedule for at least commencing implementing some restoration efforts in this timeframe, as allowed by these regulatory approvals.

### F.    The County's Final Predator Removal Plan Violates the Preliminary Injunction Order.

The Preliminary Injunction Order required the County by April 30, 2025 to submit a Final Predator Removal Plan to remove non-native Steelhead competitor and predator species from AG Creek, with an outline of necessary regulatory approvals and schedule for implementation. Dkt. 58 ¶¶ 28, 29. However, the County's Final Predator Removal Plan (Dkt. 118-2) violates the Preliminary Injunction's plain requirements to include

these elements. Sproul Decl., ¶ 6, Ex. 3 at 7, 8-9.[7] The County's Final Predator Removal Plan's section titled "Regulatory Considerations" does not specify the regulatory approvals necessary for implementation of the plan, nor does it specify the necessary steps to obtain those approvals. Dkt. 118-2 at 8-9. The plan's section titled "Schedule" states that specific treatments, locations, and timing will be described at some point after the surveys and concludes that "[a]ll measures will be implemented following permit issuance, and subject to permitting requirements." Dkt. 118-2 at 10. Stating that the dates for implementing the plan will be determined in the future is obviously not a "schedule for implementation."

In sum, the County's Final Predator Removal Plan violates the Preliminary Injunction Order by failing to outline the regulatory approvals necessary to implement the plan, failing to specify the steps for obtaining those approvals, and omitting a schedule for plan implementation. Unless remedied, these omissions will serve to continue the County's pattern of delaying implementation of remedial measures to aid Steelhead and secure ESA compliance. *See In re Dual-Deck Video*, 10 F.3d at 695. The Court should find the County to be in contempt and order a revised Final Predator Removal Plan that complies with the Preliminary Injunction Order. *See Richmark*, 959 F.2d at 1481.

## G. The Court Should Order an Expert Panel to Supervise the County's Revisions to the Challenged Plans.

The County has expressed an unwillingness to follow the clear requirements of the Court's Preliminary Injunction Order, as discussed above. As a result, the NGOs request the Court to follow the approach in *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs* and order the County to create and fund an expert panel ("Expert Panel") to assist the development of the County's revised plans that will replace the County's present

---

[7] Here, too, the County's 2025 Draft HCP indicates it will continue to defer the substance of this remedial plan. Sproul Decl., ¶ 13, Ex. 8 at 15. Again, this is a red flag that even if the County were belatedly allowed to shift the predator reduction effort into its HCP, it is likely that the County's HCP will continue to propose that the actual predator removal effort will be developed "later."

Challenged Plans—and ensure that the County does more than just draft "plans" to

someday later actually write real plans. 558 F. Supp. 3d 1056, 1075-76 (D. Or. 2021)

(ordering the creation of an independent expert panel in ESA case). The NGOs propose

that the Expert Panel be comprised of one expert selected by the NGOs, one expert

selected by the County, and a third expert selected by consensus by these two experts.

*See*, *e.g.*, *id*. (staffing ESA expert panel with experts chosen by the NGO plaintiff and the

defendant, and with third-party neutrals). As in *Nw. Envtl. Def. Ctr.,* the Court should

instruct that the Expert Panel's charge will be to help "hammer out the details" of the

Challenged Plans to comply with ESA dictates and the Preliminary Injunction Order, and

"propose implementation plans containing the best means for effectuating the ends the

Court has determined equity demands." *Id*. The County should be ordered to adopt plans

in accordance with the Expert Panel's guidance, which will serve as an important neutral

source of information to guide the Court's exercise of its equitable authority.

## V. Conclusion

For the foregoing reasons, the Court should order the County to submit revised

versions of the Challenged Plans, which correct the shortcomings that the NGOs have

identified herein. Specifically, the Court should direct the County by August 29, 2025 to

adopt a revised version of its Proposed Steelhead Passage Barriers Plan and submit all

necessary regulatory applications to remove the barriers identified in Attachment 1 to the

Preliminary Injunction Order as a standalone request for regulatory authorization. Of all

the Preliminary Injunction remedial measures, removal of the barriers in Attachment 1 is

the most straightforward, clearly defined measure. Applying for regulatory approvals as a

standalone measure could be easily accomplished and is analogous to the County's

standalone (and successful) request for regulatory approval to modify the AGCG. Sproul

Dec., ¶¶ 16 & 17, Exs. 10 & 11; Dkt. 18-14 ¶ 13 (Declaration of Kate Ballantyne noting

the AGCG fish passage improvement project). Requiring this step by August 29, 2025 is

necessary to ensure that the barriers are removed before the return of winter rains which

could complicate removal of the barriers. It is further important have these barriers

removed before the next Steelhead winter migration season. *See*, *e.g.*, Dkt. 22-4 at 5373 (NMFS's 2017 Biological Opinion listing measures to minimize adverse effects on Steelhead, including conducting all construction in AG Creek when the channel is dry).

The County should further be ordered to submit a revised Final Spillway Fish Screen Plan by August 29, 2025 that also proposes to complete design of the spillway fish screen and to submit regulatory approval applications as a standalone measure by no later than September 15, 2025. The spillway fish screen is also a relatively discrete, straightforward measure that can be designed and permitted as a standalone measure, again analogous to the AGCG modification project.

The County should further be ordered to develop actual plans, with concrete, specific proposals for BMP implementation, Steelhead predator/competitor removal, and a habitat restoration project that will include addition of gravel substrate, riparian planting, and large wood material placement by no later than October 31, 2025. Moreover, the critical feature will be the Court ordering the County to apply for all necessary regulatory approvals to implement these measures as *standalone projects* by a date certain, which the NGOs request be set as December 1, 2025. The BMP plan, predator removal plan, and habitat restoration plan are more complicated and at present are substantially less developed as compared to the barrier removal and spillway fish screen plans, but if the County is sincere in developing an HCP that includes these remedial measures (as it ultimately must to have any chance of securing an ITP from the Services), it should develop these measures by October 1, 2025. The County's request for regulatory approval of these measures as standalone projects is essential for ensuring that the remedial plans are actually approved and thus implemented in the relatively near future rather than indefinitely delayed in what so far has been the slow-walked County HCP pursuit. This will avoid them becoming mere chimera that are not actually implemented, like the remedial measures proposed in the County's now 21-year-old 2004 HCP. *See* Sproul Decl. ¶ 12, Ex. 7 at 4-5, 4-9, 4-12.

1
2
3

For the reasons discussed above, the Court should also order the County to create and fund an Expert Panel to guide the development of replacement versions of the Challenged Plans.

4
5
6
7
8
9
10
11

Finally, for the considerable expense and effort incurred by the NGOs in bringing this Motion, the Court should award the NGOs their attorneys' fees and costs in an amount to be determined by a separately filed subsequent motion. *See*, *e.g.*, *Panda*, 2025 U.S. Dist. LEXIS 107225, at 23-24; *Schein*, 2008 U.S. Dist. LEXIS 81826, at *24; *see also Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 558-61 (1986) (environmental citizen suit plaintiffs are entitled to fee recovery for work securing benefit of court ordered relief); *St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1061 (9th Cir. 2009).

12
13

Date:  June 25, 2025        Respectfully submitted,

14

*/s/ Christopher Sproul*

15

Christopher Sproul, Attorney for the Plaintiffs

16
17
18
19
20
21
22
23
24
25
26
27
28