NOSSAMAN LLP
PAUL S. WEILAND (SBN 237058)
pweiland@nossaman.com
BENJAMIN Z. RUBIN (SBN 249630)
brubin@nossaman.com
ELIZABETH KLEBANER (SBN 261735)
lklebaner@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:   949.833.7800
Facsimile:   949.833.7878

KATHERINE L. FELTON (WA SBN 30382)
*Admitted Pro Hac Vice*
kfelton@nossaman.com
BRIAN FERRASCI-O'MALLEY (WA SBN 46721)
*Admitted Pro Hac Vice*
bferrasciomalley@nossaman.com
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone:   206.395.7630
Facsimile:   206.257.0780

Attorneys for Defendant
COUNTY OF SAN LUIS OBISPO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SAN LUIS OBISPO COASTKEEPER, LOS PADRES FORESTWATCH, CALIFORNIA COASTKEEPER ALLIANCE, and THE ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN LUIS OBISPO,<br><br>Defendant. | Case No:  2:24-cv-06854-SPG (ASx)<br><br>**DECLARATION OF DAVID SPIEGEL IN SUPPORT OF COUNTY OF SAN LUIS OBISPO'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:         May 20, 2026<br>Time:         1:30 p.m.<br>Dept:         5C<br><br>Date Action Filed: Aug. 13, 2024<br>First Am. Comp. Filed: Dec. 27, 2024 |

Case No. 2:24-cv-06854-SPG (ASx)

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION

70196485

I, David Spiegel, declare as follows:

1.       I am currently a Supervising Engineer in the Utilities Division of the County of San Luis Obispo Department of Public Works. While the San Luis Obispo County Flood Control and Water Conservation District is a distinct and separate entity from the County, it is supported by County staff, including the county Department of Public Works. Accordingly, unless otherwise indicated, when I refer below to the County, I am referring to either the County of San Luis Obispo or the San Luis Obispo County Flood Control and Water Conservation District. I was hired in June of 2016 and promoted to Supervising Engineer in December of 2020. In my current position I manage a small team of engineers that work on water distribution and treatment projects for various facilities within the County. These projects include but are not limited to dams, water treatment equipment and unit processes, distribution systems, upgrades and various maintenance projects. As part of my job responsibilities, I need to be familiar with Lopez Dam operations and permitting, both in a historical and current context. As a project Engineer that has successfully completed a number of multifaceted projects, I was selected to carry on the role of Project Manager for the Lopez Water Project Habitat Conservation Plan (HCP). This includes meeting regulatory deadlines, managing budgets, overseeing consultant contracts, and reviewing consultant deliverables. Unless otherwise stated on information and belief, I have personal knowledge of the facts set forth herein, and, if called and sworn as a witness, could and would competently testify as set forth below. The documents attached as Exhibits A through C to this declaration and discussed further below are true and correct copies of documents that the County has in its records and which have been kept in the ordinary course.

2.       I graduated from Cal Poly San Luis Obispo in 2005 with a degree in Civil Engineering and an emphasis in structural engineering and received my Professional Engineer License in Civil Engineering in 2010.

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

3.      Prior to becoming a Supervising Engineer, I was employed as an Engineer III with the County performing the same duties as my current staff, as mentioned above. As an Engineer III I prepared water usage reports and developed downstream release schedules in accordance with the Interim Downstream Release Schedule and the Low Reservoir Response Plan. These reports were prepared for the municipalities that receive water from the Lopez Project and were presented at the Zone 3 Technical Advisory Committee and Advisory Committee meetings. To develop these reports I needed to understand the water rights and obligations. To do that I reviewed the applicable historical water right applications and permit – Applications 18375 and 30826, and Permit 12814.

4.      The County obtained water rights for Lopez Lake in 1961 pursuant to Application 18375. The resulting permit, Permit 12814, limits the amount of water that can be beneficially used to fifty-thousand (50,000) acre-feet per annum. In 1992, Permit 12814 was amended to specify that the use authorized was for "Domestic, Irrigation, Municipal, Industrial, Recreational and Incidental Power."

5.      Construction of Lopez Dam began in 1967 and was completed in 1968. It is located approximately 13 miles upstream from the mouth of Arroyo Grande Creek. Historical records indicate that from at least the late 1950s, Arroyo Grande Creek has been altered by various entities and third parties for flood control, water supply, and groundwater recharge purposes. Lopez Dam is an earthfill structure. Its crest width is 150 feet at an elevation of 536 feet, and height is 166 feet from crest of the dam to the downstream toe. The storage capacity of Lopez Reservoir is 49,476 acre feet.

6.      The historical records demonstrate that after completion of Lopez Dam (1969–1996), streamflow to Arroyo Grande Creek was generally maintained above 1 cubic foot per second at the outlet control building. At that time the outlet control building was located at the base of the dam and contained

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

two 8-inch hollow cone valves to provide downstream releases. A seismic retrofit was completed in the early 2000s, which included upgrades to the outlet control building. A copy of the biological opinions issued by the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) for the seismic retrofit project are attached the Declaration of Kate Ballantyne.

7.    Since 2007, except for the time period that the Court's now vacated preliminary injunction order was in effect, Lopez Dam has been operated pursuant to the Interim Downstream Release Schedule (IDRS). When the vacated preliminary injunction order was in effect, Lopez Reservoir was forced to release over half a billion additional gallons of water. This water cannot be recovered. The steady, high base flows required under the vacated preliminary injunction order contributed to conditions that resulted in property damage near the bottom of the Creek and threatened public health and safety. Plaintiffs' recently proposed flow regime, which calls for higher base flows and increased pulse flows would create even greater risk of property damage and to the public health and safety.

8.    The IDRS was adopted to guide downstream releases from Lopez Reservoir while the County develops a HCP, balancing water supply needs, downstream agricultural and environmental demands, and collection of data necessary for long-term management. The IDRS was specifically designed with listed species in mind. For example, the IDRS incorporates monitoring and adaptive management measures intended to avoid or minimize the risk to sensitive species in Arroyo Grande Creek. The 2007 staff report to the County Board of Supervisors recommending the adoption of the IDRS notes that "the resource agencies involved in the processing of the HCP," NMFS and USFWS, were "consulted informally" regarding the IDRS. The staff report also notes that NMFS, USFWS, and the California Department of Fish and Game (now called the California Department of Fish and Wildlife, and referred to herein as CDFW) would be notified if the County Board of Supervisors adopted the IDRS. The IDRS

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

was subsequently adopted by the County Board of Supervisors. A copy of the IDRS is attached to this declaration as Exhibit A.

9.    Mr. Schmitt states in his declaration that steelhead were not a priority in the adoption of the IDRS. ECF No. 182 ¶ 114. This is simply incorrect. It is clearly stated within the five objectives of the IDRS that it will "Result[] in no discernable impacts to steelhead" and it will "Generate[] data and information that can be used to supplement the HCP and/or assist in implementing the HCP once it's approved." Ex. A at 4.

10.    The IDRS establishes anticipated releases from Lopez Reservoir into Arroyo Grande Creek during the dry season and wet season. Based on historical rainfall data the wet season was determined to be January through March. Under the IDRS, the County maintained a release of approximately 3 cubic feet per second (cfs) during the wet season, and 6 cfs (approximately 4 million gallons per day) during the dry season subject to adjustment based on monitoring results. In my prior declaration, I was not clear on this point and improperly referred to the 3 and 6 cfs releases as minimums. This was a mistake, as the IDRS clearly explains that the County is authorized to release water below these thresholds when it would not have negative effects and, specifically, when those lower releases would not result in "take" of listed species.

11.    Consistent with the IDRS, the County has deviated downward from the 3 and 6 cfs releases based on monitoring results and where the County was implementing its Low Reservoir Response Plan or where precipitation events contributed to Arroyo Grande Creek flows. In addition, the actual release into Arroyo Grande Creek during a specific time period may increase beyond the 3 and 6 cfs amounts when it is determined based on visual monitoring of the Creek that flows are not reaching monitoring points identified within the IDRS. As outlined in the IDRS, an adaptive management approach was adopted. This includes County staff observing the creek after flow changes to identify and verify effects, who then

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

communicate those effects to County engineering and environmental staff to make a judgement as to whether flows should be increased or decreased. When making these judgments, staff also consider geological conditions that exist below the dam and along Arroyo Grande Creek which can affect downstream releases due to accretions/depletions to the creek depending on ground water elevation.

12.	Water diverted from Lopez Reservoir serves several uses, including municipal, industrial, agricultural irrigation, groundwater recharge, and environmental purposes. The environmental purposes include preservation of wildlife in the Arroyo Grande Creek watershed.

13.	Safe yield of diversions from Lopez Reservoir is 8,730 acre-feet per year. Safe yield is defined as the maximum annual amount of water that can be delivered on a sustainable basis in any water year type. The safe yield is comprised of two components: (1) 4,530 acre-feet per year of municipal and industrial deliveries from Lopez Reservoir, and (2) 4,200 acre-feet per year released to Arroyo Grande Creek for agricultural irrigation, groundwater recharge, and instream environmental flow. Over the last 10 years, and not accounting for the year that the vacated preliminary injunction order controlled, the municipal and industrial deliveries have averaged 3,940 acre-feet per year and the downstream release into Arroyo Grande Creek has averaged 3200 acre-feet per year. There are several factors that influence municipal and industrial deliveries, including: (i) the water entitlement; (ii) available stored water; (iii) available surplus water; (iv) ground water availability; (v) State Water Subcontractor; and (vi) weather/drought conditions.

14.	Safe yield represents the maximum amount of water that can be withdrawn from Lopez Reservoir on a sustainable long-term basis while maintaining reliable supply during drought conditions and meeting downstream release obligations. Engineers determine safe yield by modeling reservoir operations using historical and synthetic hydrologic data, including inflows,

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

evaporation, storage capacity, downstream releases, and water demands. Exceeding the safe yield would cause reservoir storage to decline over time, increasing the risk of critically low reservoir levels during drought periods and resulting in potential water shortages, reduced environmental flows, and decreased operational flexibility for managing both drought and flood conditions.

15. The water diversions for municipal and industrial deliveries provide water supply for communities within the District, Zone 3, which include the communities of Oceano Community Services District, the Cities of Grover Beach, Pismo Beach, Arroyo Grande, and County Service Area 12 (the Avila Valley area). Municipal and industrial deliveries from Lopez Reservoir provide drinking water for approximately 48,000 residents. In some instances, the Lopez Reservoir water diversions provide 100% of the drinking water to residents within a given service area. Many of these agencies do not have a readily available alternative supply of potable water if there are reductions in municipal and industrial deliveries from Lopez Reservoir. As such, reductions in deliveries from Lopez Reservoir could force some agencies to declare a water emergency. The jurisdictions served by Lopez Reservoir have already undertaken extensive and sustained water conservation measures in compliance with, and in many cases exceeding, statewide mandates. In response to California's drought-related executive orders and the permanent conservation framework established under AB 1668 and SB 606, agencies within Zone 3 have implemented comprehensive conservation programs, including restrictions on outdoor irrigation, system loss reduction, and long-term demand management. These efforts have resulted in substantial and sustained reductions in water use. As documented in the *Northern Cities Management Area 2024 Annual Monitoring Report* (attached as Exhibit B to this declaration), urban water use is at or near historic lows, representing the second-lowest level in at least 20 years, and prior state-mandated conservation targets have already been achieved and maintained. Despite these conservation

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

efforts, the importance of the Lopez Project has grown even further in recent years, as the reliability of water supplied from California's State Water Project has declined.

16.    The municipal and industrial water demands are met by taking water directly from Lopez Reservoir through a steel transmission main to the Lopez Terminal Reservoir located approximately 3 miles from Lopez Dam. The water is treated at the Lopez Water Treatment Plant, then conveyed to water contractors via the Lopez Pipeline. The Lopez Pipeline is approximately 17.6 miles long and includes turnouts to each of the contracting agencies. The operation and maintenance of Lopez Dam, water treatment plant, and water conveyance system are financed by revenues from the contracting agencies. The contracting agencies generate revenue primarily through customer water service charges, consisting of fixed fees and volumetric charges based on water use, with limited supplemental income from miscellaneous sources. These revenues are directly tied to the number of customers and the volume of water delivered. This revenue is not an unlimited source of funds. Under California law, including Proposition 218, rates must be set to recover no more than the cost of providing service and must maintain a direct nexus to those costs. Revenues are therefore constrained to meeting specific obligations, including operations and maintenance, purchased water, capital improvements, debt service, and required reserves. Additionally, because a significant portion of revenue is based on water consumption, reduced water use, whether from conservation or supply limitations, directly reduces revenue, further limiting available funds.

17.    Water is also released from Lopez Reservoir directly into Arroyo Grande Creek for downstream agricultural irrigation, groundwater recharge, and instream environmental flows. For these controlled releases, water leaves the reservoir via the intake structure and is released through the outlet works located at the left abutment of the dam. The intake structure is comprised of 7 gates

- 7 -    Case No. 2:24-cv-06854-SPG (ASx)
DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

spaced every 15 feet, at elevations between 415 and 505 feet. Water is then released to Arroyo Grande Creek through two 10-inch jet valves. The 10-inch jet valves are equipped with venturi flow metering devices that enable County staff to regulate releases with a precision of approximately 10,000 gallons. The meters measure flow in million gallons per day (MGD) and display readings to the hundredth decimal place.

18.    There is a 42-inch outlet valve/structure adjacent to the jet valves for emergency releases only. The 42-inch valve does not have a metering device to accurately calculate flow rates. The maximum discharge capacity to Arroyo Grande Creek via the outlet structure is estimated to be 105 cfs, although when the outlet structure is utilized water is generally released at 10 cfs or less. The 42-inch pipeline that connects the inlet structure to the outlet structure is both cement mortar lined pipe and a short section of epoxy coated steel. Flows in excess of 105 cfs could damage the interior coating of the pipe. Damage to this section of pipe would preclude all releases downstream of the dam, as it is the only conveyance pipe through the dam. Depending on the extent of the failure, damage to this pipe could also potentially cause a catastrophic failure of the dam.

19.    Mr. Schmitt states in his declaration that discharges can be up to 120 cfs. In support of this statement, Mr. Schmitt cites the 2001 NMFS Biological Opinion for the Seismic Remediation Project, which references the 2001 NAIC report. However, the 2001 NAIC report was based upon the then existing outlet structure – the outlet structure that existed prior to the Seismic Remediation Project – and not the current outlet structure which was constructed as part of the Seismic Remediation Project. Mr. Schmitt's statement demonstrates a lack of understanding or knowledge about Lopez Dam, and what is and is not operationally feasible.

20.    It should also be noted that releases are cumulative because there is only one pipe through the dam but five outlets: the 42inch emergency

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

valve, two 10-inch downstream release valves, the frog ponds, and the terminal reservoir (municipal supply). The sum of all downstream releases cannot exceed 105 cfs as detailed in the Lopez Dam Seismic Strengthening Project Final Design Report (a copy of which is attached as Exhibit C to this declaration).

21.     The rate and volume of the direct water releases vary depending upon winter rainfall and downstream demands. Downstream of the outlet control building there was a fish screen that was installed by CDFW in coordination with County Parks because CDFW expressed some concern about the potential for fish from Lopez Reservoir reaching the Creek. CDFW electroshocked the pond below the outlet works in 2012 and 2013 before and after the fish screen was installed. Eventually, however, CDFW quit monitoring/electroshocking the pond. In early 2024, the County met with CDFW and NMFS to discuss the screen and whether it was necessary. CDFW and NMFS agreed that no further monitoring was needed and that there was no risk of fish escaping via the high-pressure outlet pipe as they would be ripped apart by the high pressures. With this determination, the County applied for a permit to remove the fish screen with CDFW's lake and streambed alteration group, EPIMS-SLO-61063-R4. The permit was ultimately cancelled because CDFW determined removal of the fish screen is not a "Project" subject to their notification requirements.

22.     At the base of the spillway there is a flipbucket which dissipates energy of spillway flows. The flipbucket also traps fish during low flow spills, keeping them from entering Arroyo Grande Creek. In late 2023, County staff met CDFW onsite to view the spillway and the fish screen. During a visual inspection CDFW observed several hundred hatchery fish trapped in the flipbucket. CDFW staff recommended that the County do nothing as they anticipated the fish would die due to exposure. As anticipated by CDFW staff, the fish ultimately died due to heat and the flipbucket drying out.

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

23.     In addition to controlled releases of water from Lopez Reservoir, during significant or prolonged rain events there may be overtopping of the dam or uncontrolled spills down the spillway. In the 60 years since the reservoir was built it has spilled approximately 19 times, with the last spill events occurring in 2023 and 2024. Flows have ranged from 10 cfs to 1,500 cfs with some of the largest flows in the mid-1980's. Most of the recent spills have been around 600 cfs. Because weather conditions cannot be predicted with certainty, spill events cannot be precisely forecasted. What is known, however, is that operating within the reservoir's safe yield allows for sustainable water supply during drought conditions while also preserving the capacity to attenuate flows during periods of intense rainfall. While future spills and droughts can be reasonably anticipated, both must be managed within operational limits. Operating outside of these limits is contrary to sound engineering judgment and creates unreasonable risk.

24.     The history of Arroyo Grande Creek has included a number of devastating flood events, including events documented in the 1800s, early 1900s, 1936, 1943, 1952, and 2001. The County can sustain large amounts of rainfall if the precipitation is spread out, as seen in the 2023/2024 storm season. But when rainstorms are longer in duration, as seen in 2022/2023, significant damage can occur.

25.     Before Lopez Dam was built, there was no buffer in the runoff coming out of the watershed. Although Lopez Dam was not designed to be a flood control dam, it does provide some level of flood protection. It is assumed that significant flood events that occurred elsewhere in the central and south coast in 1969, 1983, 1997, and 2023 were avoided due to Lopez Dam and flood storage in Lopez Reservoir. In 2022/23, during the prolonged storm events, the reservoir went from approximately 10% full to over 100%.

26.     In 1961, the Arroyo Grande Creek Flood Control Project was completed by I.L. Croft and Son, Inc. The main feature of this project was a levee

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

system and trapezoidal channel that confined Arroyo Grande Creek from its confluence with Los Berros Creek downstream to the Pacific Ocean.

27.    In 2001 the levee on the south side was breached during a high intensity rain event. Hundreds of acres of farmland and several residences were flooded. Had the north side also failed, there would have been flooding of several residential developments, the Oceano Airport, and the regional wastewater treatment plant that services the communities of Arroyo Grande, Oceano and Grover Beach.

28.    In 2023, even after two years of improvements to the levees (i.e., raising levee, removing sediment, and installation of turf reinforcement mat) the levee breached on the South side near 22nd street, flooding the valley causing damage to one home, a horse ranch facility, agricultural lands, and stranded campers at the nearby campground. The North side managed to withstand the storm but narrowly. Significant erosion of the North levee was seen adjacent to a housing development and piping blowouts were encountered further West which, if it had failed, would have inundated farm fields, residential developments, and potentially the Oceano Airport and the regional wastewater treatment plant.

29.    Prolonged and excessive releases from Lopez Reservoir can contribute to harmful conditions. For example, as a result of the vacated preliminary injunction, higher than normal releases occurred for an extended period of time. These releases contributed to the levels at the Arroyo Grande Creek Lagoon and Meadow Creek lagoon, located at the southern end of the Creek, to remain artificially high. There are flap gates between the two lagoons, and if Arroyo Grade Creek remains higher than normal, the flap gate will not open to release water to the ocean from the Meadow Creek Lagoon, which can contribute to flooding in the neighborhood adjacent to Meadow Creek Lagoon. Artificially increasing the level of Arroyo Grande Creek Lagoon can also contribute to an unseasonal berm breach if there is an early or late season weather event.

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

30.    The State has done extensive modeling (https://climateresilience.ca.gov/overview/impacts.html) on what the projected climate will look like over the next several decades. Wetter wets and dryer dry's will be the new normal. The County used that data to project how Lopez Reservoir will react through 2050. The reservoir, if operated within the safe yield, should withstand those dryer times and provide flood benefit in the wetter times. If the reservoir is operated outside these limits, extended water shortages will be recognized as was the case from 2005 to 2023. For example, as part of the seismic retrofit in the early 2000s, the reservoir had to be lowered and more water than the safe yield was released. It took almost 20 years for the reservoir to recover. As depicted in the following graphic it is evident that the releases for the seismic retrofit had a profound impact on the water supply.



DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION

70196485

31.    The County employs four certified engineers that work on various projects for the Zone 3 agencies including operations of the Lopez Dam. The County also consults with Hydraulic Engineers to model and assess any change in operations to fully understand the impacts of those changes prior to implementation. Such modeling is standard practice when it comes to management of water projects, as it allows operators to predict the anticipated ecological and hydrological consequences of the changes being considered. For example, it allows operators to predict reservoir storage and water elevation at different locations downstream of the dam under varying hydrological conditions. The HCP includes extensive hydrological and ecological modeling. *See, e.g.*, ECF No. 141-1 at 108-124 (discussing flow modeling and agent-based modeling), ECF No. 141-3 (Lopez Dam Operations Hydrological Modeling Documentation).

32.    In addition to County consultants, the County also consults with the agencies of Zone 3 which consists of public works directors, water operators, and engineers to further assess and collaborate on viable operations and/or their potential impacts. To not fully evaluate the impacts from potential changes to Lopez Dam operations would violate the National Society of Professional Engineers (NSPE) Code of Ethics. A downloaded copy of the NSPE Code of Ethics are attached to this declaration as Exhibit D. The fact that the Plaintiffs have not done any modeling to support their proposed release schedule is irresponsible and clearly shows their lack of understanding or appreciation for the scientific rigor necessary for evaluating changes to Lopez Dam operations.

33.    The HCP is designed to support the issuance of an Incidental Take Permit (ITP) for endangered species that may be affected by dam operations. An ITP does not eliminate or prohibit take; rather, it authorizes otherwise lawful activities that may result in incidental take. The HCP outlines the measures the District will implement to minimize and mitigate impacts to covered species, improving their overall condition while allowing essential dam operations to

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

continue in compliance with the permit. Mr. Schmitt states in his declaration that he is not aware of any evidence that *O. mykiss* were stocked in Arroyo Grande Creek, Arroyo Grande Lagoon, or an Arroyo Grande Creek tributary. ECF No. 182 ¶ 14. However, the District's HCP cites that very evidence. ECF No. 141-1 at 28. Specifically, the HCP identifies that stocking occurred and cites Titus et al. (2014) in support. Titus et al. (2014) was prepared by the CDFW, and the lead author was a CDFW biologist. A copy of Titus et al. (2014) was filed with the Court by Plaintiffs. *See* ECF No. 180-16. Titus et al. (2014) synthesizes historical information, including stocking practices in the Arroyo Grande Creek watershed. As explained in Titus et al. (2014), Lopez Dam was constructed at the confluence of Lopez Canyon Creek and Arroyo Grande Creek. ECF No. 180-16 at 183. Before the construction of Lopez Dam, to reach the ocean fish stocked in Lopez Canyon Creek had to first enter Arroyo Grande Creek and then Arroyo Grande Lagoon. Titus et al. (2014) confirms that "[e]arly fish stocking records showed that the Lopez Canyon steelhead population was supplemented with a plant of 10,000 juveniles in 1930, 25,000 in 1932, 24,000 in 1933, and 15,000 . . . from Brookdale Hatchery Santa Cruz County) in 1938. The lower section of the creek was stocked annually with catchable rainbow trout as of the August 1961 CDFG survey." ECF No. 180-16 at 183.

34. The HCP was submitted to the wildlife agencies on October 1, 2025. ECF No. 141 & 141-1. Since then, the County has been meeting with the wildlife agencies to get their feedback. USFWS has reviewed the HCP and indicated it is prepared to move forward with the HCP, including with publication of the draft HCP. NMFS is in the process of reviewing the HCP and has posed questions regarding the HCP. The parties are engaged in technical discussions intended to address those questions. USFWS, NMFS, and the County have also begun to discuss the process to complete environmental review of the HCP necessary to comply with the National Environmental Policy Act, and the process

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

for selecting a consultant to support this aspect of the permitting process is underway. Neither NMFS nor USFWS has requested a new or revised HCP application. It is my understanding based on Plaintiffs' filings that they are seeking to compel the County to file a new HCP application, even though the federal wildlife agencies have not requested this, and that Plaintiffs also seek to have another group of individuals participate and potentially control the County's participation in the HCP process. These proposals by Plaintiffs would delay and unnecessarily complicate the HCP process. They would also unnecessarily increase the cost of completing the HCP process.

35.    Plaintiffs' revised pulse flow proposal differs significantly from its prior proposal, which Plaintiffs' previously described as optimal for steelhead. Plaintiffs have not identified any modeling by an engineer or hydrologist to support the change in their position, or the potential impacts of the change. This lack of consistency and lack of support highlights Plaintiffs' general lack of understanding. This lack of understanding is further reflected in Mr. Schmitt's discussion of dam operations and flow data.

36.    Mr. Schmitt states that "real-time flow data" is measured at the Lopez Creek gage (ECF No. 182 ¶ 129), but this is incorrect. The gage measures stage (water surface elevation) in real time, and flow is calculated from that data using a rating curve. The County's proposed use of the AG-AG gage follows this same standard methodology. That is, the County already collects real-time stage data for AG-AG gage. Mr. Schmitt's statement demonstrates a lack of understanding as to how real-time flow data is calculated, and how gages in the Arroyo Grande Creek watershed operate.

37.    Mr. Schmitt's pulse flow proposal (ECF No. 182 ¶ 131) also fails to account for operational realities. His approach would require operators to frequently adjust releases in response to small and rapidly changing flow conditions (e.g., increasing releases from approximately 8 cfs to 35 cfs when a 100

- 15 -                    Case No. 2:24-cv-06854-SPG (ASx)

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION

70196485

cfs trigger is met, and then to approximately 70 cfs as flows drop slightly below that threshold). The proposal does not explain how often such adjustments must occur or how operators are expected to continuously respond to fluctuating storm flows.

38.    Real world operational realities also do not permit for these types of adjustments. That is, adjustments are not instantaneous or so precise. The emergency release valve required to achieve higher flows does not have a flow meter, and operators must rely on downstream measurements to verify discharge. Because flow varies with lake elevation and head pressure, achieving target releases requires an iterative process of manual adjustments and verification, typically involving two operators. This process would need to be repeated frequently as flows recede, which is not operationally feasible. This again demonstrates Mr. Schmitt's lack of understanding or knowledge about dam operations in general, and Lopez Dam in particular.

39.    The various issues I've highlighted above demonstrate that Plaintiffs' proposal is based on a lack of understanding of both hydrologic measurements and the physical and operational constraints of Lopez Dam. This is likely due, at least in part, to Mr. Schmitt's attempt to opine on issues that he is neither familiar with or qualified to opine on. Put more plainly, Plaintiffs' proposed flow regime is simply not practicable to implement.

40.    The County under the vacated preliminary injunction completed a preliminary engineering review of screening the spillway. Screening a spillway is very problematic. The hole sizes of a screen has to be ~0.25 inches by 0.25 inches or smaller to prevent fish larvae from getting past the screen. This will foul or clog quickly with debris and algae thus putting significant force on the net in high flow events. Cleaning a ~340 foot net either under water or during dry conditions, while its bundled up on the dirt, would be difficult to say the least. Plaintiffs also do not describe the conditions to be met for the screen. Based on the preliminary analysis

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION
70196485

that was completed, a screen would only need to be about 10 feet tall to meet all previous spill event scenarios. However, to meet the maximum spillway flow it would need to be ~18 feet tall. Plaintiffs do not explain why an 18-foot tall screen would be needed as an interim measure tied to any specific time period.

41.    Based on my experience, immediate implementation of any site-specific sediment control measures is not presently feasible. Effective BMPs must be designed and applied based on identified sediment sources, site conditions, and hydrologic connectivity, which require field verification and analysis that have not yet been completed. Moreover, many of the areas contributing sediment into Arroyo Grande Creek, Tar Springs Creek, and Los Berros Creek are located on privately owned property, where the County lacks authority to implement additional measures absent landowner consent or access agreements. In addition, certain BMPs may require environmental review and regulatory permitting before installation. Accordingly, a phased approach—beginning with inventory, assessment, and coordination—is necessary to ensure that any implemented measures are legally compliant, technically appropriate, and effective, rather than arbitrary or potentially counterproductive. This will all take time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of April, 2026.

David Spiegel

- 17 -                                    Case No. 2:24-cv-06854-SPG (ASx)

DECLARATION OF DAVID SPIEGEL IN SUPPORT OF THE COUNTY'S OPPOSITION

70196485