NOSSAMAN LLP
PAUL S. WEILAND (SBN 237058)
pweiland@nossaman.com
BENJAMIN Z. RUBIN (SBN 249630)
brubin@nossaman.com
ELIZABETH KLEBANER (SBN 261735)
lklebaner@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:   949.833.7878

KATHERINE L. FELTON (WA SBN 30382)
*Admitted Pro Hac Vice*
kfelton@nossaman.com
BRIAN FERRASCI-O'MALLEY (WA SBN 46721)
*Admitted Pro Hac Vice*
bferrasciomalley@nossaman.com
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone:  206.395.7630
Facsimile:   206.257.0780

Attorneys for Defendant
COUNTY OF SAN LUIS OBISPO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SAN LUIS OBISPO COASTKEEPER, LOS PADRES FORESTWATCH, CALIFORNIA COASTKEEPER ALLIANCE, and THE ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN LUIS OBISPO,<br><br>Defendant. | Case No:  2:24-cv-06854 SPG (ASx)<br><br>**DEFENDANT COUNTY OF SAN LUIS OBISPO'S REVISED OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:         May 20, 2026<br>Time:        1:30 p.m.<br>Dept:        5C<br><br>Date Action Filed: August 13, 2024<br>First Am. Compl. Filed:  Dec. 27, 2024 |

# TABLE OF CONTENTS

**Page:**

I.    Introduction ...................................................................................................6

II.   Factual Background........................................................................................8

    A.    AG Creek and the AG Creek Watershed. ...............................................8

    B.    Lopez Dam Construction and Its Effect on AG Creek Hydrology.........10

    C.    Operations of Lopez Dam and Reservoir...............................................10

    D.    Central Coast Population of Steelhead. ..................................................11

    E.    County Compliance with the ESA in AG Creek. ...................................13

III.  Legal Background .......................................................................................16

IV.   Standard of Review .....................................................................................18

V.    Argument.....................................................................................................19

    A.    Plaintiffs Failed To Demonstrate Standing............................................19

    B.    Plaintiffs Failed To Make The Requisite Showing For A Mandatory Preliminary Injunction. .......................................................................20

        1.    Plaintiffs Have Not Demonstrated Likelihood of Success. ...............21

            a)    The Court must make new findings.............................................21

            b)    Plaintiffs' ESA claim is barred by prior consultations................23

            c)    Plaintiffs fail to establish that take is occurring. .........................26

        2.    Plaintiffs Have Not Established Irreparable Harm. .........................31

        3.    Balance of Harms and Public Interest Require Denial of PI. ............34

    C.    Plaintiffs' Request For Relief Is Not Narrowly Tailored. ......................40

# TABLE OF AUTHORITIES

**Pages:**

*ALCOA v. Adm'r, Bonneville Power Admin.*,
    175 F.3d 1156 (9th Cir. 1999)..........................................................................25

*Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon*,
    515 U.S. 687 (1995) .............................................................................17, 26, 27

*Burlington N. R.R v. Dept. of Revenue of State of Wash.*,
934 F.2d 1064 (9th Cir. 1991)................................................................................40

*California Nat. Res. Agency v. Ross*,
2020 WL 2404853 (E.D. Cal. May 11, 2020)........................................................31

*Camreta v. Greene*,
563 U.S. 692 (2011) ..............................................................................................19

*Caribbean Marine Services Co., Inc. v. Baldridge*,
844 F.2d 668 (9th Cir. 1988)................................................................................32

*Cascadia Wildlands v. Scott Timber Co.*,
328 F. Supp. 3d 1119 (D. Or. 2018).................................................................21, 28

*Center for Biological Diversity v. Haaland*,
58 F.4th 412 (9th Cir. 2023).............................................................................16, 34

*Center for Biological Diversity v. U.S. Bureau of Reclamation*,
2016 WL 9226390 (D. Or., Apr. 6, 2016).............................................................29

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ..............................................................................................17

*Conservation Cong. v. Finley*,
774 F.3d 611 (9th Cir. 2014)................................................................................34

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015)..............................................................................31

*Dahl v. HEM Pharms. Corp.*,
7 F.3d 1399 (9th Cir. 1993).............................................................................18, 40

*Deakins v. Monaghan*,
484 U.S. 193 (1988) ..............................................................................................19

*Defenders of Wildlife v. Bernal*,
204 F.3d 920 (9th Cir. 2000).........................................................................7, 18, 21

*Defenders of Wildlife v. Salazar*,
812 F.Supp.2d 1205 (D. Mont. 2009) ..................................................................32

*Defenders of Wildlife v. Zinke*,
856 F.3d 1248 (9th Cir. 2017)..............................................................................25

Case No. 2:24-cv-06854 SPG (ASx)

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022)..................................................................................... 7

*Dreith v. Nu Image, Inc.*,
   648 F.3d 779 (9th Cir. 2011)...................................................................................21

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991)........................................................................... 19, 21

*East Bay Sanctuary Covenant v. Barr*,
   934 F.3d 1026 (9th Cir. 2019).................................................................................40

*Electronic Priv. Info. Ctr. v. U.S. Dep't of Com.*,
   928 F.3d 95 (D.C. Cir. 2019) ..................................................................................20

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
   98 F.4th 1180 (9th Cir. 2024)................................................................................... 8

*Friends of Blackwater v. Salazar*,
   691 F.3d 428 (D.C. Cir. 2012) ................................................................................16

*Fund for Animals, Inc. v. Rice*,
   85 F.3d 535 (11th Cir. 1996)...................................................................................34

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015).......................................................................... 7, 20, 21

*Guilfoyle v. Beutner*,
   2021 U.S. Dist. LEXIS 195396 (C.D. Cal. Sept. 14, 2021)............................... 19

*Herb Reed Enters., v. Fla. Ent. Mgmt. Inc.*,
   736 F.3d 1239 (9th Cir. 2013).................................................................................19

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric
   Admin. Nat'l Marine Fisheries Serv.*,
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................................................................32

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .................................................................................................35

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .................................................................................................17

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................20

*Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996) .................................................................................... 35

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................................. 20

*National Wildlife Fed'n v. Burlington N. R.R.*,
  23 F.3d 1508 (9th Cir. 1994) ......................................................................... 31, 32, 33

*National Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  2026 WL 599621 (D. Or. Mar. 02, 2026) .............................................................. 44

*National Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018) ......................................................................... 31, 32, 34

*Natural Res. Def. Council, Inc. v. Winter*,
  508 F.3d 885 (9th Cir. 2007) ............................................................................ 35, 40

*Pacific Coast Fed'n of Fishermen's Ass'n v. Ross*,
  2020 U.S. Dist. LEXIS 87214 (E.D. Cal. May 18, 2020) ............................... 42, 43

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
  606 F. Supp. 2d 1195 (E.D. Cal. 2008) ................................................................. 32

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ............................................................................... 29

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) ............................................................................... 44

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
  161 F.4th 590 (9th Cir. 2025) ........................................................................ *passim*

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) ................................................................................. 8

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ............................................................................................... 35

*Townley v. Miller*,
  722 F.3d 1128 (9th Cir. 2013) ............................................................................... 20

*United States v. Cuddy*,
  147 F.3d 1111 (9th Cir. 1998) ............................................................................... 22

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950) ................................................................................................ 19

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) .............................................................................. 20

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
  900 F.3d 250 (6th Cir. 2018) ................................................................................ 20

*White v. U.S. Army Corps of Eng'rs*,
  659 F. Supp. 3d 1045 (N.D. Cal. 2023) ............................................................... 25

*White v. United States Army Corps of Eng'rs*,
  2023 WL 7003263 (N.D. Cal. Oct. 23, 2023) ........................................... 29, 32, 33

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................. 20

*Yazzie v. Hobbs*,
  977 F.3d 964 (9th Cir. 2020) ................................................................................ 20

**Federal Statutes, Regulations, and Rules**

50 C.F.R.
  § 17.3 .............................................................................................................. 17, 26
  § 402.02 ................................................................................................................ 23

62 Fed. Reg. 43,937 ........................................................................................ 8, 11, 12

70 Fed. Reg. 52,488 ................................................................................................. 12

71 Fed. Reg. 833 ...................................................................................................... 12

90 Fed. Reg. 16,102 ......................................................................................... 17, 22, 26

16 U.S.C.
  § 1531 ................................................................................................................... 16
  § 1532 ................................................................................................................... 26
  § 1533 .............................................................................................................. 16, 17
  § 1536 ................................................................................................................... 25
  § 1538 ................................................................................................................... 16

Fed. R. Evid. 702 .................................................................................................... 35

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

# I.    INTRODUCTION

The County of San Luis Obispo ("County")[1] has a long history of working with the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("USFWS") to protect species listed under the Endangered Species Act ("ESA"). While the Lopez Project was constructed years before enactment of the ESA in 1973 and operated for decades before the listing of the South-Central California Coast Steelhead ("Steelhead") in 1997, the County immediately took steps to comply with the "take" prohibition for Steelhead after NMFS listed the species. NMFS issued a biological opinion ("BiOp") covering construction of the culvert at Biddle Park in 1998. In the decades since, the County obtained authorizations from NMFS and USFWS for a range of projects in the watershed, including Lopez Dam itself.

In 2001, before making improvements to Lopez Dam and related infrastructure, the County collaborated with the U.S. Army Corps of Engineers ("Corps") and obtained BiOps and incidental take statements from USFWS and NMFS. Around the same time, the County also began working with USFWS and NMFS on a Habitat Conservation Plan ("HCP") under section 10 of the ESA that would provide further protections for ESA-listed species. The County has expended millions of dollars on studies and model development intended to support the HCP process. These efforts resulted in the submittal of a draft HCP to USFWS and NMFS in October 2025. USFWS has indicated it is prepared to move forward with the HCP, and NMFS and the County are engaged in technical discussions regarding the draft HCP. USFWS, NMFS, and the County are also actively discussing National Environmental Policy Act compliance.

Despite this history, Plaintiffs, for a second time, seek the extraordinary and

---

[1] References to the County in this brief include the County and/or the San Luis Obispo County Flood Control and Water Conservation District.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

disfavored remedy of a sweeping mandatory injunction. But they fall woefully short of meeting their burden of establishing that the law and facts clearly favor their position, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015), and that extreme or very serious damage will result from denial of the injunction, *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). Unlike when Plaintiffs filed their first motion, just days after initiating this action, Plaintiffs have now completed their fact discovery, there have been significant new factual and legal developments, and Plaintiffs have had considerable time to prepare their arguments. For these and other reasons explained below, this Court should apply the Rules of Evidence when ruling on Plaintiffs' current motion.

Plaintiffs have not established by clear and convincing evidence that "take" of Steelhead by the County is "imminent" and "reasonably certain" as the Ninth Circuit requires. *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). Further, the historical records demonstrate that the adult Steelhead population in Arroyo Grande Creek ("AG Creek") has been relatively stable for the past 60-plus years, staying within the range that existed for more than a decade before construction of Lopez Dam. Additionally, Plaintiffs have not demonstrated that maintaining the status quo will result in irreparable harm. The irreparable harm prong requires a showing of harm to Plaintiffs, and hypothetical, indeterminate harm to Steelhead does not suffice to demonstrate such irreparable harm, particularly to the heightened degree necessary to obtain a mandatory injunction.

Furthermore, the balance of the equities and public interest weigh strongly against the relief sought by Plaintiffs. There are ***three*** listed species in the AG Creek watershed. As Dr. Jennings explains, the tidewater goby, which is the only one of the three species classified as endangered, faces the greatest risk of those three species of extinction range-wide and extirpation in the AG Creek watershed. Yet Plaintiffs have fashioned an injunction without the benefit of a qualified tidewater goby or California red-legged frog expert.

7                                    Case No. 2:24-cv-06854 SPG (ASx)

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

Plaintiffs' requested relief should be denied for the additional reason that it is not narrowly tailored. Ninth Circuit precedent teaches us that district courts must assess the extent of irreparable harm then narrowly tailor relief to redress that harm. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195–96 (9th Cir. 2024). Plaintiffs have failed to set out the extent of the irreparable harm likely to be suffered and then fashion relief that is narrowly tailored to redress that harm. For example, Plaintiffs have, once again, provided no modeling or hydrological analyses to support their requested flow regime. Operating a dam and reservoir without first analyzing such operations – including through the use of hydrological modeling – amounts to malpractice, as it can result in unknown risks to listed species and to public health and safety. This was demonstrated by the implementation of Plaintiffs' prior flow regime, which resulted in no appreciable benefit to Steelhead, but did result in flooding and potentially harmed endangered tidewater goby by causing an unseasonal berm breach. ECF No. 142-1 at 9.[2]

For all of these reasons, the Court should deny Plaintiffs' motion.

## II.    FACTUAL BACKGROUND

### A.    AG Creek and the AG Creek Watershed.

The AG Creek watershed is an approximately 150-square-mile coastal watershed located in the west-central portion of the County. ECF No. 20-16 at 5. It is one of numerous watersheds along the central California coast that supports both freshwater and anadromous *O. Mykiss*. ECF No. 20-14 at 108–09. In 1997, NMFS listed as threatened the Steelhead, including anadromous *O. Mykiss* that reside below Lopez Dam in AG Creek. 62 Fed. Reg. 43,937, 43,937 (Aug. 18, 1997).[3]

---

[2] Per The Bluebook, the page numbers identified in an ECF citation herein reference the page number of the original document, not the ECF page number.

[3] Under this listing, only *O. Mykiss* that are anadromous are protected; resident *O. Mykiss* are not protected. Plaintiffs have not explained how they can differentiate

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Endangered tidewater goby ("TWG") and threatened California red-legged frog ("CRLF") are also known to inhabit the AG Creek watershed. More specifically, TWG are known to inhabit the southern portion of AG Creek and AG Lagoon, and CRLF are known to inhabit AG Creek. ECF No. 20-11 at 16–17.

AG Creek is an important regional waterway that has been altered since the late 1950s for flood control, water supply, and groundwater recharge purposes. ECF No. 30-3 at 5; Decl. of David Spiegel in Supp. of Opp'n to Mot. for Prelim. Inj. ("Spiegel Decl.") ¶ 5. The lower reaches of the watershed below Lopez Dam are mostly held in private ownership and have been greatly modified by agricultural and urban developments. Appendix 2; ECF No. 14-6 at 26. From Lopez Dam to AG Lagoon, AG Creek and its tributaries pass through cultivated fields, residential neighborhoods, and business and industrial areas. Decl. of Jared Emery in Supp. of Opp'n to Mot. for Prelim. Inj. ("Emery Decl.") ¶¶ 14, 16. These developed areas impact the water quality and habitat in AG Creek and the tributaries that connect with AG Creek. Decl. of Charles Hanson in Supp. of Opp'n to Mot. for Prelim. Inj. ("Hanson Decl.") ¶ 53. None of these developments are owned or operated by the County.

AG Creek itself is subject to a number of natural and man-made processes that play a material role in AG Creek's hydrology and water quality, including annual rainfall, private pumping activities, private in-stream diversions, private agricultural and industrial runoff, and natural habitat-altering activity by other species in the watershed, such as beavers. *Id.* ¶ 39; Emery Decl. ¶ 12. These non-County operations can have a significant effect on instream flow. Emery Decl. ¶¶ 12–14, 16 (approximately 17%–22% of the approximately 8,730 acre-feet per year released from Lopez Reservoir is pulled and used by private irrigators).

---

anadromous from resident *O. Mykiss* in AG Creek or Lagoon. Plaintiffs have also failed to explain how they have accounted for resident *O. Mykiss* in any of their arguments in support of their preliminary injunction motion.

9                                      Case No. 2:24-cv-06854 SPG (ASx)

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

As it nears the Pacific Ocean, AG Creek flows into AG Lagoon. *Id.* ¶ 16. In most years, the Lagoon is separated from the Pacific Ocean by a sand berm for the majority of the year. ECF No. 141-1 at 64 (Table 3-6). Whether AG Creek will breach the sand berm and connect to the Pacific Ocean can depend on a variety of factors, including weather events, water levels in the Lagoon, the magnitude of and duration of flow in AG Creek above the Lagoon, and how much time has elapsed since the previous breach. Emery Decl. ¶ 26.

**B.      Lopez Dam Construction and Its Effect on AG Creek Hydrology.**

Construction of Lopez Dam and Reservoir was completed in 1968. Spiegel Decl. ¶ 5. Lopez Dam and Reservoir do not have any impact on Tar Springs Creek or Los Berros Creek, which are both large tributaries to AG Creek and significant contributors to the instream flow in AG Creek. Emery Decl. ¶¶ 17, 19–20 (on average Los Berros Creek contributes 13% of the total flow in the Arroyo Grande watershed, and Tar Springs Creek contributes 23%).

Historically, the natural flows in the lower AG Creek watershed varied greatly, with flashy high flows during the rainy season in response to rainfall events, followed by very low flows in the summer and other dry periods. *Id.* ¶ 8; ECF No. 14-3 at 1. Before construction of Lopez Dam, streamflow in reaches of AG Creek would cease, Emery Decl. ¶ 15, with the lower sections going dry in the summer during most years. *See* ECF No. 14-3 at 1. Following completion of the dam, summer flows increased and winter flows decreased. *Id.* While streamflow in stretches of AG Creek can be reduced during winter months by dam operations, it is also augmented by releases from Reservoir storage in the summer, allowing summer flow to be maintained at a higher and more stable rate than if Lopez Dam was not present. Emery Decl. ¶ 15.

**C.      Operations of Lopez Dam and Reservoir.**

Water from Lopez Reservoir serves several uses, including municipal, industrial, agricultural irrigation, groundwater recharge, and environmental

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

purposes. Spiegel Decl. ¶ 12. The municipal and industrial deliveries from Lopez Reservoir provide drinking water for approximately 48,000 residents of San Luis Obispo County. *Id.* ¶ 15. In some instances, Lopez Reservoir provides 100% of the drinking water within a given service area. *Id.* Without the County's supply of water, certain service areas would have insufficient supply to meet the drinking water demands of their customers and, in some cases, would have to declare a water emergency. *Id.*; Emery Decl. ¶ 24; *see also, e.g.*, ECF No. 18-20 ¶ 5.

The actual instream flow in AG Creek can vary significantly depending upon a range of factors, including, among others, precipitation in the watershed, diversions downstream of the dam, groundwater pumping downstream of the dam, and agricultural return flows downstream of the dam. Emery Decl. ¶ 13. In addition to controlled releases of water, during significant or prolonged rain events, uncontrolled spills or overtopping of the dam may occur. Spiegel Decl. ¶ 23. Since the dam was built in 1968, spills have occurred 19 times, most recently in 2023 and 2024. *Id.* While Lopez Dam's primary purpose is not flood control, the dam has reduced the number of devastating flood events in the region. *Id.* ¶ 25.

### D.    Central Coast Population of Steelhead.

*O. Mykiss* is a fish native to the west coast of North America. The species exhibits a diverse and complex life history that has allowed it to persist in a range of environments along the coast. Hanson Decl. ¶¶ 19–22. The life histories exhibited by *O. Mykiss* include (i) "resident" individuals that spend their entire lives in freshwater, referred to as rainbow trout, and (ii) "anadromous" individuals that migrate to the ocean as juveniles that either mature in the ocean before returning to freshwater to spawn or mature only after they return to freshwater where they then spawn, referred to as steelhead. *Id.*

In 1997, NMFS identified 15 distinct populations of steelhead along the west coast of the United States. 62 Fed. Reg. 43,937 (Aug. 18, 1997). At the time, it listed two of these distinct populations as endangered and three as threatened. *Id.*

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

One of the populations NMFS listed as threatened is the South-Central California Coast Steelhead population, which includes the Steelhead in AG Creek. *Id*. In listing this population, NMFS differentiated it from others to both the north and south. In addition, it differentiated anadromous *O. Mykiss* from resident *O. Mykiss* and expressly only listed the anadromous form. *Id*. at 43951. Also, *O. Mykiss* above impassable barriers (e.g., Lopez Dam) are not listed. 71 Fed. Reg. 833, 859–62 (Jan. 5, 2006).

The Steelhead population ranges from the Pajaro River in Santa Clara County down to the southern end of San Luis Obispo County. 62 Fed. Reg. at 43,953. The Steelhead population comprises 29 separate subpopulations, and the AG Creek subpopulation is just one of these 29 subpopulations. ECF No. 20-14 at 7-7, 7-8. NMFS designated 1,249 stream miles as critical habitat for Steelhead. 70 Fed. Reg. 52,488, 52,528 (Sept. 2, 2005). The approximately 13 miles of AG Creek below Lopez Dam account for roughly 1 percent of Steelhead critical habitat. *Id*. at 52,574; Appendix 1; Hanson Decl. ¶ 18.

Steelhead may return to their natal fresh water river, stream, or creek to reproduce, but they also may disperse to other watersheds. Hanson Decl. ¶ 23. A study on Big Creek in Central California showed that 100 percent of adult steelhead sampled were strays from other watersheds. *Id*. This means that even if Steelhead are not able to enter AG Creek from the Pacific Ocean, they may still complete their life cycle. For adult steelhead to enter AG Creek from the Pacific Ocean and for juvenile steelhead to exit AG Creek into the Pacific Ocean, the sand berm that separates the two water bodies must be breached and there must be a sufficient flow of water connecting to the Pacific Ocean. *See* Hanson Decl. ¶ 98; Emery Decl. ¶ 26.

Steelhead completed their life cycle in AG Creek historically and continue to do so today. Hanson Decl. ¶¶ 8, 58, 83; ECF No. 182 ¶¶ 14–15. That said, there has been a lack of sustained, consistent data collection efforts with respect to

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Steelhead abundance in AG Creek. Hanson Decl. ¶¶ 9, 11, 46, 83, 105; ECF No. 182 ¶ 16. Efforts to assess abundance over time are further complicated by the fact that the California Department of Fish and Wildlife stocked hatchery-raised *O. Mykiss* in California's coastal rivers, streams, and creeks, including tributaries to AG Creek, for a period of decades in the mid-20th century. Hanson Decl. ¶¶ 9, 81, 83; Spiegel Decl. ¶ 33. Such stocking likely contributed to inflated abundance estimates during and following the period when it occurred. Hanson Decl. ¶¶ 9, 83.

The foregoing notwithstanding, well before commencement of construction of Lopez Dam in 1967, estimates of Steelhead in AG Creek demonstrated a sharp decline, with abundance estimates decreasing to an average of approximately 100–200 adult fish annually, with further declines since the late 1950s. *Id.* ¶ 64; ECF No. 30-5 at 2; ECF No. 14-1 at 35. Other anecdotal evidence is consistent with a relatively high abundance in the early 1900s, followed by a substantial decline from 1950 to 1960, with highly variable abundance in response to wet and dry periods to present. Hanson Decl. ¶¶ 67, 82; ECF No. 30-3 at 26, 37; ECF No. 22-6 at 237; ECF No. 20-4 at 230–31.

Currently, the upper estimate of adult Steelhead in AG Creek is in the low 100s. Hanson Decl. ¶ 82 ("varies from dozens to low 100s, with an approximate mean of 100 fish"); ECF No. 182 ¶ 15 ("current abundance of adult Steelhead in AGC is in the dozens to low hundreds"). The Steelhead population is subject to substantial interannual variation as a consequence of conditions both in the rivers and streams in the area and in the Pacific Ocean. Hanson Decl. ¶¶ 9, 83; ECF No. 22-9 at 2; ECF No. 30-3 at 37; ECF No. 182 ¶ 16 ("I also agree with NMFS and Dr. Hanson that the abundance of the Steelhead population in AGC varies substantially among years often based on precipitation.").

**E.    County Compliance with the ESA in AG Creek.**

Less than a year after NMFS listed the Steelhead, the County sought a permit from the Corps to construct the existing culvert at Biddle Park. Decl. of

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Kate Ballantyne in Supp. of Opp'n to Mot. for Prelim. Inj. ("Ballantyne Decl.") ¶ 8. The Corps consulted with NMFS and USFWS regarding the effects of the action. *Id.* In October 1998, NMFS and USFWS both issued separate BiOps and incidental take statements authorizing take incidental to the construction and maintenance of the culvert. *Id.*

In 2001, the County obtained authorizations to complete the Lopez Dam seismic remediation project, including changes to the dam and outlet works. One of the authorizations the County obtained was a permit from the Corps, which again consulted with NMFS and USFWS regarding the effects of the action on CRLF and Steelhead, respectively. *Id.* ¶ 9. In March 2001, NMFS and USFWS both issued separate BiOps and incidental take statements authorizing take incidental to the Lopez Dam seismic remediation project. *Id.*

In 2012, the County obtained authorizations for the Rodriquez Bridge Project, which was intended to stabilize a water pipeline and eliminate the potential for the pipeline to impede Steelhead passage in AG Creek. *Id.* ¶ 10. One of the authorizations the County obtained was a permit from the Corps. Before it issued the permit, the Corps consulted with USFWS and NMFS under section 7 of the ESA. In 2012, USFWS issued a BiOp and incidental take statement and in June 2012, NMFS followed suit. Ballantyne Decl. ¶ 10; *id.*, Ex. E.

After a multi-year planning and permitting effort, in 2019 the County obtained a Corps permit for its Waterway Management Program ("WMP"). The County began planning for the WMP around 2005. *Id.* ¶ 11. The WMP is a set of actions designed to restore the capacity of the leveed lower three miles of AG Creek Channel and the Los Berros Creek Diversion Channel to provide flood protection and enhance water quality and sensitive species habitat within the managed channel. Before it issued the permit, the Corps engaged in consultation with USFWS and NMFS under section 7 of the ESA. In May 2015, USFWS issued a BiOp and incidental take statement authorizing take incidental to the WMP. *Id.*

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

In November 2017, NMFS issued a jeopardy BiOp with a reasonable and prudent alternative and incidental take statement authorizing take incidental to the WMP. *Id.*

More recently, in 2024, the County partnered with Creek Lands Conservation to modify a concrete stream gage in AG Creek, which was constructed by the U.S. Geological Survey and has been maintained by the County. *Id.* ¶ 16. The County contributed funding and staff resources to the effort. *Id.* It was necessary to obtain a permit from the Corps for the project, and the Corps was required to consult with USFWS and NMFS. Both USFWS and NMFS authorized the gage modification project under programmatic BiOps covering certain categories of restoration actions. *Id.*

The County has also been engaged in a long-term effort to prepare a multi-species HCP. The County produced a first draft of the HCP in 2004. *Id.* ¶ 18. In 2007, the County adopted the Interim Downstream Release Schedule ("IDRS") to govern operations of the Lopez Project while NMFS and the County continued to work on an HCP. Spiegel Decl. ¶ 8. The IDRS was specifically designed to avoid take of listed species while allowing for continued operation of the Lopez Project. *Id.* ¶¶ 8–9. The IDRS was provided to NMFS and USFWS for their review and comment before its adoption. *Id.* ¶ 8. Since 2007, except for the period when the PI was in effect, the IDRS has controlled Lopez Dam operations. *Id*. ¶ 7.

Since 2004, the County has continuously worked on studies and model development intended to support the HCP process. Ballantyne Decl. ¶ 18. In many instances, the impetus for preparing such studies and models was input from USFWS or NMFS regarding the information necessary to support the HCP. *Id.* In 2025, the County submitted a refined multi-species HCP to USFWS and NMFS. ECF No. 141-1. The 2025 HCP is intended to provide take coverage for a range of County activities. *Id*. at 74. In addition, the 2025 HCP identifies the Steelhead, CRLF, and Western Pond turtle as covered species. *Id*. at 14–15. In late 2025,

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

USFWS completed review of the 2025 HCP and indicated to the County it is prepared to move forward with publication of a public draft HCP. Spiegel Decl. ¶ 34. As of this time, NMFS has provided input on the draft HCP to the County, and technical discussions are occurring to address that input. *Id.* In a recent letter to the parties, on behalf of USFWS and NMFS, the U.S. Department of Justice indicated those agencies "believe participation in the administrative Incidental Take Permit process provided in Section 10 of the ESA is the appropriate path forward at this time." ECF No. 174-1 at 2.

## III.    LEGAL BACKGROUND

Congress enacted the ESA in 1973 to protect and conserve threatened and endangered species. 16 U.S.C. § 1531(b). Generally, the ESA is administered by USFWS for terrestrial species and NMFS for marine species.

**Section 4.** Section 4 of the ESA includes provisions for listing of species as endangered or threatened, designating critical habitat for listed species, and preparing recovery plans for listed species. 16 U.S.C. § 1533. Under section 4, USFWS or NMFS can list a species as "endangered" or "threatened" depending on the relative level of impairment of the species. *Id.* TWG are listed as endangered. CRLF and Steelhead are listed as threatened. Section 4 also provides a process for designating critical habitat for listed species.

Section 4(f) requires the development and implementation of recovery plans "for the conservation and survival of endangered species and threatened species." *Id*. § 1533(f). Recovery plans do not impose enforceable obligations; recovery plans are guidance documents, not regulatory documents. *E.g.*, *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 418 (9th Cir. 2023); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432–34 (D.C. Cir. 2012).

**Section 9.** Section 9 prohibits the take of any fish or wildlife species listed as endangered. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

any such conduct." *Id.* § 1532(19). USFWS adopted a rule defining harm: "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. In *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995), in a 6-3 decision the Supreme Court upheld the definition of harm. The Court reasoned that under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), it was obliged to defer to the agency. 515 U.S. at 703. In a frequently cited concurrence, Justice O'Connor explained her view that the harm definition is lawful because (1) it "is limited to significant habitat modification that causes actual, as opposed to hypothetical or speculative, death or injury to identifiable protected animals," and (2) "the regulation's application is limited by ordinary principles of proximate causation, which introduce notions of foreseeability." *Id.* at 708–09.

Following the Supreme Court's decision in *Loper Bright Enters.* v. *Raimondo,* 603 U.S. 369, 399–400 (2024), overturning *Chevron*, the USFWS and NMFS published a notice proposing to rescind the harm definition. 90 Fed. Reg. 16,102 (Apr. 17, 2025). That notice explains that the definition in the existing regulation is not the single, best meaning of the term "harm," *id.* at 16,103, and that the best reading of the term "harm" construes it to require an affirmative act directed immediately and intentionally against a particular animal, not an act or omission that indirectly or accidently causes injury. *Id.*

The protections Congress afforded endangered species under section 9 reflect recognition that such species are in danger of extinction. In contrast, threatened species are not automatically afforded the same protections including the take prohibition; rather, USFWS and NMFS can choose to extend some, all, or none of those protections to threatened species. 16 U.S.C. § 1533(d).

17

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

**Section 7.** Section 7 provides a pathway for federal agencies to obtain authorization to conduct actions that result in incidental take of listed species that is otherwise prohibited. It requires federal agencies to consult to ensure that actions such agencies authorize, fund, or carry out are not likely to jeopardize the continued existence of any listed species or result in destruction or adverse modification of designated critical habitat of such species. *Id.* § 1536(a)(2).

Formal consultations result in a biological opinion and incidental take statement. *Id*. § 1536(b). Any take of listed species that complies with the terms and conditions of an incidental take statement is authorized. *Id*. § 1536(o)(2).

**Section 10.** Section 10 provides a pathway for non-federal entities to obtain authorization to conduct actions that result in incidental take of listed species that is otherwise prohibited. To obtain an incidental take permit ("ITP") under section 10, a non-federal entity must develop, fund, and implement an approved HCP to minimize and mitigate to the maximum extent practicable the impact of the proposed taking. *Id.* § 1539(a)(2). The decision whether to apply for an ITP is voluntary. *E.g.*, *Bernal*, 204 F.3d at 927 ("We have established that pursuing an ITP is not mandatory and a party can choose whether to proceed with the permitting process").

## IV.   STANDARD OF REVIEW

The Ninth Circuit has confirmed that mandatory injunctions are disfavored, and Plaintiffs' claim for relief "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 597 (9th Cir. 2025) (quoting *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993)). In *Coastkeeper*, the Ninth Circuit also held that when a preliminary injunction under the ESA could endanger other listed species, in addition to analyzing whether plaintiffs are likely to succeed on the merits of their claims, and whether plaintiffs are likely to suffer irreparable harm absent an injunction, "the court must balance

the equities and consider the public interest as to the other listed species." *Id.* at 600. The Ninth Circuit also directed that this "decision must be made by the district court in the first instance." *Id.* at 602.

The Ninth Circuit vacated this Court's prior PI order. *Id.* at 602–03. As such, that PI order has no precedential authority. *Camreta v. Greene*, 563 U.S. 692, 713 (2011) (vacatur strips a decision of its binding effect and clears the path for future relitigation) (quoting *Deakins v. Monaghan,* 484 U.S. 193, 200 (1988) and *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("a decision that has been vacated has no precedential authority whatsoever"). Plaintiffs completely failed to address these controlling Supreme Court and Ninth Circuit decisions in their moving papers, and erroneously and repeatedly cite to the vacated PI order.

Further, in the present situation, because this lawsuit was filed in 2024, because Plaintiffs have completed their fact discovery, and because Plaintiffs are seeking a mandatory injunction, this Court should apply the Rules of Evidence when considering Plaintiffs' motion. *Guilfoyle v. Beutner*, No. 2:21-cv-05009, 2021 U.S. Dist. LEXIS 195396, at *25–26 (C.D. Cal. Sept. 14, 2021) ("Plaintiffs filed this lawsuit months ago and have had considerable time to prepare their moving papers. Hence, there is not the same type of urgency at issue in obtaining this preliminary injunction as exists in many cases and that could otherwise persuade the Court to relax the requirements of the Federal Rules of Evidence."); *Herb Reed Enters., v. Fla. Ent. Mgmt. Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (explaining that Rules of Evidence are relaxed on preliminary injunction motions "when there has been limited factual development").

## V.   ARGUMENT

### A.   Plaintiffs Failed To Demonstrate Standing.

Plaintiffs have failed to provide any declarations demonstrating that they currently have standing to pursue the instant preliminary injunction motion.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

"Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs' failure to provide any current standing declarations, let alone declarations that satisfy all the Constitutional requirements set forth in Article III, requires denial of their motion. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("At the preliminary injunction stage . . . plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))).[4]

> **B.**     **Plaintiffs Failed To Make The Requisite Showing For A Mandatory Preliminary Injunction.**

Mandatory preliminary injunctions "are not issued in doubtful cases," *Coastkeeper*, 161 F.4th at 603 (VanDyke, J., concurring), and Plaintiffs have not met their "doubly demanding" burden to secure one here, *Garcia*, 786 F.3d at 740. Plaintiffs readily admit that their requested new injunction is based on "***hypotheses*** that the injunctive flow regime to benefit Steelhead will not harm, but instead will provide net benefit to TWG and CRLF." ECF No. 179 at 27 (emphasis added). Plaintiffs' only proffered "expert" confirms the speculative nature of their requested relief, explaining "there is not enough information to say with absolute certainty precisely how a revised Lopez Dam flow regime will impact flows in

---

[4] *See also Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) ("At this preliminary injunction stage, [plaintiff] 'must make a clear showing of each element of standing'" (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013))); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

AGC, AG Lagoon, and the ESA-listed species that depend on those habitats."[5] ECF No. 182 ¶ 140. This falls well short of establishing that the law and facts clearly favor Plaintiffs' position. *Garcia*, 786 F.3d at 740; *see also Coastkeeper*, 161 F.4th 603 (VanDyke, J., concurring) ("district courts must be confident that the relief granted will not adversely affect other species before pulling the trigger on a mandatory preliminary injunction").

### 1.   Plaintiffs Have Not Demonstrated Likelihood of Success.

Plaintiffs have not established by clear and convincing evidence that "take" of Steelhead by the County is "imminent" and "reasonably certain." *Bernal*, 204 F.3d at 925. Plaintiffs' motion relies on logical fallacies and speculation.

### a)   The Court must make new findings.

Plaintiffs argue, without authority, that the Court's prior findings underpinning the vacated PI should remain. The controlling authorities dictate otherwise, as vacatur "strips the decision below of its binding effect and clears the path for future relitigation." *Id.*; *Durning*, 950 F.2d at 1424 n.2 ("a decision that has been vacated has no precedential authority whatsoever"). Accordingly, Plaintiffs' heavy reliance on the prior PI in their briefing means they have failed to satisfy the demanding requirements for issuance of a mandatory injunction.

Even absent the Ninth Circuit's vacatur of the PI, "a district court has the inherent power to revisit its non-final orders." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011). "The law of the case doctrine has limited application to determinations made in issuing (or denying) a preliminary injunction." *Cascadia Wildlands v. Scott Timber Co.*, 328 F. Supp. 3d 1119, 1127 (D. Or. 2018), *aff'd,* 105 F.4th 1144 (9th Cir. 2024). Courts may depart from a prior decision if an intervening change in the law has occurred, the evidence on remand is substantially

---

[5] Additionally, Plaintiffs' "expert" now contends that Plaintiffs' initial injunctive relief plan, for which he advocated, was "flawed." ECF No. 182 ¶¶ 122, 128, 129, 136.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

different, other changed circumstances exist, or a manifest injustice would otherwise result. *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998).

Plaintiffs claim that "[t]he facts and law pertinent to the Court's PI holdings pertinent to the NGO's likelihood of success on the merits have not changed." *See* ECF No. 179 at 16–17. In reality, the factual circumstances of the case have changed significantly over the past 19 months. Plaintiffs filed their first preliminary injunction motion just four days after filing their complaint. At that time, the County had not yet been able to undertake a thorough review of its historical files regarding AG Creek. Ballantyne Decl. ¶ 7. Nor had the parties conducted any discovery. Since that time, the parties have all but completed fact discovery in this case. In addition, the County produced a series of plans and reports to the Court, including some that include pertinent facts to the present motion. *E.g.,* ECF No. 142 & 142-1. Over the past 19 months many important aspects of the factual picture have been developed, including regarding the County's activities in the AG Creek watershed, the effects (and lack thereof) of County activities on Steelhead, the effects of others' activities on Steelhead, and interactions between the County and NMFS.

As a practical matter, when the PI was issued, this Court had not yet been presented with all the relevant facts available now (e.g., knowledge of the Lopez Dam consultation, the Biddle Creek consultation, the confirmation from NMFS and that the County is in compliance with its incidental take statement for the WMP). The legal landscape has changed as well, with the Ninth Circuit vacating the PI—establishing new requirements that Plaintiffs have not overcome—and USFWS and NMFS issuing a *Federal Register* notice proposing to rescind the definition of "harm" previously relied on by this Court and stating the best reading of "harm" construes it to require an affirmative act directed immediately and intentionally against a particular animal, not an act or omission that indirectly or accidentally causes injury. 90 Fed. Reg. at 16,103. Considering all of these changed

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

circumstances, the Court should review the instant motion with fresh eyes.

**b)    Plaintiffs' ESA claim is barred by prior consultations.**

Plaintiffs' arguments fail for yet another reason—the County's activities have been considered and approved by the relevant federal agencies. Plaintiffs spin a yarn alleging that the County has been ignoring its obligations under the ESA for decades. In actuality, the County has been working with USFWS, NMFS, and other partners for decades to address potential impacts to ESA-listed species. The County and its partners have obtained take authorization under 10 different BiOps for five separate projects, and, as recommended by the NMFS and USFWS, the County is actively seeking approval of its 2025 HCP. Ballantyne Decl. ¶¶ 7–11, 13–16.

In 2001, the County obtained authorizations from NMFS and USFWS to complete the Lopez Dam seismic remediation project. *Id.* ¶ 9. NMFS issued a BiOp and incidental take statement. *Id.*, Ex. C. Consistent with its own regulations that govern consultation under section 7, the effects of the action NMFS analyzed encompassed "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2000). While the anticipated construction schedule for the proposed action was "April 2001 to July 2002," the NMFS effects analysis considered "the potential implications of extending the existing effects of the dam on steelhead and critical habitat into the future." Ballantyne Decl., Ex. C at 2, 5. The effects analysis in the 2001 BiOp includes sections that expressly covered "existing effects of the dam" and "extending existing effects into the future." *Id.* at 5–6.

The proposed "action" is narrower than the "effects of the action." The 2001 BiOp analyzed the effects of the action on Steelhead and the incidental take statement provides take authorization for the effects of the action on the species. This includes the existence of the dam into the future since "the life of the dam is

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

expected to be extended." *Id.* at 5. On the other hand, in the incidental take statement, NMFS indicates that "no take of any kind for any activity associated with operation of the dam is provided in this Incidental Take Statement." *Id.* at 17. The best reading of the 2001 BiOp taken as a whole, including this language, is that NMFS intended to provide take coverage for effects of the continued existence of the dam into the future (i.e., blocked access to historical spawning and rearing habitat, reduced discharge, attenuated peak flows and (or) fluctuating flows, shifts in the composition of substrate particle types, habitat loss and reduction, habitat fragmentation, alterations to channel morphology, habitat degradation, and alteration in water temperature) but not for the effects of the County's operation of the dam (i.e., the flow regime). *Id.* at 5.

This reading is reinforced by the fact that at the time NMFS issued its 2001 BiOp the County was engaged in discussions with NMFS regarding the development of an HCP to govern dam operations. Ballantyne Decl. ¶ 18. Thus, Plaintiffs' contention that the 2001 BiOp "limits its take authorization to the harm to Steelhead caused by the seismic retrofit construction activity itself, not the dam's ongoing existence," ECF No. 179 at 17 (emphasis omitted), is flat wrong.

Presumably recognizing the weakness of their position, Plaintiffs make the alternative argument that even if the incidental take statement provides take coverage for the effects of the dam on Steelhead, it "requires the County, *inter alia*, to maintain a continuous discharge of least 7 cfs in AG Creek." ECF No. 179 at 17. This alternative argument, like the first, is based on a mischaracterization of the 2001 BiOp and incidental take statement. Term and condition 2.A. in the incidental take statement states: "A discharge of no less than 7 cfs shall be continuously maintained, with no interruption, in Arroyo Grande Creek ***during the entire duration of the proposed action***." Ballantyne Decl. Ex. C at 18 (emphasis added). As explained above, while the "effects of the action" extend into the future, the anticipated duration of the "proposed action" was limited to April 2001 to July

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

2002. *Id.* at 2 ("The anticipated construction schedule is April 2001-July 2002"). Term and condition 1.D. provided that "[t]he Applicant shall confine the construction activities occurring within the creek and riparian corridor to the period 1 April 2001 to 15 October 2002." *Id.* at 18. Therefore, the requirement to release 7 cfs applied only during the duration of the proposed action, that is, the period when construction was occurring.

This reading of the flow requirement to apply only during the construction period is consistent with the description of the proposed action to include "temporarily pump reservoir or groundwater to maintain surface flow in Arroyo Grande Creek." *Id.* at 2. Plaintiffs' reading of the flow requirement to apply in perpetuity is inconsistent with the fact that the 2001 BiOp and incidental take statement expressly ***do not*** cover operation of the dam, as the proposed action called for reducing Lopez Reservoir storage to no more than 510 feet and dewatering the existing outlet works canal, so dam operation of the magnitude proposed by Plaintiffs was an impossibility. *Id.* at 9, 19. Logically and legally, if NMFS did prescribe operations on an ongoing basis by imposing a 7 cfs requirement, they would not have carved out operations from the 2001 BiOp and incidental take statement. *ALCOA v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

Because NMFS has already authorized the existence of Lopez Dam under the ESA, which Plaintiffs assert is the single "greatest negative impact on the AG Creek Steelhead population of all factors," ECF No. 179 at 7, Plaintiffs have failed to demonstrate by clear and convincing evidence that they are likely to succeed on the merits. *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1253 (9th Cir. 2017) (compliance with incidental take statement exempts activity from section 9's take prohibition); *White v. U.S. Army Corps of Eng'rs*, 659 F. Supp. 3d 1045, 1049 (N.D. Cal. 2023) (same, citing 16 U.S.C. § 1536(b)(4)(iv), (o)(2)).

In October 1998, just over a year after NMFS listed the Steelhead, NMFS

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

issued a separate BiOp and incidental take statement under section 7 of the ESA covering construction of the culvert at Biddle Park. Ballantyne Decl. ¶ 8, Ex. A. That BiOp analyzed the effects of the culvert on Steelhead, including the potential for the culvert to impede passage. *Id.*, Ex. A at 5. Following a formal assessment of the Biddle Park culvert in May 2024, the California Department of Fish and Wildlife concluded that it "is not currently a barrier." *Id.* ¶ 8, Ex. B at 6; *see also* Hanson Decl. ¶ 93. Thus, the facts demonstrate that the County secured take authorization for the culvert at the time of construction and that the culvert is not a barrier to passage, contrary to Plaintiffs' assertions.

These and other BiOps belie Plaintiffs' claims that the County is not engaging with NMFS. More importantly, these incidental take statements rebut Plaintiffs' theories on liability in this case.

<b>c)      Plaintiffs fail to establish that take is occurring.</b>

The term "take" encompasses acts that "harass, harm, pursue . . . wound, kill, trap, capture, or collect" any ESA-protected species. 16 U.S.C. § 1532(19). The term "harm" is further defined as "an act which ***actually kills or injures*** wildlife." 50 C.F.R. § 17.3 (emphasis added). To prove "harm" to a listed species, at a minimum there must be: (1) actual death or injury; (2) to identifiable members of a listed species; (3) that is proximately caused by the challenged activity and is foreseeable. *Sweet Home*, 515 U.S. at 691 n.2, 696–97 n.9, 700 n.13, 708–09.[6]

Plaintiffs fail to meet this standard and do not even attempt to meet the standard set forth by USFWS and NMFS. 90 Fed. Reg. at 16,103. They provide no evidence of "actual death or injury" to "identifiable" Steelhead. *Sweet Home*, 515 U.S. at 687, 691 n.2, 696–97 n.9, 700 n.13, 708–09. Nor do they show that the generalized harms they allege are, in this specific factual context, actual,

---

[6] In a concurring opinion, Justice O'Connor reaffirmed that the challenged regulation "requires demonstrable effect (i.e., actual injury or death) on actual, individual members of the protected species." *Sweet Home*, 515 U.S. at 711.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

foreseeable, and proximately caused by the County's actions. *Id.* Their general arguments with respect to Lopez Dam are insufficient to demonstrate a likelihood of success in establishing unauthorized take, as they do not demonstrate, by clear and convincing evidence, imminent death or injury to any identifiable Steelhead that will be proximately caused by Lopez Dam, the Biddle Park double-arch culvert, or the grade control structure in Los Berros Creek.

Plaintiffs contend that Lopez Dam is causing take by blocking access to habitat or interfering with the life cycle of Steelhead. ECF No. 179 at 15. But Plaintiffs provide no evidence that this blocked access "actually kills or injures" identifiable Steelhead. *See Sweet Home*, 515 U.S. at 708. The evidence demonstrates, and the parties agree, that Steelhead can and do complete their lifecycle below the dam. Hanson Decl. ¶¶ 8, 58, 83; ECF No. 182 ¶ 15.

Steelhead have persisted below the dam for over 60 years. Hanson Decl. ¶¶ 9, 83; ECF No. 182 ¶ 15. Plaintiffs cite to the fact that NMFS has designated AG Creek as a "Core 1" population to instill fear of a population-wide injury, ECF No. 179 at 6, but they neglect to mention that AG Creek is one of *eleven* Core 1 populations designated by NMFS. Hanson Decl. ¶ 17 (citing Recovery Plan). In any event, irrespective of the informal designation given to the AG Creek population, the fact remains that Plaintiffs fail to demonstrate by clear and convincing evidence the County is causing or will imminently cause actual death or injury of identifiable Steelhead.

Plaintiffs also try to argue likelihood of success with a more general argument that there are "solid grounds" to conclude the dam, associated water diversions, and other County activities are harming Steelhead and threatening the entire Steelhead population. ECF No. 179 at 16. This is an illogical argument without evidence. As previously discussed, Plaintiffs cannot point to any Steelhead that have been actually killed or injured. Furthermore, *approximately 99% of the critical habitat designated for Steelhead is outside AG Creek*. *See* Appendix 1.

27    Case No. 2:24-cv-06854 SPG (ASx)

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

Plaintiffs allege the County's actions in an area that accounts for just 1% of the species' critical habitat threatens to destroy the entire population. This is nonsense. The fact that Lopez Dam blocks upstream access does not provide clear and convincing evidence of imminent and reasonably certain "take" of any identifiable Steelhead.[7]

Plaintiffs also contend that "physical barriers" in AG Creek "contribute to the anticipated decline" of Steelhead. ECF No. 179 at 15. But Plaintiffs do not specify which barriers. Based on the citation in Plaintiffs' brief it appears they are referring to the dam. *See* ECF No. 54 at 18. Here again, Plaintiffs have not established that any physical barrier in AG Creek "actually kills or injures wildlife." Nor have Plaintiffs established a decline in the overall Steelhead population in AG Creek. In fact, the evidence before this Court confirms that Steelhead continue to exist in AG Creek in numbers comparable to the population that existed years before construction of Lopez Dam.

For at least a decade before construction of Lopez Dam, the annual adult Steelhead population in AG Creek was at a high of 200 fish and trending downward toward a low of zero. Hanson Decl. ¶¶ 63–64; ECF No. 30-5 at 3; ECF No. 14-1 at 35; ECF No. 182 ¶ 14 ("100-200 fish annually in the mid-1900s," and "average annual run of 100 to 200 adult Steelhead from 1950 to 1960"). Since

---

[7] The facts in this case are distinguishable from the facts in *Cascadia Wildlands*. The plaintiffs in that case argued the proposed project "would cause" take in violation of the ESA by "clearing acres of trees" that were ***currently*** being used by the threatened species. 105 F.4th at 1148. In comparison, the Steelhead in AG Creek have not used the habitat above Lopez Dam for over 50 years. Further, in *Cascadia Wildlands*, "the record incorporate[d] numerous pieces of evidence from which the court could infer that murrelets would return to the [specific property] to nest and ***go nowhere else*.**" *Id.* at 1157 (emphasis added). Here, half a century of evidence establishes that Steelhead complete their life cycles in AG Creek below the dam. Further, Steelhead can and will return to different streams. Hanson Decl. ¶ 23.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

construction of Lopez Dam, the estimated number of adult Steelhead in AG Creek has remained within this historical range, including current estimates. Hanson Decl. ¶¶ 72, 83; ECF No. 182 ¶ 15 ("current abundance of adult Steelhead in AGC is in the dozens to low hundreds"); *id.* ¶ 16 (agreeing "with NMFS and Dr. Hanson that the abundance of the Steelhead population in AGC varies substantially among years often based on precipitation").

Mr. Schmitt states that "there is uncertainty as to Steelhead abundance in [AG Creek] and a lack of data regarding trends in adult Steelhead abundance in [AG Creek]." ECF No. 182 ¶ 16. But this should lead to the rejection of Plaintiffs' motion, as it demonstrates that Plaintiffs have not met their high burden for a mandatory preliminary injunction. *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("mandatory injunctions are not granted unless extreme or very serious damage will result, and are not issued in doubtful cases"); *White v. United States Army Corps of Eng'rs*, No. 3:22-CV-06143-JSC, 2023 WL 7003263, at *9 (N.D. Cal. Oct. 23, 2023) ("Plaintiff admits he is seeking a mandatory injunction and therefore must establish 'extreme or very serious damage will result' in the absence of the injunction."); *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, No. 6:15-cv-02358-JR, 2016 WL 9226390, at *4 (D. Or., Apr. 6, 2016) (applying heightened scrutiny and ultimately denying a preliminary injunction request to alter control of dams to achieve a particular level of water flow).

Plaintiffs make passing reference to "water diversions" harming Steelhead in support of their argument for likelihood of success. ECF No. 179 at 16. But they do not argue that insufficient water releases are causing "take" of the species. *Id*. Those releases are governed by the IDRS, which was adopted to better manage releases from Lopez Reservoir to address water supply sustainable yield metrics and specifically ***to avoid*** take of Steelhead. Spiegel Decl. ¶¶ 8–9. Plaintiffs argue that the IDRS eliminates large pulse flows and substantially cuts downstream

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

flows. ECF No. 179 at 8. They contend these changes preclude "flow conditions needed for effective Steelhead migration." *Id*. But the evidence demonstrates Steelhead migration ***is occurring*** with the IDRS in place, Hanson Decl. ¶ 83, and that the population has remained stable. *Id.* In any case, Plaintiffs point to no actual evidence of death or injury to identifiable Steelhead. *Id*. ¶ 104 (opining he is unaware of adverse impacts to Steelhead due to the IDRS).

Plaintiffs also argue that under the IDRS, fine sediment is filling AG Creek and Lagoon. But they do not support this argument with actual evidence that water releases under the IDRS are the proximate cause of the Creek and Lagoon filling with sediment, or that the quantity and spatial extent of fine sediment increases are leading to actual death or injury of identifiable Steelhead. Instead, in support of this argument they reference only paragraphs 63–65 of the Schmitt Declaration. Mr. Schmitt, to state it bluntly, does not have the expertise to opine on the quantity and spatial extent of fine sediment increases in AG Creek and Lagoon over time, if any, or the cause or causes of such increases. Further, as Dr. Hanson explains, there is insufficient data to conclude that hypothetical sediment loading is causing actual harm to Steelhead in AG Creek. Hanson Decl. ¶ 100. In sum, Plaintiffs have not shown by clear and convincing evidence that the sediment is increasing in AG Creek and Lagoon, that the IDRS is the cause of the increase (as opposed to sediment loading from adjacent farming operations or stormwater runoff), and that the increase is reasonably certain to result in the actual death or injury of identifiable Steelhead in the near future (i.e., imminently).

Plaintiffs do not mention Los Berros Creek or the Los Berros Creek grade control structure in their brief. *See* ECF No. 179. Plaintiffs also fail to provide any evidence of Steelhead attempting and failing to migrate upstream of the grade control structure in Los Berros Creek. Without any actual evidence of impediment, or fish interacting with the grade control structure at all, Plaintiffs have clearly failed to provide clear and convincing evidence that the Los Berros Creek grade

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

control structure will cause imminent take of Steelhead.

Plaintiffs argue that Lopez Dam "artificially warms creek waters," which they assert causes a "proliferation of non-native predators that prey upon Steelhead" when they spill over the dam. *Id.* at 9. But Plaintiffs offer no actual evidence that non-native predators are proliferating in AG Creek as compared to pre-dam populations, that Lopez Dam is the cause of the proliferation, or that the hypothetical proliferation of non-native predators will result in "take" of Steelhead. *See* Spiegel Decl. ¶ 22 (fish got caught in flipbucket and perished). For example, Mr. Schmitt does not provide an estimate of the number of non-native predators in AG Creek, or an evaluation based on any modeling of the potential for interaction between Steelhead and these non-native predators. *Compare* Hanson Decl. ¶ 97 (noting lack of information). Plaintiffs also ignore that many activities outside of the County's control influence temperatures in AG Creek, Emery Decl. ¶ 12, and the County is not responsible for the presence of non-native predators, either in Lopez Lake or AG Creek.

### 2.      Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs must "demonstrate" that they are "likely to suffer irreparable harm in the absence of preliminary relief." *California Nat. Res. Agency v. Ross*, No. 1:20-CV-00426-DAD-EPG, 2020 WL 2404853, at *2 (E.D. Cal. May 11, 2020). Irreparable harm is not presumed in ESA cases. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). Plaintiffs must establish "a definitive threat of future harm to protected species, not mere speculation." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994). Moreover, Plaintiffs must also show irreparable harm to their own interests. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018).

Plaintiffs rely on the misplaced belief that law of the case principles will carry their water and establish a showing of irreparable harm. But as described above (*supra* section V.B.1.a.), the Ninth Circuit stripped the PI of its precedential

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

effect. With the prior findings vacated, Plaintiffs are left with just two paragraphs of allegations about irreparable harm to support their desired injunction. *See* ECF No. 179 at 17–19. "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). Since Plaintiffs have not provided clear and convincing evidence, their request for a mandatory preliminary injunction should be denied.

To obtain injunctive relief, Plaintiffs cannot merely speculate that there will be harm to Steelhead—they must establish a "a definitive threat of future harm to protected species." *Burlington N. R.R.*, 23 F.3d at 1512 n.8. Plaintiffs have failed to do so. While the Ninth Circuit has rejected a rigid per se rule that extinction level harm is required to demonstrate irreparable harm, *Nat'l Marine Fisheries Serv.*, 886 F.3d at 819, it does not compel adoption of the equally extreme per se rule proposed by Plaintiffs. In standard prohibitory injunction cases, district courts in the Ninth Circuit "are split on whether to analyze harm on the species-wide level or based on the individual animal level." *White*, 2023 WL 7003263 at *8. But "no court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1248 (N.D. Cal. 2015) (citations omitted); *see also Defs. of Wildlife v. Salazar,* 812 F.Supp.2d 1205, 1209 (D. Mont. 2009) ("to consider any taking of a listed species as irreparable harm would produce an irrational result").

Some district courts have issued injunctive relief where an action "would cause harm to a small number of individual species' members, but always *under circumstances in which the loss of those individuals would be significant for the species as a whole*." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008) (emphasis in original). In this case, Plaintiffs are seeking a "particularly disfavored" mandatory preliminary injunction and "therefore must establish extreme or very serious damage will result in the absence of the injunction". *White*, 2023 WL 7003263 at *9 (internal quotations omitted).

Plaintiffs' motion should be denied because they cannot show significant impacts for the species as a whole or that extreme or very serious damage will result absent an injunction. *Id.* at *12 (plaintiff "has not shown that in the absence of his proposed injunction, 'extreme' or 'very serious damage' will befall the Russian River salmon this coming year"). Plaintiffs have not even shown ***any*** "definitive threat of future harm" to individual Steelhead. *Burlington N. R.R.*, 23 F.3d at 1512 n.8. As explained above, *supra* section V.B.1.c, the evidence before this Court demonstrates and the parties agree that Steelhead can and do complete their lifecycle below the dam. Moreover, Steelhead continue to exist in AG Creek in numbers comparable to the decades before the construction of Lopez Dam, refuting Plaintiffs' sky-is-falling narrative. Hanson Decl. ¶¶ 82–83; ECF No. 30-5 at 2; ECF No. 14-1 at 35; ECF No. 182 ¶ 14.

Plaintiffs further contend that the County is threatening the survival of Steelhead both in AG Creek and through its range. *See* ECF 179 at 18–19. Plaintiffs improperly conflate an argument that the County is interfering with the overall recovery of Steelhead with an argument that the County is taking Steelhead. The latter is actionable under the ESA; the former is not.

Plaintiffs rely on statements in the preamble of a NMFS rule concerning the abundance of Steelhead across the entire population. But the statements contained in the preamble are, for the most part, not specific to the AG Creek. As NMFS opined in its 2001 BiOp that specifically addresses the effect of Lopez Dam on Steelhead, the AG Creek population represents a small fraction of the overall Steelhead population. Ballantyne Decl., Ex. C at 15. The preamble to the NMFS

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

rule does not contain any statements alleging unauthorized take of Steelhead by the County. Plaintiffs' irreparable harm claim is also belied by the fact that roughly ***99% of the critical habitat designated for Steelhead is outside AG Creek***. Plaintiffs have not shown by clear and convincing evidence that harm to Steelhead in an area that is approximately 1% of its critical habitat is so impactful that it threatens to destroy or very seriously damage the entire population.

Similarly, Plaintiffs cannot rely on the NMFS recovery plan for Steelhead to establish that the County's activities constitute irreparable harm. While recovery plans "provide guidance for the conservation of those species, they are not binding authorities." *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014). Recovery plans are guidance documents, not regulatory documents that can be used to initiate enforcement actions. *Ctr. for Biological Diversity*, 58 F.4th at 418. Conflict with a recovery plan is not a *per se* violation of section 9 of the ESA. Finding otherwise would unduly elevate the recovery plan "into a document with the force of law," whereas the ESA "makes it plain that recovery plans are for guidance purposes only." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 548 (11th Cir. 1996). Aspirational statements in a recovery plan prepared in 2013 do not provide clear and convincing evidence that maintaining the status quo in 2026 will irreparably harm Steelhead in AG Creek. *See also* Decl. of Dr. Mark R. Jennings in Supp. of Opp'n to Mot. for Prelim. Inj. ("Jennings Decl.") ¶¶ 19–21.

Plaintiffs must also "show that they themselves are likely to suffer irreparable harm absent an injunction." *Nat'l Marine Fisheries Serv.*, 886 F.3d at 822. Plaintiffs have not provided any evidence in connection with their current motion that they (or their members) are likely to be irreparably harmed in the immediate future. Accordingly, the motion must fail.

**3.      Balance of Harms and Public Interest Require Denial of PI.**

When preliminary relief sought under the ESA may benefit one listed species at the expense of another listed species, "a court must consider competing

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

equities and the public interest as to those other species." *Coastkeeper*, 161 F.4th at 594.[8] Here, the balance of the harms and public interest weigh against granting Plaintiffs' motion. To begin with, Plaintiffs' contentions that the base flows and pulse flows they ask this Court to mandate "pose no real net risk of harm" to TWG and CRLF, ECF No. 179 at 25–26, are based entirely on Mr. Schmitt. But Mr. Schmitt is not qualified to offer opinions on TWG or CRLF. Fed. R. Evid. 702.[9]

For both relevancy and reliability, the trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The proponent of an expert has the burden of proving admissibility. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Plaintiffs have not met (and cannot meet) the burden of establishing that Mr. Schmitt is an expert on TWG or CRLF.

Particularly noteworthy is Mr. Schmitt's flip-flop with respect to the remedy being proposed. Eighteen months ago, Mr. Schmitt argued "the County ***must*** implement [Plaintiffs'] revised interim flow release schedule" to benefit Steelhead, which he falsely characterized as "[t]he County's proposal." ECF No. 13-2 ¶¶ 117, 119 (emphasis added). Now, Mr. Schmitt advocates for operations that differ in

---

[8] In *Starbucks Corp. v. McKinney*, the Supreme Court held that it is only appropriate for the federal courts to deviate from the *Winter* test where there is a "clear command" from Congress to do so. 602 U.S. 339, 346 (2024). The Court explained that a "clear command" is an express statutory provision that addresses the factors federal courts are to consider when granting injunctive relief. *Id.* at 348 (providing three examples when Congress provided a clear command to deviate from the *Winter* test). Because the ESA does not have any such clear command, per *Starbucks* the Court is obliged to consider the balance of the harms and the public interest generally, and not just with respect to other listed species.

[9] The County has filed a separate Motion to Strike or Exclude Portions of Tevin Schmitt's Declaration [ECF No. 182] Pursuant to Federal Rule of Evidence 702.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102

every respect from those he previously insisted were necessary to remedy Plaintiffs' alleged irreparable harm. The base flow differs from the prior base flow, the pulse flow window differs from the prior window, the pulse flow triggers differ from the prior triggers, the maximum pulse flow rate differs from the prior rate, the pulse flow duration differs from the prior duration, and the maximum number of pulse flows per year differs from the prior number. *Compare* ECF No. 13-1 at 6–8 *with* 182-5 at 12–13. None of these changes are justified by new scientific research that emerged in the intervening period; rather, they reflect the whimsical nature by which Mr. Schmitt forms his opinions. For example, Mr. Schmitt now describes the very pulse flow triggers he advocated before previously as "flawed," insisting that though he got it wrong before but has it right now. ECF No. 182 ¶ 129.

As concerning, Mr. Schmitt is advocating for an operational scenario that Plaintiffs have not modeled. Such modeling is standard practice when it comes to management of water projects. Emery Decl. ¶ 29; Spiegel Decl. ¶ 31. It allows operators to predict the anticipated ecological and hydrological consequences of changes being considered. Spiegel Decl. ¶ 31. For example, it allows operators to predict reservoir storage and water elevation at different locations downstream of the dam under varying hydrological conditions. This is why the 2025 HCP includes extensive hydrological and ecological modeling. *Id.* ¶ 31; ECF No. 141-1 at 108–124, ECF No. 141-3. Mr. Schmitt's failure to model the operational scenario he advocates – or to work with a qualified hydrologist to do so – are notable indicia of his lack of expertise and understanding of the prevailing standards of practice. Spiegel Decl. ¶¶ 19, 32, 35–39; *see also* Hanson Decl. ¶¶ 115–116.

Even if the Court were to provide some weight to the opinions Mr. Schmitt expresses (it shouldn't), the balance of the harms and public interest weigh against granting Plaintiffs' motion. When considering the interests of the Steelhead, TWG, and CRLF, it is important to distinguish between operations under the IDRS, the operations proposed by Plaintiffs in conjunction with their first motion for

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

preliminary relief, the operations proposed by Plaintiffs in conjunction with their current motion, and the 2025 HCP operations proposed to NMFS and USFWS by the County. Appendix 3 sets forth key components of these operational scenarios.

The operations advocated by Plaintiffs run the risk of depleting reservoir storage to a point where downstream releases will be reduced or even eliminated within a short time horizon as Mr. Emery demonstrates and Dr. Hanson notes. Emery Decl. Figs. 3–5; Hanson Decl. ¶ 115. This has the potential to cause adverse impacts to Steelhead that Plaintiffs fail to account for. Hanson Decl. ¶ 116.

In addition, the pulse flow rate advocated by Plaintiffs purportedly to benefit Steelhead, which is between two and five times higher than the rate they sought a year ago, will increase the risk of harm to young CRLF. Not only is the peak rate of flow significantly higher than under the PI, but Plaintiffs also propose up to five pulses, enhancing the likelihood of pulses in the spring when there is the greatest risk of harm to CRLF. As Dr. Jennings explains, high magnitude pulses that are triggered during a time when early life stage CRLF are occupying AG Creek have the potential to dislodge egg masses and wash both egg masses and emerging tadpoles downstream and out to the Pacific Ocean. Jennings Decl. ¶¶ 18, 22, 33, 35, 39. In an attempt to respond to this eventuality, Mr. Schmitt states in his declaration "evidence in the record shows that CRLF egg masses do not ***always*** get washed out and thus CRLF egg masses are able to survive rain events resulting in high flows in AGC." ECF No. 182 ¶ 149 (emphasis added). Because Mr. Schmitt references "evidence in the record" but then fails to cite to any evidence, there is no basis to determine the reliability of his claim. Even if evidence in the record did demonstrate that egg masses dislodged by pulse flows would not "always" be washed out to the ocean where mortality would be 100 percent, it is plain that dislodging any egg masses from the habitat in which they were laid is harmful to the species. *See also* Jennings Decl. ¶ 27.

The pulse flow advocated by Plaintiffs also will increase the risk of harm to

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

TWG. *Id.* ¶ 18. The risk under the newly proposed operational regime is even greater than under the operational regime previously proposed by Plaintiffs. As Dr. Jennings explains, this is the case because the newly proposed operational regime contemplates pulses with a maximum rate that is two to five times higher than the first motion. *Id.* ¶¶ 26, 39. It is also the case because under the newly proposed operational regime, pulses can take place even when the berm separating AG Lagoon from the Pacific Ocean is in place. As a consequence, the pulses can directly cause breaches, washing TWG into the Pacific Ocean.

The higher summer baseflows Plaintiffs propose can be expected to promote more suitable habitat conditions for non-native predators in the AG Lagoon and result in atypical summer berm breaches that could be detrimental to early life stages of TWG. Spiegel Decl. ¶ 29; Jennings Decl. ¶ 39. Unlike the adults, early life stage TWG cannot withstand rapid changes in salinity that occur when there is a breach. The higher spring and summer flows required in 2025 under the now vacated PI contributed to water levels above flood stage in the AG Lagoon and Meadow Creek Lagoon beginning in May, flood conditions in the uplands adjacent to the lagoons in the fall, and breach of the berm separating AG Lagoon from the Ocean following an unusually early storm event in mid-October. Spiegel Decl. ¶¶ 7, 29; ECF No. 142-1 at 9. Mr. Schmitt contends "in my opinion the chance of an unseasonal berm breach reoccurring under my revised proposed flow regime is low." ECF No. 182 ¶ 123. But he does not dispute the fact that high base flows through the spring and summer contributed to the breach. And Mr. Schmitt's views on the likelihood of a future berm breach are entitled to no weight given his lack of qualifications in the areas of hydrology and geomorphology.

To the extent that the operations and other actions advocated by Plaintiffs actually increase the Steelhead population, there is no question this will increase the risk of predation by Steelhead on both CRLF and TWG. Jennings Decl. ¶¶ 37–38. Mr. Schmitt does not deny that Steelhead prey on CRLF and TWG; rather, he

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

contends such predation "reflects natural ecosystem processes." ECF No. 182 ¶ 108. However, Mr. Schmitt goes on to dismiss, without any supporting evidence, the harmful effects of such predation. *Id*. Try as he may, Mr. Schmitt cannot escape the fact that, as Judge VanDyke explains, the injunction requested "may be a zero-sum game: an injunction that helps the Steelhead inherently risks harming the goby and the frog." *Coastkeeper*, 161 F.4th at 603. Judge VanDyke goes on to correctly point out that whereas the Steelhead is listed as threatened, the TWG is listed as endangered. *Id*. Add to this fact that TWG are the most vulnerable of the three listed species at issue in this case, Jennings Decl. ¶ 40, and it is apparent that the equities favor denial of Plaintiffs' motion. *Id.* ¶¶ 18, 52.

For all the reasons set forth above, the balance of the equities and public interest favor denial of Plaintiffs' motion. At the same time, the Court should not turn a blind eye to the harms that would stem from granting the motion. The County was forced to release over a half a billion gallons of water under the PI that can never be recovered. Spiegel Decl. ¶ 7. The increased water releases also contributed to conditions that resulted in property damage and threatened public health and safety. Spiegel Decl. ¶¶ 7, 29. Plaintiffs' proposed injunction would create even greater risks to property damage and public health and safety. *Id.* ¶ 7.

Finally, the injunction requested by Plaintiffs amounts to wholesale commandeering of the County government and is anathema to the separation of powers and federalism. Plaintiffs ask this Court to illegally delegate its decision-making authority to an unelected special master and panel of experts and to grant those persons authority to take over County functions and finances. ECF No. 182-5.[10] Among the powers Plaintiffs ask to impart to an unelected special master are

---

[10] Plaintiffs improperly incorporated the arguments from their Motion to Appoint Special Master and Expert Panel and two additional filings. *E.g.*, ECF 179 at 31 ("For the reasons briefed in the NGOs' January 26, 2026 Motion to Appoint special master and expert panel"); *id.* at 33 ("As the NGOs explained in their

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

the power to gather evidence, hold hearings, dictate the contents of an HCP, commandeer and draft an HCP, and engage consultants of the special master's choosing to be paid for by the County to draft an HCP. *Id*. at 10–12. This power grab is both alarming and unlawful. *E.g.*, *Burlington N. R.R v. Dept. of Revenue of State of Wash.*, 934 F.2d 1064, 1071 (9th Cir. 1991); Ballantyne Decl. ¶ 26.

### C.    Plaintiffs' Request For Relief Is Not Narrowly Tailored.

Even if the Court were to find some violation of the ESA, the Court should deny the requested relief as it is not narrowly tailored. "An injunction must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotation marks omitted); *see also Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). Further, as noted previously in this brief, because Plaintiffs are seeking mandatory injunctive relief, a heightened demonstration is required. *Dahl*, 7 F.3d at 1403. Plaintiffs have not made any attempt to show a link between the requested relief and any specific "harm" to Steelhead in AG Creek for the interim period that an injunction would likely be in place, and it is not the Court's burden to fill that gap. Plaintiffs also cannot sidestep their obligation by putting the onus on a future "special master" or "expert panel" to determine what is narrowly tailored.

While Plaintiffs talk in generalities, they have not provided any evidence of actual harm to identifiable Steelhead. In fact, even Mr. Schmitt confirmed that "there is limited data on Steelhead abundance in AGC and thus there is uncertainty as to Steelhead abundance in AGC and lack of data regarding trends in adult

---

Supplemental Case Status Report"); *id.* at 37 ("As the NGOs' response to the DOJ Letter explained"). For the reasons explained in ECF No. 190, Plaintiffs' arguments are legally and factually flawed. *E.g.,* ECF No. 189-2 (admission by Plaintiffs demonstrating they misrepresented Mr. Spina's participation in this matter); ECF No. 190 at 18-19 (improper delegation of Court's Article III powers); *id.* at 19 (lack of qualifications); *id.* at 20 (conflict of interest); *id.* at 21-22 (prohibited by the Ethics Act); *id.* at 23-25 (improper cost splitting).

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Steelhead abundance in AGC." ECF No. 182 ¶ 16. Mr. Schmitt also admits that "the abundance of the Steelhead population in AGC varies substantially among years often based on precipitation." *Id.* Plaintiffs have also offered no quantitative or qualitative estimate of the extent of "take" alleged caused by the County. Nevertheless, they assert that the County must immediately undertake a litany of mandatory actions. Plaintiffs contend that these actions are justified because a handful of courts in other cases imposed some of the relief that Plaintiffs have requested in their motion. But this argument is mere sophistry, because what may be narrowly tailored in a completely separate case under completely different circumstances in no way demonstrates that the relief requested in this case, with respect to these particular species, in this particular creek, is narrowly tailored. Notably, no decision cited by Plaintiffs provided all the relief they now seek.

But that is not the only flaw in Plaintiffs' logic. Plaintiffs also fail to grapple with the fact that the County has already received authorization from NMFS for the effects of Lopez Dam. *See* Section V.B.1.b, *supra*. Plaintiffs do not explain how their requested interim relief is narrowly tailored or even justified when accounting for the fact that NMFS has already authorized what Plaintiffs claim is the single "greatest negative impact" to Steelhead.

As for the Biddle Park culverts, Plaintiffs' claims of take based on an alleged passage impediment rely on speculation by Mr. Schmitt that is undermined by the facts. *Compare* ECF No. 182 ¶ 66 (in which Mr. Schmitt claims "the Biddle Park double arch culvert is a barrier to Steelhead migration") *with* Hanson Decl. ¶ 93 (explaining 2024 evaluation that showed the culvert is not a barrier to Steelhead migration). And this is to say nothing about the fact that NMFS issued a BiOp and incidental take statement for the Biddle Park culvert.

The only other alleged impediment structure that Plaintiffs mention in their filings that the County owns or maintains is the Los Berros Creek grade control structure. But Plaintiffs do not even mention Los Berros Creek in their brief. *See*

41                                                    Case No. 2:24-cv-06854 SPG (ASx)

ECF No. 179. And Plaintiffs do not provide any evidence of Steelhead attempting and failing to migrate north of the structure in Los Berros Creek. Without any actual evidence of impediment, or even fish interacting with the grade control structure at all, Plaintiffs have clearly failed to demonstrate that their requested injunctive relief is narrowly tailored.

Plaintiffs have also failed to provide the necessary link to justify their request for installation of a fish screen. As an initial matter, Plaintiffs have not provided any evidence that it is imminent that predatory fish in Lopez Lake will spill into AG Creek, that those fish would survive a spill event, and that if those fish survived, they would prey on Steelhead. Moreover, the County is not responsible for the presence of any non-native predatory fish, either in Lopez Lake or AG Creek. ECF No. 18-18 ¶¶ 4–5. Each of Plaintiffs' bald assertions is just a hypothetical link in a long chain of hypothetical events without any actual proof that a predatory fish has ever escaped from Lopez Lake and preyed on a Steelhead in AG Creek, and there is absolutely no evidence demonstrating that such events will occur imminently. *Pac. Coast Fed'n of Fishermen's Ass'n v. Ross*, Case No. 1:20-cv-00431, 2020 U.S. Dist. LEXIS 87214, at *38 (E.D. Cal. May 18, 2020) (requiring plaintiff to provide "an explanation of how, under present conditions . . . the requested injunction would benefit the species of concern").

Plaintiffs also fail to justify the requested relief for a predator removal plan, BMP plan, or the habitat restoration measures. For example, Plaintiffs fail to quantify or explain how any of these mandatory actions would avoid "harm" to Steelhead, when they have asserted that the single "greatest negative impact" to Steelhead in AG Creek is the existence of Lopez Dam, and Lopez Dam has already been permitted under the ESA. Plaintiffs also fail to quantify the extent to which each of these mandatory actions individually or cumulatively would benefit Steelhead before either the Court enters a final judgment in this case or the federal regulatory agencies, who are already in the process of reviewing the County's HCP

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

application, grant their final approval of the HCP. ECF No. 174-1 at 1–2. As explained by NMFS and USFWS in their submittal to this Court, "issuance of the Permits would likely moot the ESA take claims on which Plaintiffs' motions for preliminary injunctive relief are based. The permit process is underway: the County has submitted a draft [HCP] to the Services, which they are currently reviewing." *Id. at 2*; *see also* Decl. of Stephanie Parsons in Supp. of Opp'n to Mot. for Prelim. Inj. ("Parsons Decl.") ¶ 80. Plaintiffs' complete lack of quantification demonstrates that the requested relief is not narrowly tailored. *See also* Spiegel Decl. ¶ 41 (discussing issues with Plaintiffs' BMP proposal). Plaintiffs' hypothesis that the requested actions will overall, over an indeterminate period of time, be beneficial to Steelhead falls woefully short of demonstrating that the relief requested is narrowly tailored. *See also* Jennings Decl. ¶¶ 34, 46–50 (flaws and risks to Steelhead, TWG, and CRLF from Plaintiffs' predator removal proposal); *id.* ¶¶ 44–46 (risks to Steelhead, TWG, and CRLF from Plaintiffs' monitoring proposal); *id.* ¶ 51 (flaws in Plaintiffs' proposed adaptive management).

Moreover, it is clear that much of the requested relief is not even intended to address the alleged interim "harm," as Plaintiffs are requesting permanent relief, which is patently improper at this stage. *See* ECF No. 179 at 21 (Plaintiffs "seek to enjoin the County to implement several near-term measures as well as longer-term actions"). For example, Plaintiffs are requesting the implementation of habitat restoration and installation of a fish screen. These are, by definition, not interim measures. Parsons Decl. ¶¶ 85–92 (discussing factors that affect implementation of the requirements Plaintiffs seek to mandate); Spiegel Decl. ¶ 40 (discussing issues with Plaintiffs' fish screen proposal). Plaintiffs also do not explain how any of the activities can be completed during the "interim" period that an injunction would be in effect in light of the various state and federal requirements associated with many of the activities. *Pac. Coast Fed'n of Fishermen's Ass'n v. Ross*, 2020 U.S. Dist. LEXIS 87214, at \*38 (requiring plaintiffs to provide "at least a basic showing" that

43

the defendant "has the ability and sufficient discretionary authority (i.e., is not constrained by other legal or contractual requirements) to implement the requested relief"). In contrast, the County has provided expert testimony demonstrating that, in light of the applicable state and federal regulatory requirements, it is likely that most of the activities Plaintiffs have requested could only be implemented after the Court reaches a final decision on the merits or the HCP is approved. Parsons Decl. ¶¶ 94–101; Spiegel Decl. ¶ 41. In either scenario, it is clear that this "sort of distant relief is not calibrated to address the imminent harms for which preliminary injunctions are intended." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, Case No. 3:01-cv-640, 2026 WL 599621, at *20 (D. Or. Mar. 02, 2026) (declining to order defendant to complete repair and maintenance projects because the "time horizon on the requested repairs extends far into the future, with benefits likely not reaped until future seasons, possibly even after a final decision on the merits").

In addition, many of Plaintiffs' proposed measures require the cooperation of third parties that are not subject to this Court's jurisdiction. *E.g.,* ECF No. 182-5 ¶ 19 (requiring actions related to property "owned by third parties"), ¶ 23 (requiring activities in AG Lagoon, which the California Department of Parks and Recreation owns and manages); Parsons Decl. ¶¶ 28–29. As such, the Court should deny the requested relief. *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) ("an injunction must be narrowly tailored to affect only those persons over which it has power") (internal quotation marks omitted).

All but admitting that the activities cannot be completed during the "interim" time period that a preliminary injunction would be in place, Plaintiffs demand "prompt" completion and shift responsibility to a proposed "special master" and/or "expert panel" to oversee implementation. But Plaintiffs' repeated invocation of a "special master" and "expert panel" is not a basis to ask this Court to abdicate its responsibility of first finding that each specific form of relief is narrowly tailored to remedy the specific harm shown during the "interim" time period.

Plaintiffs also take the incredible position that the Court should now intervene in the ongoing HCP process and appoint its own panel to review, oversee, and require changes to the HCP application, essentially pulling the review process away from NMFS and USFWS and unnecessarily delaying the completion of that process. Spiegel Decl. ¶ 34; Parsons Decl. ¶¶ 59, 94. But NMFS and USFWS are the federal resource agencies responsible for the species and implementation of the ESA, and they have confirmed that they are reviewing the County's HCP application. Moreover, NMFS and USFWS have expressly requested that the Court allow the agencies to work on the HCP without interference. ECF No. 174-1 at 2. Plaintiffs have not and cannot show that interfering with and delaying the HCP process is a narrowly tailored remedy.

Finally, Plaintiffs attempt to whitewash the many flaws associated with their requested injunctive relief by highlighting that this Court issued a preliminary injunction earlier in the litigation. But the prior PI has no precedential value. Plaintiffs' argument also fails to acknowledge numerous significant developments since the vacated PI was issued, such as the Steelhead Monitoring Report, which found that Plaintiffs' flows did not result in any positive or negative impact to Steelhead passage conditions or migration behavior and includes findings about how Plaintiffs' flow regime could have resulted in harm to other listed species. ECF No. 142-1 at 8–9. The Court also did not have the benefit of seeing Plaintiffs abandon their prior flow regime in favor of something completely different (but equally untested), despite their representations to this Court that the prior flow regime was necessary and based on their scientific expertise. Additionally, the Court also did not have the benefit of the Ninth Circuit's opinion in *Coastkeeper*, 161 F.4th 590, and the concurrence by Judge VanDyke explaining "district courts must be confident that the relief granted will not adversely affect other species before pulling the trigger on a mandatory preliminary injunction." *Id*. at 603.

As the relief requested is not narrowly tailored, it should be denied.

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION
70260102

Date:    April 22, 2026

NOSSAMAN LLP
PAUL S. WEILAND
BENJAMIN Z. RUBIN
ELIZABETH KLEBANER
KATHERINE L. FELTON
BRIAN FERRASCI-O'MALLEY


By: */s/ Paul S. Weiland*
       Paul S. Weiland

*Attorneys for Defendant*
*COUNTY OF SAN LUIS OBISPO*

REVISED OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION

70260102